R. Joseph Barton (Cal. Bar No. 212340)
BLOCK & LEVITON LLP
1735 20th St NW
Washington DC 20009
joe@blockesq.com
Telephone: (202) 734-7046
Facsimile: (617) 507-6020

Gregory Y. Porter (*to be admitted pro hac vice*)
BAILEY & GLASSER LLP
1054 31st Street, NW, Suite 230
Washington, D.C. 20007
gporter@baileyglasser.com
Telephone: (202) 463-2101
Facsimile: (202) 463-2103

Joseph Creitz (Cal Bar. No. 169552)
CREITZ & SEREBIN LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
joe@creitzserebin.com
Telephone: (415) 466-3090
Facsimile: (415) 513-4475

Major Khan (*to be admitted pro hac vice*)
MAJOR KHAN LLC
1120 Avenue of the Americas
Suite 4100
New York, NY 10036
Telephone: (646) 546-5664
Facsimile: (646) 546-5755

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

WINSTON R. ANDERSON, and all others
similarly situated,

    Plaintiff,

       v.

INTEL CORPORATION INVESTMENT
POLICY COMMITTEE, INTEL RETIREMENT
PLANS ADMINISTRATIVE COMMITTEE,
FINANCE COMMITTEE OF THE INTEL
CORPORATION BOARD OF DIRECTORS,
CHRISTOPHER C. GECZY, RAVI JACOB,
DAVID S. POTTRUCK, ARVIND SODHANI,
RICHARD TAYLOR, TERRA CASTALDI,
RONALD D. DICKEL, TIFFANY DOON
SILVA, TAMI GRAHAM, CARY KLAFTER,
STUART ODELL, CHARLENE
BARSHEFSKY, JOHN J. DONAHOE, REED E.
HUNDT, JAMES D. PLUMMER, STACY
SMITH, ROBERT H. SWAN, AND TODD
UNDERWOOD,

    Defendants,

and

INTEL 401(K) SAVINGS PLAN and INTEL
RETIREMENT CONTRIBUTION PLAN,

    Nominal Defendants.

Case No:

**COMPLAINT**

**CLASS ACTION**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ................................................................................. 1

II. JURISDICTION AND VENUE ....................................................................... 6

III. PARTIES ............................................................................................................ 6

    A.    PLAINTIFF ........................................................................................ 6

    B.    DEFENDANTS ................................................................................. 7

IV. CLASS ALLEGATIONS ............................................................................... 15

    A.    Numerosity and Impracticability of Joinder ................................ 16

    B.    Commonality ................................................................................. 16

    C.    Typicality ...................................................................................... 18

    D.    Adequacy ....................................................................................... 18

    E.    Rule 23(b)(1) ................................................................................. 19

    F.    Rule 23(b)(2) ................................................................................. 19

    G.    Rule 23(b)(3) ................................................................................. 20

V. FACTUAL ALLEGATIONS ........................................................................... 21

    A.    Overview of the Plans and the Intel Investment Options The 401(k)
        Savings Plan ................................................................................. 21

        1.    The Retirement Contribution Plans ................................. 22

        2.    The Target Date Funds and the Global Diversified Funds ...................... 24

        3.    Fiduciary Responsibilities of the Investment Committee
            Defendants ......................................................................... 29

    B.    The Investment Committee Defendants Subjected the Plans and
        Participants to Unnecessary and Imprudent Expenses ......................................... 30

    C.    The Investment Committee Defendants Failed to Monitor and Replace
        the Asset Allocation Models and Allocation Percentages for the Intel
        Funds .............................................................................................. 46

        1.    Excessive Allocations to the Non-Traditional Investment Accounts ........ 46

        2.    Deviation from Professional Standards for Target Date Funds ............... 52

3.    The Intel Funds Imprudently Invested in Hedge Funds ........................... 55

4.    Significant Investment in Hedge Funds and Private Equity Are

Generally Not Suitable For Balanced Funds.................................... 59

5.    Risks and Costs of Hedge Funds and Private Equity ............................ 60

6.    Self-Interest of the Investment Committee Defendants .......................... 69

7.    Underperformance of the Non-Traditional Investments Accounts ......... 73

D.    The Administrative Committee Defendants Made Inadequate Disclosures

About the Intel Funds and Provided Misinformation About Participants'

Accounts and the Intel Funds ...................................................... 77

VI. CLAIMS FOR RELIEF.............................................................................. 85

COUNT I (VIOLATIONS OF ERISA § 404(A) BY THE INVESTMENT

COMMITTEE IN SELECTING AND MONITORING THE INVESTMENT

OPTIONS FOR THE PLANS) ...................................................... 85

COUNT II (VIOLATIONS OF ERISA § 404(A) BY THE INVESTMENT

COMMITTEE AND INVESTMENT COMMITTEE DEFENDANTS IN

ALLOCATING THE INTEL FUNDS' ASSETS) ...................................... 88

COUNT III (VIOLATIONS OF ERISA §§ 404(A)(1)(A) AND 404(A)(1)(B) BY THE

ADMINISTRATIVE COMMITTEE DEFENDANTS FOR FAILURE TO

MAKE ADEQUATE AND ACCURATE DISCLOSURES)........................... 91

COUNT IV (VIOLATIONS OF ERISA § 404(A) BY THE FINANCE COMMITTEE

AND CHIEF FINANCIAL OFFICER DEFENDANTS FOR FAILURE TO

MONITOR OTHER FIDUCIARIES) .................................................. 96

COUNT V (VIOLATION OF ERISA § 102(A), 29 U.S.C. § 1022(A) AGAINST THE

ADMINISTRATIVE COMMITTEE DEFENDANTS) ................................. 99

COUNT VI (CO-FIDUCIARY LIABILITY UNDER ERISA § 405 AGAINST ALL

DEFENDANTS) ................................................................... 100

COUNT VII (FAILURE TO PROVIDE DOCUMENTS UPON REQUEST

PURSUANT TO ERISA § 104(B)(4), 29 U.S.C. § 1024(B)(4), & 29 C.F.R. §

**2550.404A-5 AGAINST THE ADMINISTRATIVE COMMITTEE**

**DEFENDANTS)** ................................................................................................................ **104**

**VII. ENTITLEMENT TO RELIEF** .............................................................................................. **105**

**VIII. PRAYER FOR RELIEF** ................................................................................................... **105**

## I.  NATURE OF THE ACTION

1.      Plaintiff Winston Anderson brings this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), for breaches of fiduciary duties. This action alleges that the fiduciaries of the Intel 401(k) Savings Plan ("the 401(k) Savings Plan") and the Intel Retirement Contribution Plan ("the Retirement Contribution Plan") (collectively "the Plans") breached their fiduciary duties by investing billions of dollars in retirement savings in unproven and unprecedented investment allocation strategies featuring high-priced, low-performing illiquid and opaque hedge funds. Plaintiff is a participant in the Plans and brings this action on behalf of a class of similarly situated participants as a class action to recover relief on behalf of the Plans against the Intel Retirement Plans Investment Policy Committee ("the Investment Committee") and its members, the Intel Retirement Plans Administrative Committee ("the Administrative Committee") and its members, the Finance Committee of the Intel Corporation Board of Directors ("the Finance Committee") and its members, and the Chief Financial Officers of Intel Corporation ("the Chief Financial Officers").

2.      The Investment Committee designed and implemented retirement investment strategies, a suite of target date portfolios ("Intel TDFs") with a dynamic allocation model (meaning allocations to asset classes changed over time) and a multi-asset fund with a fixed allocation model ("Intel GDFs")[1] that deviated greatly from prevailing professional investment standards for such retirement strategies in several critical ways—chief among them investing billions in hedge funds, private equity, and commodities—and then as investment returns repeatedly lagged peers and benchmarks did nothing while billions of dollars in retirement savings were lost. The Investment Committee deviated from the standard of care of similarly-situated plan fiduciaries who select target date funds for their plans that include little or no exposure to these strategies. The Investment Committee (a) failed to properly monitor the performance and fees of the Intel TDFs and Intel GDF in the Plans and to properly investigate the availability of lower-cost investment alternatives with

---

[1] The Global Diversified Fund in the 401(k) Savings Plan is called the 401K Global Diversified Fund. Collectively, the Global Diversified Fund in the Retirement Contribution Plan and that in the 401(k) Savings Plan are referred to herein as the Intel GDFs.

similar or superior performance, and (b) failed to properly monitor and evaluate the unconventional, high-risk allocation models adopted for these custom investment options, which excessively allocated assets of the Plans to speculative investments. Additionally, the Administrative Committee failed to provide adequate disclosures associated with the custom investment options' heavy allocation to hedge funds and private equity, and either misinformed or failed to inform participants about the allocation mix of their account balances and the allocation strategy of the custom target-date options. Finally, the Finance Committee and the Chief Financial Officers failed to monitor the Investment and Administrative Committees. As a result of these imprudent decisions and inadequate processes, Defendants caused the Plans and many participants in the Plans to suffer substantial losses in retirement savings.

3.      The 401(k) Savings Plan and the Retirement Contribution Plan are both defined contribution plans under ERISA. As a result, the retirement income provided to participants by the Plans depends on employer and employee contributions and the performance of investment options net of fees and expenses. The Investment Committee chooses the investment options available in the Plans and thereby chooses the fees and expenses paid by the Plans and their respective participants.

4.      The Investment Committee decided that the Plans should offer customized asset allocation portfolios rather than invest in similar portfolios designed and managed by investment professionals such as Vanguard Group, Inc. or Fidelity Investments. An asset allocation fund or portfolio invests in several asset classes such as equities from large cap to micro cap, bonds from treasuries to high yield, international securities (both equities and bonds), real estate, etc. Allocation models may be fixed or change over time. Both the Intel TDFs and Intel GDFs are custom asset allocation models. Instead of investing the Plans in asset allocation funds offered by professional asset managers such as Fidelity Investments and Vanguard Group, Inc., the Investment Committee chose to create its own asset allocation models.

5.      Until January 1, 2018, the Intel TDFs and GDFs were not actual funds as there was no distinct legal entity such as a mutual fund or collective trust that held the investments. Rather, the Intel TDFs and GDFs were allocation models that directed participant savings into various pooled investment funds such as Large Cap, Commodities, Private Equity and Hedge Funds. Each of these

pooled investment funds was structured as a collective trust. Effective December 31, 2017, the Intel TDFs and GDFs were converted from model portfolios to collective investment trusts ("CITs"). Effective January 1, 2018, Global Trust Company ("GTC") was appointed as the trustee for the Intel TDF and GDF CITs and GTC hired Watson Wyatt Investment Services, Inc., to advise it on asset allocation and sub-advisor selection for the CITs. In other words, after driving the retirement savings of thousands of Intel employees into the ditch, the Investment Committee turned the keys of the wreck over to someone else. Further, until GTC was hired to manage the Intel funds, unlike most professionally managed asset allocation funds, the Intel TDFs and Intel GDFs were not funds as such. Rather, they were asset allocation models that invest in various underlying funds representing the asset classes selected by the Investment Committee. These underlying funds were (and are) held in the Plans' Master Trust Investment Accounts, which are pooled investment accounts representing various asset classes and investment strategies.

6.      The Intel GDFs follow a fixed asset allocation model. The model does not shift the percentage of fund assets from one asset class to another.

7.      The Intel TDFs follow a dynamic allocation model: The asset allocation changes over time. A target date fund, such as the Intel TDFs, is intended to reallocate assets over time as a participant approaches retirement age. Target date funds are generally offered as a suite of "vintages" in five-year or ten-year intervals where the vintage refers to the date of the fund such as a 2045 fund. The vintage or target date is intended for participants who will reach normal retirement age (i.e., 65) in or around the given year. For example, a participant who reached age 65 in 2046 would generally invest in the 2045 fund.

8.      In this case, the Investment Committee created a suite of target date funds starting with 2005 and ending with 2055. The suite also includes a TDF Income Fund for participants who have reached retirement age. When an Intel TDF hits the target date, it has the same allocation model as the TDF Income Fund. Thus, all pre-2020 Intel TDFs have virtually the same allocation as the income fund.

9.      The Intel TDFs were (and are) the default investment alternative in the 401(k) Savings Plan. The Intel GDF for many years was the only investment option available in the

Retirement Contribution Plan for the overwhelming majority of that plan's participants. Plaintiff Anderson was defaulted into the Intel Target Date 2030, 2035, and 2040 Funds in the 401(k) Savings Plan and the Intel GDF in the Retirement Contribution Plan.

10.     Unlike professionally managed target date funds offered by Fidelity, Vanguard, and others, the Intel TDFs included significant allocations to hedge funds as well as disproportionate allocations to commodities, private equity, and international securities. Similarly, the Intel GDFs included outsize allocation to hedge funds, private equity, and other alternative asset classes as compared to professionally managed fixed asset allocation funds.

11.     The Investment Committee was the fiduciary for the Plans responsible for selecting, managing, and monitoring the investment options in the Plans. The Committee created the Intel TDFs and the GDFs (collectively "the Intel Funds"), and selected and maintained the Intel Funds as the Plans' investment options. The Committee also developed, chose, and managed the asset allocation model for the Intel Funds, including the asset classes and investment strategies to which the Intel Funds' assets are allocated as well as the allocation percentages. Further, the Committee designated the Intel TDFs as the default investment options of the 401(k) Savings Plan and the Intel GDF as the default investment option of the Retirement Contribution Plan.

12.     The Intel TDFs have consistently charged fees significantly higher than both actively-managed and passively-managed target-date series offered by professional asset managers, but the Intel TDFs had substantially worse performance, both in absolute terms and on a risk-adjusted basis. The actively-managed GDFs have consistently underperformed both actively-managed and passively-managed investment alternatives that were significantly less expensive, both in absolute terms and on a risk-adjusted basis. The Investment Committee failed to properly monitor the performance and fees of the Intel Funds and failed to properly investigate and give appropriate consideration to the availability of lower-cost, better-performing investment alternatives. Instead of using the Plans' bargaining power to negotiate low-cost, better-performing investment options and benefit participants and beneficiaries, the Investment Committee selected and retained the high-cost and underperforming Intel Funds.

13.     The Investment Committee also adopted and implemented allocation models for the Intel Funds that drastically departed from prevailing standards of professional asset managers by allocating significant portions of the Intel Funds' assets to speculative investments. For example, as of September 2015, between approximately 27 and 37% of each of the Intel TDFs' assets and approximately 56% of the Intel GDFs' assets were allocated to "alternative" investments such as hedge funds, private equity, commodities, and emerging market funds held in the Master Trust Investment Accounts. Comparable target date funds and balanced funds did not allocate their assets anywhere close to the Intel Funds' allocations. The Investment Committee's failure to engage in an adequate process of monitoring the allocation models for the Intel Funds exposed the Plans and their participants to the underperformance of the speculative investments that the Intel Funds were allocated to, and the corresponding underperformance of the Intel Funds, and to the high management and performance fees charged by hedge fund and private equity managers.

14.     The result of the Investment Committee's failed attempt to embark on an unprecedented and risky experiment with the Plans' assets is that the Intel Funds have dramatically underperformed professionally managed target date and asset allocation, and participants have paid enormous fees for poor performance. The Plans and their participants have earned significantly less than if the Investment Committee had designed prudent asset allocation funds and/or offered prudent funds by well-established and reputable money managers.

15.     Plaintiff alleges five claims on behalf of a class of participants in the Plans who invested in the Intel Funds (a) for breaches of duty under ERISA § 404(a) by the Investment Committee in selecting and monitoring the investment options in the Plans, including monitoring and evaluating on a regular basis the Intel Funds and their performance and fees; (b) for breaches of duty under ERISA § 404(a) by the Investment Committee in managing the assets of the Plans, including monitoring and evaluating on a regular basis the asset allocation models and allocation percentages for the Intel Funds; (c) for breaches of duty under ERISA § 404(a) by the Administrative Committee for failing to provide material and accurate disclosures to participants; (d) for breaches of duty under ERISA § 404(a) by the Finance Committee and Chief Financial Officers for failing to monitor the Investment Committee and removing any member of the Investment

Committee whose performance was inadequate in managing the Plans' assets; and (e) for co-fiduciary liability under ERISA § 405 against all Defendants. Plaintiff seeks relief including a declaration that Defendants breached their fiduciary and co-fiduciary duties, as well as restoration to the Plans losses to participants' accounts that resulted from Defendants' breaches.

## II.  JURISDICTION AND VENUE

16.     This Court has exclusive and subject matter jurisdiction over this action under ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331 because it is an action under ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3).

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because, upon information and belief, most, if not all, of the individual Defendants can be found in this District.

18.     Assignment to the San Jose Division is appropriate because Intel is headquartered in Santa Clara County, where much of the complained-of conduct likely occurred.

## III.  PARTIES

**A.     PLAINTIFF**

19.     Plaintiff Winston R. Anderson is and has been a participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), in the Intel 401(k) Savings Plan ("the 401(k) Savings Plan") and the Intel Retirement Contribution Plan ("the Retirement Contribution Plan") (collectively "the Plans"). Plaintiff is a former employee of Intel Corporation and a current resident of Arizona. He worked for Intel from 2000 until 2015. As a result of his employment with Intel, he became a participant in the Plans. Plaintiff is fully vested in his accounts in the Plans. During the relevant period, his accounts in the Plans are and have been invested in the Intel GDF and Intel TDFs. Specifically, during the relevant period, his account in the Retirement Contribution Plan is and has been invested in the Intel Global Diversified Fund, and his account in the 401(k) Savings Plan is and has been invested in the Intel Target Date 2030 Fund, the Intel Target Date 2035 Fund, and the Intel Target Date 2040 Fund.

//

//

**B.    DEFENDANTS**

**Investment Committee Defendants**

20.    The **Intel Corporation Investment Policy Committee** ("the Investment Committee") is a named fiduciary of the Plans with respect to the management and control of the Plans' assets pursuant to Section 13(a) of the Retirement Contribution Plan as restated effective January 1, 2014 ("the Retirement Contribution Plan Document"), the 401(k) Savings Plan as amended and restated effective January 1, 2014 ("the 401(k) Savings Plan Document"), and Section 1.2(a) of the Retirement Plans Master Trust Agreement Between Intel Corporation, the Investment Committee, and the Plans' trustee State Street Bank and Trust Company ("the Master Trust Agreement). As such, the Investment Committee is a fiduciary of the Plans within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a). Pursuant to Section 13(f) of the Retirement Contribution and 401(k) Savings Plan Documents (collectively "the Plan Documents"), the Investment Committee is responsible for designating and evaluating the investment options offered to participants under the Plans. Pursuant to the same provision of the Plan Documents, the Investment Committee has the discretionary authority to appoint and remove the trustee and investment managers for the Plans and conduct periodic reviews of the performance, costs, and expenses of the Plans' investment options, trustee, investment managers, and outside service providers. As such, the Investment Committee is a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

21.    **Christopher C. Geczy** has been a Member of the Investment Committee from 2014 to the present. He has worked as an Adjunct Professor of Finance at The Wharton School at the University of Pennsylvania since 1997 and serves as the Academic Director of Jacobs Levy Equity Management Center for Quantitative Financial Research and Wharton Wealth Management Initiative. He is the Founder, CEO and Chief Investment Officer of Forefront Analytics, where he oversees investment decision-making. Mr. Geczy acts as an editor of the *Journal of Alternative Investments* and serves on the Advisory Board of the Journal of Wealth Management. Mr. Geczy worked for the Board of Governors of the Federal Reserve System's Division of Research and Statistics in Washington, D.C. He has served on the Economic Advisory Board of NASDAQ. Mr.

Geczy is a founding board member of the Mid-Atlantic Hedge Fund Association and former Chairman. According to his LinkedIn Profile, Mr. Geczy lives in the Greater Philadelphia Area.

22.     **Ravi Jacob** has been a Member of the Investment Committee from at least January of 2010 to the present. Mr. Jacob has been a Corporate Vice President and the Treasurer of Intel since 2005. As Treasurer, Mr. Jacob manages Intel's cash and investments, capital markets activity, currency and other financial risks, credit and collections, retirement assets, and insurance. According to his LinkedIn Profile, Mr. Jacob lives in the San Francisco Bay Area.

23.     **David S. Pottruck** has served as the Chairman of the Investment Committee from at least 2009 until 2018. He was a Member of Intel's Board of Directors from 1998 until 2018. Mr. Pottruck is the Chairman and Chief Executive of Red-Eagle Ventures Inc. located in San Francisco. He served in various high-level executive positions at Charles Schwab Corporation from 1984 to 2004. According to his LinkedIn Profile, David S. Pottruck lives in the San Francisco Bay Area.

24.     **Arvind Sodhani** was a Member of the Investment Committee from at least October 2009 to 2016. Mr. Sodhani had been an Executive Vice President of Intel from 2007 to 2016. He was also the President of Intel Capital from 2005 to 2016. Mr. Sodhani oversaw Intel's internal new business incubation, external investments, and mergers and acquisitions. He was Head of M&A and Strategy of Intel Corporation from 1988 to 2015. He served as a Treasurer and Senior Vice President of Intel Corporation from 1988 to 2005. Mr. Sodhani joined Intel-Europe in 1981 as Assistant Treasurer and was promoted to Assistant Treasurer of Intel in 1984. He was subsequently promoted to Treasurer in 1988. During his tenure at Intel, Mr. Sodhani was a Board Member of the NASDAQ Stock Market, Inc. and a Non-Industry Director of Nasdaq OMX Group from 1997to 2007. According to his LinkedIn Profile, Mr. Sodhani lives in San Francisco, California.

25.     **Richard Taylor** was a Member of the Investment Committee from at least October 2009 to 2016. He is the HR Project Manager at Intel and has led Human Resources since 1999. He oversees all of the human resource policies and programs for the company worldwide. Mr. Taylor joined Intel in 1986 as an Audit Manager in Europe. According to his LinkedIn Profile, Mr. Taylor lives in the Portland, Oregon area.

26.     Defendants Christopher Geczy, Ravi Jacob, David S. Pottruck, Arvind Sodhani, Richard Taylor are collectively referred to as the "**Investment Committee Defendants**." At all relevant times, the Investment Committee and the Investment Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) as a result of their membership on the Committee and because they each exercised discretionary authority or discretionary control respecting management of the Plans and/or exercised authority or control respecting management or distribution of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

### Administrative Committee Defendants

27.     The **Intel Retirement Plans Administrative Committee** ("the Administrative Committee") is a named fiduciary of the Plans with respect to the operation and administration of the Plans pursuant to Section 13(a) of the Plan Documents and Section 1.2(b) of the Master Trust Agreement. As such, the Administrative Committee is a fiduciary of the Plans within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a). Pursuant to Section 13(e) of the Plan Documents, the Administrative Committee is responsible for preparing and furnishing to participants and beneficiaries a general explanation of the Plans and all other information required to be furnished to them under federal law or the Plans. The Administrative Committee is the named administrator of the Plans. As such, the Administrative Committee is a fiduciary of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

28.     **Terra Castaldi** was a Member of the Administrative Committee from 2015 until October 2018. She was a Senior Director in the Benefits Tax and Legal Department of Intel from 2005 until October 2018. Prior to joining Intel, she was a Partner at Morgan, Lewis & Bockius LLP. According to her LinkedIn Profile, Terra Castaldi lives in the San Francisco Bay Area.

29.     **Ronald D. Dickel** was a Member of the Administrative Committee from 2010 to 2015. He was the Vice President of Finance and the Director of Global Tax and Trade at Intel from 2010 until June 2018. Mr. Dickel joined Intel in 2010 as a Vice President and a Director. Prior to his employment at Intel, Mr. Dickel was a Tax Associate at the law firm of Skadden, Arps, Slate, Meagher & Flom LLP. According to his LinkedIn Profile, Mr. Dickel lives in Los Gatos, California.

30.     **Tiffany Doon Silva** has been a Member of the Administrative Committee from 2015 to the present. She is an attorney in the legal department at Intel. Prior to joining Intel, Ms. Silva was an Attorney at Gibson, Dunn & Crutcher LLP from 1995 to 1999. According to her LinkedIn Profile, Tiffany Doon Silva lives in the San Francisco Bay Area.

31.     **Tami Graham** was a Member of the Administrative Committee from 2015 until 2018. Ms. Graham was the Director of Global Benefits Design at Intel's Worldwide Compensation and Benefits Group and the Global Benefits Design Manager. She was formerly a member of Intel's HR Legal Group as a legal advisor for the design and administration of Intel's compensation and benefit programs. According to her LinkedIn Profile, Ms. Graham lives in the Sacramento, California area.

32.     **Cary Klafter** was a Member of the Administrative Committee from at least 2009 to 2015. Mr. Klafter was the Corporate Vice President of Legal and Corporate Affairs of Intel from 1996 to 2015. He was elected to serve as the Corporate Secretary in 2003. Prior to joining Intel in 1996, Mr. Klafter was an Associate and Partner with Morrison & Foerster LLP, a law firm, from 1972 to 1996. According to his LinkedIn Profile, Mr. Klafter lives in the San Francisco Bay Area.

33.     **Stuart Odell** was a Member of the Administrative Committee from 2015 until 2018. Mr. Odell served as a Director of Retirement Investments and is the Assistant Treasurer in the Treasury Department of Intel. Mr. Odell and his investment team at Intel were responsible for oversight and management of Intel's $14 billion in qualified and nonqualified retirement plan assets. He was a Board Member and Trustee of the San Jose Federated City Employees Retirement System from 2011 to 2015. According to his LinkedIn Profile, Mr. Odell lives in the San Francisco Bay Area.

34.     Defendants Terra Castaldi, Ronald Dickel, Ravi Jacob, Tami Graham, Cary Klafter, Stuart Odell, David Pottruck, Tiffany Doon Silva, and Richard Taylor are collectively referred to as the "**Administrative Committee Defendants**." At all relevant times, the Administrative Committee and the Administrative Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) as a result of their membership on the Committee and because they each exercised discretionary authority or discretionary control respecting management of the

Plans and/or exercised authority or control respecting management or distribution of the Plans'
assets, and/or had discretionary authority or discretionary responsibility in the administration of the
Plans.

**Finance Committee Defendants**

35.     The **Finance Committee of the Intel Corporation Board of Directors** ("the
Finance Committee") is one of the standing committees of Intel's board of directors ("the Board")
and is comprised of directors who represent the Board in ensuring that Intel's senior management
adequately carries out its responsibility with respect to Intel's capital and investment transactions.
With respect to the Plans, pursuant to Section 13(b) of the Plan Documents, at all relevant times until
at least March 2016, the Finance Committee was responsible for the appointment, retention, and
removal of the members of the Investment Committee and the Administrative Committee. The
Finance Committee was authorized to remove, with or without cause, any members of the
Investment Committee and the Administrative Committee and required to appoint their successors.
Pursuant to Section 13(m) of the Plan Documents and under ERISA, at all relevant times until at
least March 2016, the Finance Committee had an ongoing duty to review the continued prudence of
its appointments of the Investment Committee and Administrative Committee members. The
Investment Committee and the Administrative Committee were required to report to the Finance
Committee on an ongoing basis any information as is necessary and appropriate to permit the
Finance Committee to carry out that duty. As such, at all relevant times until at least March 2016,
the Finance Committee was a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C.
§ 1002(21)(A).

36.     **Charlene Barshefsky** was a member of the Finance Committee between 2007 and
2017 and served as the Chair of the Finance Committee between 2009 and 2017. She has been a
Member of Intel's Board of Directors since 2004. Ms. Barshefsky is currently a Partner of the law
firm Wilmer Cutler Pickering Hale and Dorr LLP, where she is the Chair of the International Trade,
Investment and Market Access Practice Group. She serves on the Boards of Directors of American
Express Company, The Estée Lauder Companies Inc., and Starwood Hotels & Resorts Worldwide,
Inc. Ms. Barshefsky lives in Washington, D.C.

37.     **John J. Donahoe** was a Member of the Finance Committee from March 2009 to May 2017. He served on Intel's Board of Directors from 2009 to 2017. He has been the Chairman of the Board of Directors of PayPal Holdings, Inc., located in San Jose, California since July 2015. He is a Member of the Advisory Board and Director of eVolution Global Partners, LLC, a global venture capital firm that specializes in early stage investments within the information technology and media sectors. Mr. Donahoe was President and CEO of eBay from March 2008 to July 2015. Since 1982, he worked as Worldwide Managing Director of Bain & Company, a global management consulting firm, becoming the firm's President and Chief Executive Officer ("CEO") in 1999 to 2005. He has currently been serving as President and CEO of ServiceNow since April 2017. Mr. Donahoe lives in Portola Valley, California.

38.     **Reed E. Hundt** was a Member of the Finance Committee from 2010 to at least 2016. Mr. Hundt has served on Intel's Board of Directors since 2001 and is presently on the Audit Committee and Compensation Committee. He has been an advisor to the private equity firm Blackstone Group since 2010. He is also a Principal at REH Advisors, a business advisory firm and CEO of Coalition for Green Capital, both since 2009. He was Chairman of the Federal Communications Commission from 1993 to 1997. Mr. Hundt practiced law at Latham & Watkins LLP from 1975 to 1993. According to his LinkedIn Profile, Mr. Hundt lives in Washington, D.C.

39.     **James D. Plummer** was a Member of the Finance Committee from 2006 to May 2017. He has served on Intel's Board of Directors since 2005. He is a Professor and the Dean of the School of Engineering at Stanford University in Stanford, California. He has also been an Independent Director at Cadence Design Systems. Mr. Plummer lives in Portola Valley, California.

40.     Defendants Charlene Barshefsky, John J. Donahoe, Reed E. Hundt, and James D. Plummer are collectively, referred to the "**Finance Committee Defendants**." At all relevant times, the Finance Committee and the Finance Committee Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) as a result of their membership on the Committee and because they each exercised discretionary authority or discretionary control respecting management of the Plans and/or exercised authority or control respecting management or

distribution of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**Chief Financial Officer Defendants**

41.     According to the 2016 and 2017 Form 5500s for the Plans and pursuant to the resolution of the Intel's Board of Directors, the Plans were purportedly amended effective March 2016 to replace the Finance Committee with the Chief Financial Officer of Intel with respect to the Finance Committee's responsibilities regarding the appointment, retention, and removal of the members of the Investment and Administrator Committees. Pursuant to Section 13(b) of the Plan Documents and the resolution, effective March 2016, the Chief Financial Officer is responsible for the appointment, retention, and removal of the members of the Investment and Administrative Committees. Effective March 2016, the Chief Financial Officer is authorized to remove, with or without cause, any members of the Investment or Administrative Committee and required to appoint their successors. Pursuant to Section 13(m) of the Plan Documents and under ERISA, effective March 2016, the Chief Financial Officer has an ongoing duty to review the continued prudence of its appointments of the Investment and Administrative Committee members. The Investment and Administrative Committees are required to report to the Finance Committee on an ongoing basis any information as is necessary and appropriate to permit the Chief Financial Officer to carry out that duty. As such, effective March 2016, the Chief Financial Officer is a fiduciary of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

42.     **Stacy Smith** was the Chief Financial Officer of Intel from October 2007 to September 2016. Mr. Smith originally joined Intel in 1988 and has held positions in Finance, Sales and Marketing, and Information Technology. He became vice president of Sales and Marketing in 2002 and was appointed assistant chief financial officer in March 2006. Mr. Smith retired from Intel in January 2018 and is currently the Non-Executive Chairman of the Board Directors of Autodesk, Inc. He lives in the San Francisco Bay Area.

43.     **Robert H. Swan** was the Chief Financial Officer and Executive Vice President of Intel from October 2016 until January 31, 2019. He was named interim chief executive officer of Intel on June 21, 2018. Mr. Swan oversees Intel's global finance organization, Information

Technology and the Corporate Strategy Office. According to his LinkedIn Profile, Robert H. Swan lives in the San Francisco Bay Area.

44. **Todd Underwood** has been the Chief Financial Officer of Intel since January 31, 2019. Prior to his January 31, 2019 appointment to CFO, Mr. Underwood was vice president of finance and director of corporate planning and reporting since August 2016.

45. Defendants Stacy Smith, Robert H. Swan, and Todd Underwood are collectively referred to as the "**Chief Financial Officer Defendants**." At all relevant times, the Chief Financial Officer Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) as a result of their role as the Chief Financial Officer of Intel and because they each exercised discretionary authority or discretionary control respecting management of the Plans and/or exercised authority or control respecting management or distribution of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**Nominal Defendants**

46. **The Intel 401(k) Savings Plan** ("the 401(k) Savings Plan") is and at all relevant times has been an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined contribution plan" or "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). Intel originally established the 401(k) Savings Plan as part of the Intel Corporation Profit-Sharing Retirement Plan ("the Profit Sharing Plan") effective July 1, 1979. Intel bifurcated the Profit Sharing Plan into the Retirement Contribution Plan and the 401(k) Savings Plan effective January 1, 1996. Prior to January 1, 2011, the 401(k) Savings Plan was known as the Intel Corporation 401(k) Savings Plan. The 401(k) Savings Plan is maintained and sponsored by Intel.

47. **The Intel Retirement Contribution Plan** ("the Retirement Contribution Plan") is and at all relevant times has been an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined contribution plan" or "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). Intel established the Profit Sharing Plan effective July 1, 1979, and bifurcated it into the 401(k) Savings Plan and the Retirement Contribution Plan effective January 1, 1996. Prior to January 1, 2011, the Retirement Contribution

1  Plan was known as the Intel Corporation Profit Sharing Retirement Plan. The Retirement

2  Contribution Plan is maintained and sponsored by Intel.

3  **Relevant Non-Parties**

4  48.  **Intel Corporation.** Founded in 1968, Intel Corporation ("Intel") is a technology

5  company that designs and builds processors, motherboards, electronic disk, storage, mobile chips

6  and other technologies and devices related to communications and computing, and is headquartered

7  in Santa Clara, California. As of December 31, 2017, Intel had over 102,000 employees worldwide,

8  with approximately 50% of these employees located in the United States. Intel employs significant

9  numbers of people in California, Colorado, Arizona, New Mexico, Washington, Oregon,

10  Massachusetts, and Utah. Intel is and at all relevant times has been the plan sponsor of the 401(k)

11  Savings Plan and the Retirement Contribution Plan within the meaning of ERISA § 3(16)(B), 29

12  U.S.C. § 1002(16)(B).

13  49.  **Intel Capital Corporation.** Founded in 1991, Intel Capital Corporation ("Intel

14  Capital") is the corporate venture capital division and a subsidiary of Intel. Headquartered in Santa

15  Clara, California, Intel Capital operates as an investment firm that is focused on equity investments

16  related to technology startups, global investments, and mergers and acquisitions. Intel Capital invests

17  in developers and providers of hardware, software, and services worldwide in sectors including

18  cloud and storage, mobility, digital media, security, robotic technologies, and semiconductor

19  manufacturing. According to Intel Capital's website, since 1991, Intel Capital has invested over $12

20  billion in over 1,500 companies in over 55 countries. Between 1998 and 2016, Intel Capital

21  increased its international investing from less than 5% of its investment dollars to about 42%. In

22  2016, Intel Capital invested $455 million in 87 companies, including 34 new ones. In 2017, Intel

23  Capital invested $690 million in 87 companies, including 42 new ones. In its history, Intel Capital

24  has contributed billions in cash to Intel.

25  **IV.  CLASS ALLEGATIONS**

26  50.  Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

27  of Civil Procedure on behalf of the following Class:

28

1         All participants in the Intel Retirement Contribution Plan and the Intel 401(k)

2         Savings Plan, whose accounts were invested in any one of the Intel Target Date

3         Funds, the Intel Global Diversified Fund, or the Intel 401K Global Diversified

4         Fund at any time on or after August 9, 2013.

5         51.     Excluded from the Class are the following persons: (a) Defendants, (b) any

6   fiduciaries of the Plans; (c) any officers or directors of Intel; and (d) any member of the immediate

7   family of and any heirs, successors or assigns of any such excluded party.

8   **A.**      **Numerosity and Impracticability of Joinder**

9         52.     Joinder of all members of the Class would be impracticable based on the number and

10  geographic diversity of the members of the Class. Based on the most recent Form 5500 filed with the

11  Department of Labor for 2017, the 401(k) Savings Plan had over 70,000 participants and/or

12  beneficiaries as of December 31, 2017. Most of these participants had their Plan investments in or

13  were defaulted to an Intel Target Date Fund. Based on the most recent Form 5500 filed with the

14  Department of Labor for 2017, the Retirement Plan had over 40,000 participants and/or beneficiaries

15  as of December 31, 2017. The Global Diversified Fund was the only available investment for the

16  vast majority of Retirement Plan participants before January 1, 2015 and continue to be the default

17  investment option of the Retirement Contribution Plan after that date.

18        53.     According to Intel's website, it has locations in at least the following states: Arizona,

19  California, Colorado, Connecticut, the District of Columbia, Florida, Georgia, Idaho, Illinois,

20  Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, New York, North

21  Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Texas, Virginia, Washington, and

22  Wisconsin. As such, the members of the Classes are also geographically dispersed. The Class

23  satisfies the numerosity requirement because it is composed of thousands of persons, in numerous

24  locations.

25  **B.**      **Commonality**

26        54.     Plaintiff's claims raise common questions that will have common answers for each

27  member of the Class with respect to liability and relief. Some of the common questions of law and

28  fact for the Class include:

---

*Anderson v. Intel*,          Complaint

A.    Whether the Investment Committee was a named fiduciary for the Plans;

B.    Whether the Investment Committee's fiduciary duties included managing the Plans' assets, selecting, monitoring, and removing or replacing the investment options for the Plans, and monitoring the performance of the investment options and their fees and expenses;

C.    Whether the Investment Committee's fiduciary duties included managing the Plans' assets, selecting, monitoring, and replacing the asset allocation strategy adopted for the Intel Funds, selecting, monitoring, and removing or replacing the underlying investments to which the Intel Funds allocated the Plans' assets.

D.    Whether the Investment Committee breached its fiduciary duties to the Plans and their participants in selecting and maintaining the Intel Funds as investments of the Plans including by failing to give appropriate consideration to facts and circumstances relevant to the fees and expenses and performance of the Intel Funds;

E.    Whether the Investment Committee breached its fiduciary duties to the Plans and their participants in constructing and managing the Intel Funds including by failing to give appropriate consideration to facts and circumstances relevant to the asset allocation strategy it adopted and implemented for the Intel Funds;

F.    Whether the asset allocation models chosen by the Investment Committee for the Intel Funds deviate and deviated from prevailing standards for target date funds and balanced funds;

G.    Whether the Investment Committee prudently and loyally selected and managed the underlying funds to which the Intel Funds allocated the Plans' assets;

H.    Whether the Plans and their participants suffered losses as a result of the Investment Committee's fiduciary breaches;

1    I.  Whether the Administrative Committee was a named fiduciary for the Plans;

2    J.  Whether the Administrative Committee breached its fiduciary duties to the

3        Plans and their participants by failing to provide adequate disclosures about

4        the Intel Funds and/or misinforming participants about the Intel Funds.

5    K.  The appropriate relief for the Administrative Committee's breaches.

6 **C.**  **Typicality**

7    55.  Plaintiff's claims are typical of the claims of the Class because his claims arise from

8 the same event, practice and/or course of conduct as other members of the Class. Plaintiff's claims

9 challenge whether the fiduciaries of the Plans acted consistently with their fiduciary duties and

10 whether their breaches caused losses or otherwise harmed the Plans and their participants. These are

11 claims common to and typical of other Class members. Moreover, these claims seek recovery on

12 behalf of the Plans.

13    56.  Plaintiff's claims are typical of the claims of the Class because like all participants in

14 the Plans, whose accounts were invested through any of the Intel Target Date Fund, the Investment

15 Committee chose the asset allocation model, the asset classes, and the funds representing the

16 selected asset classes for every Intel TDP, including the Intel Target Date 2030 Fund, the Intel

17 Target Date 2035 Fund, and the Intel Target Date 2040 Fund in which Plaintiff invested in the

18 401(k) Plan.

19    57.  Plaintiff's claims are typical of the claims of the Class because like all participants in

20 the Plans, whose accounts were invested through any of the Global Diversified Funds, the

21 Investment Committee chose the asset allocation model, the asset classes, and the funds representing

22 the selected asset classes for the Global Diversified Fund in which Plaintiff invested in the

23 Retirement Contribution Plan.

24 **D.**  **Adequacy**

25    58.  Plaintiff will fairly and adequately protect the interests of the Class. He is committed

26 to the vigorous representation of the Class.

27    59.  Defendants do not have any unique defenses against Plaintiff that would interfere

28 with Plaintiff's representation of the Class.

60. Plaintiff has engaged counsel with extensive experience prosecuting class actions in general and ERISA class actions in particular.

**E.     Rule 23(b)(1)**

61. The requirements of Rule 23(b)(1)(A) are satisfied in this case. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to uniformly act in the best interests of the Plans and their participants. As this action challenges whether Defendants acted consistently with their fiduciary duties to the Plans, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the fiduciaries of the Plans.

62. The requirements of Rule 23(b)(1)(B) are satisfied in this case. As Administration of the Plans treated all similarly situated participants be treated consistently, whether Defendants fulfilled their fiduciary obligations with respect to the Plans and the Plans' participants in this action would, as a practical matter, be dispositive of the interests of the other members of the Class regardless of whether they are parties to the adjudication.

**F.     Rule 23(b)(2)**

63. The requirements of Rule 23(b)(2) are met in this action. Defendants have applied the same or substantially similar investment policies and investment options in the Plans that cover all members of the Class. The breaches alleged against Defendants on behalf of the Class relate to policies that applied to all members of the Class. As such, Defendants have acted or refused to act on grounds generally applicable to the Class as a whole.

64. The primary relief sought on behalf of the Class is a determination that Defendants breached their fiduciary duties, a determination of the amount by which those breaches adversely affected the Plans rather than individual members of the Class, and a consequent order requiring Defendants to make good those losses to the Plans. Such relief is accomplished by issuance of a declaration or an injunction and therefore the primary requested relief constitutes final injunctive or declaratory on behalf the Class with respect to the Plans.

**G.     Rule 23(b)(3)**

65.     The requirements of Rule 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plans. Because Class members are those participants whose accounts were invested in the affected investments, common questions related to liability will necessarily predominate over individual questions. Similarly, as relief will be on behalf of and will flow to the Plans, common questions related to remedies and relief will likewise predominate over individual issues.

66.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The losses suffered by many of the individual members of the Classes are relatively small in proportion to the substantial cost to bring this litigation, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. The fiduciaries of the Plans have an obligation to treat all similarly situated participants similarly and are subject to uniform standards of conduct under ERISA. Thus, the members of the Class have an interest in having this action proceed in a single action. As such, no Class member has an interest in individually controlling the prosecution of this matter.

67.     Plaintiff and his counsel are not aware of any other lawsuit filed by any member of the Class concerning this controversy, other than (a) *Sulyma v. Intel Corp. Inv. Policy Comm.*, No. 5:15-cv-04977 (N.D. Cal.), which was dismissed on statute of limitations grounds which dismissal was reversed by the Ninth Circuit Court of Appeals, *Sulyma v. Intel Corp. Inv. Policy Committee*, 909 F.3d 1069 (9th Cir. 2018), *certiorari granted*, and (b) *Lo v. Intel Corp.*, No. 5:16-cv-00522 (N.D. Cal.), which the Court consolidated with the *Sulyma* action.

68.     This District is the most desirable forum for concentration of this litigation because: (1) Intel is headquartered in this District; (2) a number of the actions challenged by this Complaint took place in this District, chiefly, on information and belief, Investment Committee meetings; (3) the Plans are administered in or near this District; (4) many of the employees of the company are located in or near this District; and (5) many of the employees of Intel named as Defendants can be found in this District.

69.     Given the nature of the allegations, there are no difficulties likely to be encountered in the management of this matter as a class action.

## V.  FACTUAL ALLEGATIONS

**A.     Overview of the Plans and the Intel Investment Options The 401(k) Savings Plan**

70.     Since it was established, the 401(k) Savings Plan has been amended and restated multiple times. Since 2014, the written instrument of the 401(k) Savings Plan has been the 401(k) Savings Plan Document.

71.     The 401(k) Savings Plan is a contributory defined contribution plan covering eligible United States employees of Intel Corporation and its subsidiaries and affiliates. All employees who become eligible to participate in the 401(k) Savings Plan are automatically enrolled in it unless they make an affirmative election not to participate.

72.     Benefits provided under the 401(k) Savings Plan are funded by participants' tax-deferred contributions and any discretionary contributions made by Intel, taking into account investment returns and losses as well as expenses. Participants hired on or after January 1, 2011 but prior to January 1, 2013, unless they chose a different deferral rate, were deemed by default to have elected to contribute 3% of their pre-tax earnings, with this amount increasing by 1% each year to a maximum deferral rate of 10%. Participants hired on or after January 1, 2013, unless they choose a different deferral rate, are deemed by default to have elected to contribute 6% of their pre-tax earnings, with this amount increasing by 2% each year to a maximum deferral rate of 16%. Intel makes discretionary contributions to the 401(k) Savings Plan in such amounts as annually determined by Intel's board of directors.

73.     According to its 2015 Form 5500, as of December 31, 2015, the 401(k) Savings Plan had approximately 67,000 participants with account balances and approximately $8.5 billion in total assets. According to its 2016 Form 5500, as of December 31, 2016, the Plan had over 69,000 participants with account balances and approximately $9.74 billion in total assets. According to its 2017 Form 5500, as of December 31, 2017, the Plan had over 71,000 participants with account balances and approximately $ 11.82 billion in total assets.

74. Participants in the 401(k) Savings Plan may direct the investment of their individual account balances into the investment options offered by the Plan and established by the Investment Committee.

75. Among the investment options of the 401(k) Savings Plan are and have been the Intel TDFs and the 401K Global Diversified Fund. The Intel TDFs are the 401(k) Savings Plan's default investment options.

76. The Investment Committee designated and continues to designate the Intel TDFs as the default investment options of the 401(k) Savings Plan. For any participant who either enrolls in the Plan or is automatically enrolled in the Plan and fails to make an investment election, his or her deferred compensation is by default invested in a TDF that corresponds to his or her age and assumed retirement age of 65. If a participant at any other time fails to direct how all portions of his or her accounts in the 401(k) Savings Plan are to be invested, including when an investment option is removed from the Plan's investment lineup, those portions will also by default be invested in a Target Date Fund. For such participants the Intel Target Date Funds is their sole investment.

**1.      The Retirement Contribution Plans**

77. Since it was established, the Retirement Contribution Plan has been amended and restated multiple times. Since 2014, the Retirement Contribution Plan has been maintained pursuant to the Intel Retirement Contribution Plan Document.

78. Effective January 1, 2011, the Retirement Contribution Plan was amended to preclude employees hired on or after January 1, 2011 from participating in the Plan. While this Plan is not available to employees hired on or after January 1, 2011, the Plan continues to cover eligible United States employees of Intel Corporation and its subsidiaries and affiliates who were hired prior to January 1, 2011.

79. The Retirement Contribution Plan is a non-contributory defined contribution plan. Benefits provided under the Retirement Contribution Plan are funded by discretionary contributions by Intel, taking into account investment returns and losses as well as expenses. The amounts of any discretionary contributions by Intel to the Retirement Contribution Plan are determined annually by

Intel's Board of Directors. Participants do not and did not make employee contributions to the Retirement Contribution Plan.

80.     According to its 2015 Form 5500, as of December 31, 2015, the Retirement Contribution Plan had approximately 46,000 participants with account balances and approximately $6.3 billion in total assets. According to its 2016 Form 5500, as of December 31, 2016, the Plan had approximately 42,000 participants with account balances and approximately $6.07 billion in total assets. According to its 2017 Form 5500, as of December 31, 2017, the Plan had approximately 40,000 participants with account balances and approximately $6.59 billion in total assets.

81.     Before January 1, 2015, the investment options provided under the Retirement Contribution Plan included the GDF as well as some of Intel's TDFs and Intel's stable value fund.

82.     Prior to January 1, 2015, only participants in the Retirement Contribution Plan who were aged 50 and over could invest their accounts in any combination of the Intel GDF, the Intel TDFs, and the stable value fund provided under the Plan. Participants in the Plan who were under the age of 50 were not allowed to direct the investment of Intel's contributions on their behalf. Instead, the Investment Committee had the discretionary authority to direct the investment of those contributions. Pursuant to the Investment Committee's direction, before January 1, 2015, contributions made on behalf of participants under the age of 50 were required to be invested in the Intel GDF.

83.     Prior to January 1, 2015, because the participants who could invest in the Intel TDFs were limited to those aged 50 and over, the Intel TDFs provided under the Plan were limited to those that corresponded to those participants' ages and assumed retirement age of 65. For example, in 2013, the Target Date Funds offered under the Plan were limited to the Target Date 2005-2025 Funds and the Target Date Income Fund.

84.     Effective January 1, 2015, the Retirement Contribution Plan was amended to eliminate non-participant-directed investment in the Intel GDF and allow participants to elect to have their accounts invested in any of the investment options made available under the Plan regardless of their ages.

85.     Around the same time, the investment options for the Retirement Contribution Plan was expanded to include all of Intel's TDFs (*i.e.*, the Target Date 2005–2055 Funds and the Target Date Income Fund) so that not only participants aged 50 and over but also participants under 50 can direct the investment of their accounts in an Intel TDF corresponding to their age.

86.     The Investment Committee designated and continues to designate the GDF as the default investment option of the Retirement Contribution Plan. To the extent that these contributions are made, they are invested by default in the Intel GDF unless participants elect otherwise. In other words, the Intel GDF becomes the sole investment option of these participants who do not direct their accounts to be invested in other investments options in the Plan.

### 2.     The Target Date Funds and the Global Diversified Funds

87.     The Intel TDFs offered under the 401(k) Savings Plan include the following: (a) Target Date 2005 Fund; (b) Target Date 2010 Fund; (c) Target Date 2015 Fund; (d) Target Date 2020 Fund; (e) Target Date 2025 Fund; (f) Target Date 2030 Fund; (g) Target Date 2035 Fund; (h) Target Date 2040 Fund; (i) Target Date 2045 Fund; (j) Target Date 2050 Fund; (k) Target Date 2055 Fund; and (l) Target Date Income Fund (collectively "401(k) TDFs").

88.     The Intel TDFs offered under the Retirement Contribution Plan include the following: (a) Retirement Contribution Target Date 2005 Fund; (b) Retirement Contribution Target Date 2010 Fund; (c) Retirement Contribution Target Date 2015 Fund; (d) Retirement Contribution Target Date 2020 Fund; (e) Retirement Contribution Target Date 2025 Fund; (f) Retirement Contribution Target Date 2030 Fund; (g) Retirement Contribution Target Date 2035 Fund; (h) Retirement Contribution Target Date 2040 Fund; (i) Retirement Contribution Target Date 2045 Fund; (j) Retirement Contribution Target Date 2050 Fund; (k) Retirement Contribution Target Date 2055 Fund; and (l) Retirement Contribution Target Date Income Fund (collectively "RC TDFs").

89.     The Intel TDFs, just as other target date funds available in the market, are designed for investors expecting to retire around the year indicated in each Intel TDF's name. As represented in the fund fact sheets, the Intel TDFs are supposed to be managed in such a way that the funds gradually become more conservative over time as they approach their target dates.

90.     The Intel GDF offered under the 401(k) Savings Plan is called the "401K Global Diversified Fund." The Intel GDF offered under the Retirement Contribution Plan is called the "Global Diversified Fund."

91.     The two Intel GDFs are investment options sharing the same asset allocation model that invest in a mix of asset classes.

92.     The Intel TDFs and GDFs offered as investment options under the Plans were, until December 31, 2017, "asset allocation models." As collective investment trusts ("CITs"), since January 1, 2018, the Intel TDFs and GDFs are now structured as funds.

93.     An asset allocation fund is a portfolio consisting of various asset classes such as domestic and international equities as well as bonds and cash equivalents. Asset allocation funds are often structured in such a way that the portfolio does not directly invest in securities representative of the asset classes but rather invests in underlying funds belonging to the asset classes. Asset allocation funds come in several varieties, which include balanced funds and target date funds.

94.     Until December 31, 2017, as asset allocation models or portfolios, the Intel TDFs and the Intel GDFs did not issue shares or units and were not actual funds in which participants in the 401(k) Savings Plan and the Retirement Contribution Plan hold shares or units. Rather, each of the Intel Funds was effectively an investment strategy that, pursuant to the asset allocation adopted for that Intel Fund, directed the assets of the Plans invested in that Intel Fund to be allocated to certain underlying funds and provided each participant investing in the Intel Fund with a proportionate interest in those underlying funds.

95.     The underlying funds of the Intel Funds that are relevant to this action are held in the Intel Corporation Retirement Plans Master Trust ("the Master Trust"). The Master Trust holds the assets of the 401(k) Savings Plans and the Retirement Contribution Plan as well as the assets of the Intel Minimum Pension Plan, Intel's defined benefit pension plan. The Master Trust includes multiple investment accounts ("the Master Trust Investment Accounts"). The underlying funds in which the Intel Funds invest — or more precisely, to which the assets of the 401(k) Savings Plan and the Retirement Contribution that are invested in the Intel Funds are allocated — are the Master Trust Investment Accounts.

96.     As of December 31, 2014, the Master Trust had nine Master Trust Investment Accounts, which included among other accounts the Hedge Fund Account, the Alternative Investments Account, the Commodities Fund, and the Emerging Markets Fund Account.

97.     In or about May 2015, a portion of the Hedge Fund Account was spun off to form the Growth Oriented Hedge Fund Account and the remaining portion of the Hedge Fund Account was renamed the Defensive Oriented Hedge Fund Account. The Commodities Fund Account was renamed the Diversified Real Assets Fund Account. As of December 31, 2015, the Master Trust had thirteen Master Trust Investment Accounts, which included among other accounts the Defensive Oriented Hedge Fund Account (formerly the Hedge Fund Account), the Growth Oriented Hedge Fund Account, the Alternative Investments Account, the Diversified Real Assets Fund Account (formerly the Commodities Fund Account), and the Emerging Markets Fund Account (collectively "the Non-Traditional Assets Class Accounts").

98.     The Hedge Fund Account invested in hedge fund investment partnerships. As of December 31, 2014, the Master Trust Investment Account had approximately $2.71 billion in total assets.

99.     The Defensive Oriented Hedge Fund Account and the Growth Oriented Hedge Fund Account invested in hedge fund investment partnerships. As of December 31, 2015, December 31, 2016, and December 31, 2017, the Defensive Oriented Hedge Fund Account had approximately $915.9 million, $668.1 million, and $691.2 million in total assets, respectively. As of December 31, 2015, December 31, 2016, and December 31, 2017, the Growth Oriented Hedge Fund Account had approximately $1.71 billion, $1.30 billion, and $1.27 billion in total assets, respectively. The two Master Trust Investment Accounts had approximately $2.62 billion in combined assets as of December 31, 2015, approximately $1.97 billion in combined assets as of December 31, 2016, and approximately $1.96 billion in combined assets as of December 31, 2017.

100.     The Alternative Investments Fund Account invested in private equity investment partnerships including venture capital and private real estate and natural resources funds. The Master Trust Investment Account had approximately $814.2 million, $1.07 billion, $1.27 billion, and $1.43

billion in total assets as of December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017, respectively.

101.    The Diversified Real Assets Fund Account invested in commodities funds. The Master Trust Investment Account had approximately $293.31 million, $203.73, and $461.20 million, and $539.06 million in total assets as of December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017, respectively.

102.    The Emerging Markets Fund Account invested in emerging markets and emerging markets private equity funds. The Master Trust Investment Account had approximately $1.15 billion, $560.05 million, $503.73 million, and $634.09 million in total assets as of December 31, 2014, December 31, 2015, December 31, 2016, and December 31, 2017, respectively.

103.    The rest of the thirteen Master Trust Investment Accounts invested in international stock funds and equity securities, large cap equity funds, small cap equity funds and equity securities, U.S. government securities and bonds, corporate debt securities, and Treasury Inflation-Protected Securities. These accounts included the U.S. Large Cap Stock Fund Account, the U.S. Small Cap Stock Fund Account, the International Stock Fund Account, the Global Equity Fund Account, the Global Bond Fund Account, the Opportunistic Bond Fund Account, the Stable Value Fund Account, and the Treasury Inflation Protected Securities Fund Account (collectively "the Traditional Asset Class Accounts").

104.    The Master Trust Investment Accounts, including the Non-Traditional Investments Accounts, are not investment options offered in the investment lineup of the 401(k) Savings Plan or the Retirement Contribution Plans that participants can choose to direct or not to direct to invest their accounts in. Rather, each of the Intel Funds allocates the portions of the participants' accounts invested in that Fund and thus the Plan's assets to the Master Trust Investment Accounts pursuant to the mix of asset classes as determined by that Fund's asset allocation strategy. In other words, if a portion of the participant's account is invested in an Intel Fund, it will be allocated to the Master Trust Investment Accounts based on the asset allocation adopted for that Fund.

105.    As of December 31, 2014, the 401(k) Savings Plan and the Retirement Contribution Plan had approximately $7.8 billion and $6.7 billion in total assets, respectively. The assets of the

Master Trust Investment Accounts had over $11 billion in combined value. Of that amount, approximately $4.4 billion accounted for the assets of the 401(k) Savings Plan allocated to the Master Trust Investment Accounts, and approximately $6.4 billion accounted for the assets of the Retirement Contribution Plan allocated to the Master Trust Investment Accounts.

106.    As of December 31, 2015, the 401(k) Savings Plan and the Retirement Contribution had approximately $8.5 billion and $6.3 billion in total assets, respectively. The assets of the Master Trust Investment Accounts had over $10.5 billion in combined value. Of that amount, approximately $4.5 billion accounted for the assets of the 401(k) Savings Plan allocated to the Master Trust Investment Accounts, and approximately $5.6 billion accounted for the assets of the Retirement Contribution Plan allocated to the Master Trust Investment Accounts.

107.    As of December 31, 2016, the 401(k) Savings Plans and the Retirement Contribution Plan had approximately $9.74 billion and $6.07 billion in total assets, respectively. The assets of the Master Trust Investment Accounts had over $11 billion in combined value. Of that amount, approximately $5.1 billion accounted for the assets of the 401(k) Savings Plan allocated to the Master Trust Investment Accounts, and approximately $5 billion accounted for the assets of the Retirement Contribution Plan allocated to the Master Trust Investment Accounts.

108.    As of December 31, 2017, the 401(k) Savings Plans and the Retirement Contribution Plan had approximately $11.82 billion and $6.59 billion in total assets, respectively. The assets of the Master Trust Investment Accounts had over $12 billion in combined value. Of that amount, approximately $5.8 billion accounted for the assets of the 401(k) Savings Plan allocated to the Master Trust Investment Accounts, and approximately $5.1 billion accounted for the assets of the Retirement Contribution Plan allocated to the Master Trust Investment Accounts.

109.    The Plans have had and continue to have substantial stakes in the Intel Funds. The majority of the assets of the 401(k) Savings Plan have been and continue to be invested in the Intel Target Date Funds, the Plan's default investment options. The majority of the assets of the Retirement Contribution Plan have been and continue to be invested in the Global Diversified Fund, the Plan's default investment option and the only investment option that accounts of participants under the age of 50 could be invested in before 2015.

### 3.    Fiduciary Responsibilities of the Investment Committee Defendants

110.    The Investment Committee Defendants had the authority, discretion, and responsibility to select, monitor, and remove or replace investment options in the 401(k) Savings Plan and the Retirement Contribution Plan. Their specific responsibilities and powers included, but were not limited to, (a) making decisions with respect to selecting and removing or replacing investment options for the Plans and selecting and replacing the asset allocation strategy adopted for any of those investment options; (b) monitoring the performance and fees and expenses of the Plans' investment options on a regular basis and removing or replacing any investment options that were imprudent or disloyal; (c) monitoring the asset allocation strategy adopted for any of those investment options and replacing any asset allocation strategy that was imprudent or disloyal; and (d) appointing, monitoring, and removing any investment managers with respect to management of the Plans' investment options or investment of the Plans' assets. It is presently unknown to Plaintiff whether, how, and to what degree the Investment Committee Defendants retain authority and discretion over the Intel TDFs and GDFs after the appointment of GTC to serve as trustee for the Intel Funds.

111.    Specifically, pursuant to the Intel 401(k) Savings Plan Investment Policy Statement and the Intel Retirement Contribution Plan Investment Policy Statement, as amended and restated by the Investment Policy Committee on January 12, 2017, effective from January 12, 2017 (collectively "the Investment Policies"), the Investment Committee has the authority to appoint investment managers or trustees to manage the assets of the Plan and is responsible for reviewing the Plans' investment funds and managers, allocating assets within funds and between managers, and appointing and replacing any such funds or managers. The Investment Committee is also responsible for periodically reviewing performance, costs, and expenses of investment managers and determining the reasonableness of expenses incurred by the Plan taking into account fund expense ratios and fund returns net of expenses (both relative to peer group). Further, the Investment Committee is responsible for selecting the investments for Plan assets and determining the performance benchmarks, asset allocation, monitoring and rebalancing criteria, and similar metrics applicable to such investment choices.

112.     Pursuant to the Investment Policies, the Investment Subcommittee, a subgroup of the Investment Committee as delegated by it, is responsible for investment decisions for Plan assets including decisions relating to definition and development of investment strategies and philosophies of the Investment Committee and/or for the Plans, ratification of manager selection, and manager performance monitoring. The Investment Committee has oversight of the Investment Subcommittee, which is required to report to the Investment Committee on investment activities and decisions on a periodic basis, which is expected to be quarterly.

**B.     The Investment Committee Defendants Subjected the Plans and Participants to Unnecessary and Imprudent Expenses**

113.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is based on employee and employer contributions and the gains and losses through investment in the options made available under the plan less expenses. *See* 29 U.S.C. §1002(34). Excessive fees and poor investment performance will significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of benefits available at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

114.     Multi-billion dollar defined contribution plans such as the 401(k) Savings Plan and the Retirement Contribution Plan have great bargaining power to negotiate low-cost investment alternatives. As of December 31, 2014, and December 31, 2015, the 401(k) Savings Plan had approximately $7.9 billion and $8.5 billion in assets, respectively. As of December 31, 2014, and December 31, 2015, the Retirement Contribution Plan had approximately $6.7 billion and $6.3 billion in assets, respectively. The 401(k) Savings Plan stands in the top 0.1% of over 530,000 401(k) plans in plan assets. Investment Company Institute, *A Close Look at 401(k) Plans, 2014* ("ICI Study - 2014") at 12, *available at* https://www.ici.org/pdf/ppr_16_dcplan_ profile_401k.pdf.

115.     In 2013, in defined contribution 401(k) plans with over $1 billion in assets, the average expense ratio for target-date funds was 0.48% and the average expense ratio for non-target date balanced funds was 0.33%. Investment Company Institute, *A Close Look at 401(k) Plans, 2013*, at 51, *available at* https://www.ici.org/pdf/ppr_15_dcplan_profile_401k.pdf. In 2014, the average expense ratio for target-date balanced funds in plans with over $1 billion in assets was 0.46% and the average expense ratio for non-target date balanced funds was 0.33%. ICI Study - 2014, at 53.

116.     The fees charged for investing in the Intel TDFs and the Intel GDFs have been and are significantly higher than the above-mentioned averages and to alternative target-date funds and non-target balanced funds with comparable investment styles and similar or superior performance. In 2014, the 12 Intel TDFs in the 401(k) Savings Plan had expense ratios between 1.07 and 1.09%, which exceeded the category average of 0.46% by more than 130%. The Intel GDFs had an expense ratio of 1.25%, which exceeded the category average of 0.33% for non-target date balanced funds by more than 270%. In 2015, the Intel Funds in the 401(k) Savings Plan charged similarly high fees. The Intel Target Date Funds in the Plan had expense ratios between 0.92% and 1.04%, and the 401K GDF had an expense ratio of 1.25%. The Intel Funds in the investment lineup of the Retirement Contribution Plan had the same or similar expense ratios as the Intel Funds in the 401(k) Savings Plan.

117.     Comparable investment alternatives to the Intel Funds, however, show that the above comparisons *understate* the gross excessiveness of the fees for the Intel Funds. For example, as of September 2015, the fees for the Intel Funds in the 401(k) Savings were considerably higher — up to 940 % more expensive — than actively-managed and passively-managed investment alternatives with comparable investment styles and with similar or superior performance, as shown by Table 1:

//

//

//

//

//

//

Table 1

| Intel Fund in 401(k) Savings Plan | Expense Ratio | Passively-Managed / Actively-Managed Alternatives | Expense Ratio | Fee Excess |
|---|---|---|---|---|
| Target Date Income Fund | 101 bps[2] | Vanguard Target Retirement Fund - Institutional (VITRX) | 10 bps | 901% |
| | | Vanguard Target Retirement Fund - Investor (VTINX) / | 16 bps | 531% |
| | | T. Rowe Price Retirement Balanced Fund - Investor (TRRIX) | 56 bps | 80% |
| Target Date 2005 Fund | 101 bps | Fidelity Freedom Index 2005 - Investor (FJIFX) / | 16 bps | 531% |
| | | T. Rowe Price Retirement 2005 - Investor (TRRFX) | 58 bps | 74% |
| Target Date 2010 Fund | 104 bps | Vanguard Target Retirement 2010 Fund - Institutional (VIRTX) | 10 bps | 940% |
| | | Vanguard Target Retirement 2010 Fund - Investor (VTENX) / | 16 bps | 550% |
| | | American Funds 2010 Target Date Retirement Fund - R6 (RFTTX) | 36 bps | 189% |
| Target Date 2015 Fund | 103 bps | Vanguard Target Retirement 2015 Fund - Institutional (VITVX) | 10 bps | 903% |
| | | Vanguard Target Retirement 2015 Fund - Investor (VTXVX) / | 16 bps | 543% |
| | | American Funds 2015 Target Date Retirement Fund - R6 (RFJTX) | 36 bps | 186% |

---

[2] The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to 0.01%, or 1/100th of a percent. Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', *available at* http://www.investopedia.com/terms/b/basispoint.asp (last visited Oct. 12, 2017).

---

| Intel Fund in 401(k) Savings Plan | Expense Ratio | Passively-Managed / Actively-Managed Alternatives | Expense Ratio | Fee Excess |
|---|---|---|---|---|
| Target Date 2020 Fund | 102 bps | Vanguard Target Retirement 2020 Fund - Institutional (VITWX) | 10 bps | 902% |
| | | Vanguard Target Retirement 2020 Fund - Investor (VTWNX) / | 16 bps | 538% |
| | | American Funds 2020 Target Date Retirement Fund - R6 (RRCTX) | 38 bps | 168% |
| Target Date 2025 Fund | 100 bps | Vanguard Target Retirement 2025 Fund - Institutional (VRIVX) | 10 bps | 900% |
| | | Vanguard Target Retirement 2025 Fund - Investor (VTTVX) / | 17 bps | 488% |
| | | American Funds 2025 Target Date Retirement Fund - R6 (RFDTX) | 40 bps | 150% |
| Target Date 2030 Fund | 96 bps | Vanguard Target Retirement 2030 Fund - Institutional (VTTWX) | 10 bps | 860% |
| | | Vanguard Target Retirement 2030 Fund - Investor (VTHRX) / | 17 bps | 465% |
| | | American Funds 2030 Target Date Retirement Fund - R6 (RFETX) | 42 bps | 129% |
| Target Date 2035 Fund | 92 bps | Vanguard Target Retirement 2035 Fund - Institutional (VITFX) | 10 bps | 820% |
| | | Vanguard Target Retirement 2035 Fund - Investor (VTTHX) / | 18 bps | 411% |
| | | American Funds 2035 Target Date Retirement Fund - R6 (RFFTX) | 43 bps | 114% |

| Intel Fund in 401(k) Savings Plan | Expense Ratio | Passively-Managed / Actively-Managed Alternatives | Expense Ratio | Fee Excess |
|---|---|---|---|---|
| Target Date 2040 Fund | 92 bps | Vanguard Target Retirement 2040 Fund - Institutional (VIRSX) | 10 bps | 820% |
| | | Vanguard Target Retirement 2040 Fund - Investor (VFORX) | 18 bps | 411% |
| | | / | | |
| | | American Funds 2040 Target Date Retirement Fund - R6 (RFGTX) | 43 bps | 114% |
| Target Date 2045 Fund | 92 bps | Vanguard Target Retirement 2045 Fund - Institutional (VITLX) | 10 bps | 820% |
| | | Vanguard Target Retirement 2045 Fund - Investor (VTIVX) | 18 bps | 411% |
| | | / | | |
| | | American Funds 2045 Target Date Retirement Fund - R6 (RFHTX) | 43 bps | 114% |
| Target Date 2050 Fund | 92 bps | Vanguard Target Retirement 2050 Fund - Institutional (VTRLX) | 10 bps | 820% |
| | | Vanguard Target Retirement 2050 Fund - Investor (VFIFX) | 18 bps | 411% |
| | | / | | |
| | | American Funds 2050 Target Date Retirement Fund - R6 (RFITX) | 44 bps | 109% |

| Intel Fund in 401(k) Savings Plan | Expense Ratio | Passively-Managed / Actively-Managed Alternatives | Expense Ratio | Fee Excess |
|---|---|---|---|---|
| Target Date 2055 Fund | 96 bps | Vanguard Target Retirement 2055 Fund - Institutional (VIVLX) | 10 bps | 860% |
| | | Vanguard Target Retirement 2055 Fund - Investor (VFFVX) / | 18 bps | 433% |
| | | American Funds 2055 Target Date Retirement Fund - R6 (RFKTX) | 47 bps | 104% |
| 401K Global Diversified Fund | 125 bps | Vanguard LifeStrategy Growth Fund - Investor (VASGX) / | 20 bps[3] | 525% |
| | | T. Rowe Price Balanced Fund - Investor (RPBAX) | 55 bps | 127% |

118.    The fees charged for the Intel Funds have been far higher than the fees charged for either actively-managed or passively-managed investment alternatives with comparable investment strategies or styles and with similar or superior performance. In 2017, the expense ratios of the Intel TDFs in the 401(k) Savings Plan fell between 0.82% and 0.95%, which were considerably higher than comparable investment alternatives. For example, Intel Target Date 2015 and 2020 Funds were up to 956% more expensive than comparable investment alternatives offered by Vanguard and up to 171 % more expensive than actively-managed alternatives offered by American Funds. The Intel TDFs in the Retirement Contribution Plan charged similarly high fees, with expense ratios between 0.83 and 0.96%. The expense ratio of the Intel GDF in the 401(k) Savings Plan, which had increased to 1.52% in 2017 from 1.25% in 2015, was also considerably higher than comparable alternatives. So was the Intel GDF in the Retirement Contribution Plan, which had an expense ratio of 1.53%. In 2018, the expense ratios of the Intel TDFs in the Plans continue to be high, ranging up to 1.01%. As of September 2018, the expense ratio of the Intel GDFs in the 401(k) Savings Plan and the Retirement Contribution Plan have increased to 2.08% and 2.09%, respectively.

---

[3] Vanguard has since reduced the net expense ratio of this fund to 14 bps.

119.    The Intel TDFs have significantly higher fees compared to the market in general. Morningstar reports that asset-weighted expense ratios for TDFs have declined 35% since 2009. Morningstar 2018 Target-Date Fund Landscape ("TDF Landscape"), at 15. The Intel TDF fees have gone in the opposite direction, increasing, on average, 24% since 2011, as Table 2 illustrates:

**Table 2**

| Intel TDF Vintage | Fee as of 12/31/2011[4] | Fee as of 12/31/2018[5] | % Increase |
|---|---|---|---|
| Income | 62 bps | 92 bps | 46 |
| 2005 | 65 bps | 94 bps | 45 |
| 2010 | 69 bps | 94 bps | 36 |
| 2015 | 68 bps | 98 bps | 44 |
| 2020 | 69 bps | 99 bps | 43 |
| 2025 | 70 bps | 90 bps | 29 |
| 2030 | 71 bps | 80 bps | 13 |
| 2035 | 71 bps | 76 bps | 7 |
| 2040 | 71 bps | 72 bps | 1 |
| 2045 | 71 bps | 74 bps | 4 |
| 2050 | 71 bps | 73 bps | 3 |
| Avg. | 69 bps | 86 bps | 25 |

120.    The Morningstar report covers 58 target date fund ("TDF") series offered by professional asset managers. TDF Landscape at 16–17, Ex. 13. The average asset-weighted expense ratio for TDFs at the end of 2017 was 66 basis points. *Id.* at 15. The average Intel TDF fee was 86 basis points, which is higher than 44 of the professionally-managed TDF series covered by Morningstar. *Id.* at 16–17, Ex. 13. The fourteen providers that had fees exceeding 86 basis points had a collective market share of only 4.38%. *Id.* No provider with more than 5% market share

---

[4] Intel 401(k) Savings Plan: Important Plan and Investment-Related Information, Including the Plan's Investment Options, Performance History, Fees and Expenses.

[5] https://workplaceservices.fidelity.com/mybenefits/navstation/navigation.

1   charged more than 73 basis points. *Id.* Only one provider charging more than 86 basis points had

2   market share exceeding 1% (1.67%). *Id.*

3       121.    The differences are even greater when considering the cheapest share class for each

4   TDF provider—that is the share class large investors like the Plans are most likely to invest in. Every

5   single TDF provider charges, on average, less than the Intel TDFs. *Id.* at 20, Ex. 16. The Intel TDFs

6   are the most expensive TDFs in the country for large plan investors.

7       122.    The differences are even starker when evaluated from the investors' perspective. On

8   an asset-weighted basis, the average investor paid 47 basis points, *id.* at 17, less than half the average

9   fee for Intel TDFs.

10       123.    Compared to other defined contribution plans which, like Intel's, have over $10

11   billion in total assets, the fee difference is even more significant. Most such plans use TDFs in a

12   "collective trust" rather than mutual fund structure, allowing them to achieve additional institutional

13   fee savings. These TDFs funds typically charge fees below 0.20%, including the Blackrock Lifepath

14   Funds (0.08%); Prudential Bright Horizon Funds (0.12%); Vanguard Target Retirement Trust Select

15   Funds (0.05%); and DFA Life Path Funds (0.06%). The jumbo plans which do use mutual fund

16   TDFs invest in either the actively managed Fidelity Freedom Funds (0.47% for the 2030 Fund) or

17   passively managed Vanguard Index TDFs identified above.

18       124.    Indeed, of the 10 closest plans to Intel's in terms of assets (5 larger and 5 smaller), six

19   invest in the Blackrock Lifepath collective trusts (0.08%). One invests in Prudential's collective trust

20   TDF product (charging 0.12%), one in Vanguard's Target Date mutual funds (charging 0.14% or

21   less), one in State Street Global Advisor's collective trust (charging, upon information and belief,

22   less than 0.14%), and one, 3M, utilizes its own custom target date fund whose are not known to

23   Plaintiff.

24       125.    Although participants in the Intel Plans paid high fees, they did not receive superior

25   investment returns. For example, as of the end of 2018, Intel Target Date 2015, 2020, 2030, 2025,

26   2035, 2040, and 2045 Funds in the 401(k) Savings Plan generally underperformed comparable

27   alternatives such as those offered by Vanguard in each calendar year between 2011 and 2018, and

28

consistently yielded significantly lower average returns for that same time period, as illustrated by Table 3:

**Table 3**

| | 2011 Return | 2012 Return | 2013 Return | 2014 Return | 2015 Return | 2016 Return | 2017 Return | 2018 Return | Ave. Return |
|---|---|---|---|---|---|---|---|---|---|
| Intel Target Date 2015 Fund | -0.31% | 9.18% | 12.36% | 3.75% | -2.08% | 6.21% | 11.19% | -2.86% | 4.68% |
| Vanguard Target Retirement 2015 Fund (VTXVX) | 1.71% | 11.37% | 13.00% | 6.56% | -0.46% | 6.16% | 11.50% | -2.97% | 5.86% |
| Intel Target Date 2020 Fund | -0.06% | 10.05% | 12.70% | 3.97% | -1.73% | 7.06% | 12.71% | -3.56% | 5.14% |
| Vanguard Target Retirement 2020 Fund (VTWNX) | 0.60% | 12.35% | 15.85% | 7.11% | -0.68% | 6.95% | 14.08% | -4.24% | 6.50% |
| Intel Target Date 2025 Fund | -1.51% | 10.86% | 12.63% | 4.04% | -1.88% | 7.94% | 14.63% | -5.13% | 5.20% |
| Vanguard Target Retirement 2025 Fund (VTTVX) | -0.37% | 13.29% | 18.14% | 7.17% | -0.85% | 7.48% | 15.94% | -5.15% | 6.96% |
| Intel Target Date 2030 Fund | —[6] | 11.32% | 12.55% | 3.91% | -2.37% | 8.92% | 16.43% | -6.49% | 5.53% |

[6] The Intel Target Date 2030 and 2040 Funds do not have full-year performance data for 2011 because they were not available as investments options in the 401(k) Savings Plan until July 1, 2011.

| | 2011 Return | 2012 Return | 2013 Return | 2014 Return | 2015 Return | 2016 Return | 2017 Return | 2018 Return | Ave. Return |
|---|---|---|---|---|---|---|---|---|---|
| Vanguard Target Retirement 2030 Fund (VTTHX) | -1.27% | 14.24% | 20.49% | 7.17% | -1.03% | 7.85% | 17.42% | -5.86% | 7.38% |
| Intel Target Date 2035 Fund | -1.91% | 11.31% | 12.64% | 3.95% | -2.52% | 9.50% | 17.60% | -7.24% | 5.42% |
| Vanguard Target Retirement 2035 Fund (VTHRX) | -2.24% | 15.16% | 22.82% | 7.24% | -1.26% | 8.26% | 19.12% | -6.58% | 7.82% |
| Intel Target Date 2040 Fund | – | 11.32% | 12.65% | 3.94% | -2.69% | 9.53% | 18.72% | -7.66% | 5.73% |
| Vanguard Target Retirement 2040 Fund (VFORX) | -2.55% | 15.56% | 24.37% | 7.15% | -1.59% | 8.73% | 20.71% | -7.32% | 8.13% |
| Intel Target Date 2045 Fund | -2.20% | 11.32% | 12.65% | 3.97% | -2.72% | 9.78% | 19.11% | -7.56% | 5.54% |
| Vanguard Target Retirement 2045 Fund (VTIVX) | -2.51% | 15.58% | 24.37% | 7.16% | -1.57% | 8.87% | 21.42% | -7.90% | 8.18% |

126.    As of the end of 2015, other Intel TDFs in the 401(k) Savings Plan and the Intel TDFs in the Retirement Contribution Plan similarly underperformed Vanguard's alternatives. The GDFs in the Plans also underperformed Vanguard's comparable alternative in the period between 2011 and 2015, with an average annual return of 5.37% at the end of 2015, compared to an average annual return of at least 7.84% of the Vanguard LifeStrategy Growth Fund.

127.    The Intel TDFs have continued to underperform comparable investment alternatives. For example, as of December 31, 2016, Intel Target Date 2015, 2025, 2035, and 2045 Funds in the

401(k) Savings Plan all underperformed comparable alternatives by Vanguard, American Funds and

T. Rowe Price over available five- and ten-year horizons as illustrated by Table 4:

**Table 4**

| Ave. Annual Returns as of 12/31/2016 | Intel Target Date 2015 Fund | Vanguard Target Retirement 2015 Fund (VTXVX) | American Funds 2015 Target Retirement Fund (RFJTX) | T. Rowe Price Retirement Fund 2015 (TRRGX) |
|---|---|---|---|---|
| 5 Year | 5.77% | 7.22% | 8.04% | 8.06% |
| 10 Year | 3.51% | 4.85% | _7 | 5.04% |

| Ave. Annual Return as of 12/31/2016 | Intel Target Date 2025 Fund | Vanguard Target Retirement 2025 Fund (VTTVX) | American Funds 2025 Target Retirement Fund - R6 (RFDTX) | T. Rowe Price Retirement Fund 2025 (TRRHX) |
|---|---|---|---|---|
| 5 Year | 6.59% | 8.86% | 10.40% | 9.75% |
| 10 Year | 3.09% | 5.00% | – | 5.32% |

| Ave. Annual Return as of 12/31/2016 | Intel Target Date 2035 Fund | Vanguard Target Retirement 2035 Fund (VTTHX) | American Funds 2035 Target Retirement Fund - R6 (RFFTX) | T. Rowe Price Retirement Fund 2035 (TRRJX) |
|---|---|---|---|---|
| 5 Year | 6.82% | 10.15% | 11.31% | 10.87% |
| 10 Year | 2.70% | 5.09% | – | 5.52% |

| Ave. Annual Return as of 12/31/2016 | Intel Target Date 2045 Fund | Vanguard Target Retirement 2045 Fund (VTIVX) | American Funds 2045 Target Retirement Fund - R6 (RFHTX) | T. Rowe Price Retirement Fund 2045 (TRRKX) |
|---|---|---|---|---|
| 5 Year | 6.84% | 10.54% | 11.51% | 11.14% |

---

[7] The 10-year average returns for the American Funds Target Date Funds are not available because they did not become available until July 13, 2009.

| 10 Year | 2.60% | 5.27% | – | 5.65% |
|---|---|---|---|---|

128.    As of December 31, 2017, Intel Target Date 2015, 2025, 2035, and 2045 Funds in the 401(k) Savings Plan all underperformed comparable alternatives by Vanguard and T. Rowe Price over available five- and ten-year horizons:

**Table 5**

| Ave. Annual Returns as of 12/31/2017 | Intel Target Date 2015 Fund | Vanguard Target Retirement 2015 Fund – Investor (VTXVX) | T. Rowe Price Retirement 2015 Fund – Investor (TRRGX) |
|---|---|---|---|
| 5 Year | 6.16%%% | 7.25% | 7.97% |
| 10 Year | 3.99%% | 5.23% | 5.67% |

| Ave. Annual Return as of 12/31/2017 | Intel Target Date 2025 Fund | Vanguard Target Retirement 2025 Fund – Investor (VTTVX) | T. Rowe Price Retirement 2025 Fund – Investor (TRRHX) |
|---|---|---|---|
| 5 Year | 7.30% | 9.36% | 10.06% |
| 10 Year | 3.91% | 5.79% | 6.34% |

| Ave. Annual Return as of 12/31/2017 | Intel Target Date 2035 Fund | Vanguard Target Retirement 2035 Fund – Investor (VTTHX) | T. Rowe Price Retirement 2035 Fund – Investor (TRRJX) |
|---|---|---|---|
| 5 Year | 8.00% | 10.90% | 11.53% |
| 10 Year | 3.79% | 6.18% | 6.83% |

| Ave. Annual Return as of 12/31/2017 | Intel Target Date 2045 Fund | Vanguard Target Retirement 2045 Fund – Investor (VTIVX) | T. Rowe Price Retirement 2045 Fund – Investor (TRRKX) |
|---|---|---|---|
| 5 Year | 8.30% | 11.64% | 12.03% |
| 10 Year | 3.80% | 6.56% | 7.10% |

129.   The Intel TDFs have also underperformed the most widely-used benchmark for TDFs, the S&P Target Date Index. TDF Landscape at 32, Ex. 27 (identifying benchmarks).

130.   The Intel TDFs also underperform almost all peer funds on an average and weighted-average basis. Weighted average returns are a useful performance metric because they measure the returns earned by the average investor, as opposed to the returns generated by the average investment manager.

131.   Table 6 below compares the ten-year returns of the Intel TDFs as of year-end 2018 to same-vintage TDFs managed by professional asset managers available in the market during the entire period using average return, weighted average return, and average risk-adjusted return. For example, the Intel 2015 TDF earned 6.62% compared to the average mutual fund which earned 7.60%. Within the group of 13 mutual funds with 10 years of such data, ending December 2018, the Intel performance was in the 83rd percentile. Other vintages fared similar or worse; in some cases, the Intel TDF was the worst performing TDF for that Vintage. The peer returns are based on the cheapest share class.

**Table 6**

| 10 Year | Vintage 2000-2010 | Vintage 2015 | Vintage 2025 | Vintage 2035 | Vintage 2045 | Vintage Retirement |
|---|---|---|---|---|---|---|
| Std Avg. | 7.074 | 7.605 | 8.829 | 9.693 | 10.041 | 6.128 |
| Wtd Avg. | 8.063 | 8.288 | 9.344 | 10.237 | 10.461 | 6.371 |
| # Peers | 12 | 13 | 19 | 19 | 18 | 19 |
| Intel | **6.01** | **6.62** | **7.52** | **7.71** | **7.79** | **5.59** |
| Ret v Std | -15% | -13% | -14.8% | -20.5% | -22.4% | -8.8% |
| Ret v Wtd | -25.5% | -20.1% | -19.5% | -24.5% | -25.5% | -12.2% |
| Rank | 82 | 83 | 95 | 100 | 100 | 78 |

132.   Table 6 above shows that the Intel TDFs underperform the average professional TDF manager by a substantial margin. It also shows that the Intel Plans and their participants did even worse compared to the average TDF investor.

133.   The same is true for 2011–2018, as Table 7 demonstrates below.

//

//

**Table 7**

| 2011–2018 | Vintage 2015 | Vintage 2025 | Vintage 2035 | Vintage 2045 |
|-----------|-----------|-----------|-----------|-----------|
| Std Avg. | 5.22 | 6.09 | 6.82 | 7.14 |
| Wtd Avg. | 5.83 | 6.60 | 7.27 | 7.49 |
| # Peers | 15 | 21 | 21 | 20 |
| Intel | **4.86** | **5.63** | **6.04** | **6.23** |
| Ret v Std | -6.9% | -7.5% | -11.4% | -12.7% |
| Ret v Wtd | -16.6% | -14.7% | -16.9% | -16.8% |
| Rank | 73 | 81 | 91 | 95 |

134.    Applying these data to a hypothetical plan participant shows the cumulative impact over a life of retirement savings. Assume a plan participant retiring at age 65 in 2045 who invested $15,000 a year in a 2045 TDF until retirement. Assume also the annualized Intel 2045 TDF, average peer TDF, and weighted average peer TDF from 2011 through 2018 apply going forward to 2045. The following chart shows the total savings at retirement for the three returns. The average and weighted peer returns yield, respectively, $380,645 and $550,727, more than the projected Intel 2045 TDF return, as Figure 1 below reflects.

**Figure 1**



135.    Assuming this same hypothetical plan participant begins drawing $150,000 a year starting in 2046 and that her investment is in a TDF Retirement. Assuming the Intel TDF Retirement

returns shown in Tables 6 and 7 above from 2046 forward, the participant would run out of money at age 86. Assuming the peer average and peer weighted average returns, at age 86, the participant would still have $2.2 million and $3.5 million, respectively. These data underscore the catastrophic effect of poor investment design by the Investment Committee on retirement savings.

136.    The Intel TDFs also fail to measure up on a risk-adjusted basis. Risk-adjusted return is a measure of the return of the investment relative to the risk of the investment. Thus, where two investments have the same return, the investment that took less risk would have a better risk-adjusted return. All things being equal, an investor would prefer to take less risk to generate the same return. A risk-adjusted return comparison presumably should be more favorable to the Intel TDFs than a standard return comparison because the Intel TDFs purportedly take less risk by investing in hedge funds. But the Intel TDFs perform poorly on a risk-adjusted basis as well. As Exhibit A illustrates, in every year from 2012–2017, the Intel TDFs performed poorly compared to Vanguard TDFs and the S&P TDF index for every vintage. The data makes two important points. First, the returns generated by the Intel TDFs are not commensurate with the risk, i.e., the returns should be higher given the level of risk. The Vanguard TDF of the same vintage and the S&P TDF index for the same vintage both deliver more return per unit of risk in every year 2012-2017. Second, the slopes of the Intel TDFs are shallower than the comparables. Specifically, as risk increases, the incremental return of the Intel TDFs is half the incremental return of the comparables. In other words, the more risk the Intel TDFs take, the less value for investors.

137.    The Intel GDFs in the Plans have continued to underperform comparable alternatives. For example, as of December 31, 2016, the two Intel Funds underperformed comparable alternatives by Vanguard and American Funds over available five- and ten-year horizons as illustrated by Table 8:

//

//

//

//

//

**Table 8**

| Ave. Annual Return as of 12/31/2016 | 401K Global Diversified Fund | Global Diversified Fund | Vanguard LifeStrategy Growth Fund (VASGX) | T. Rowe Price Balanced Fund (RPBAX) |
|---|---|---|---|---|
| 5 Year | 6.38% | 6.86% | 9.73% | 8.95% |
| 10 Year | 2.65% | 2.97% | 4.65% | 5.54% |

138.     Similarly, as of December 31, 2017, the two Intel GDPs underperformed comparable alternatives by Vanguard and American Funds over available five- and ten-year horizons as follows:

**Table 9**

| Ave. Annual Return as of 12/31/2016 | 401K Global Diversified Fund | Global Diversified Fund | Vanguard LifeStrategy Growth Fund (VASGX) | T. Rowe Price Balanced Fund (RPBAX) |
|---|---|---|---|---|
| 5 Year | 6.98% | 7.54% | 10.64% | 9.71% |
| 10 Year | 3.07% | 3.43% | 5.75% | 6.56% |

139.     Comparing the Intel GDFs to the broader market for GDFs over the past ten years also shows lagging returns as Table 10 demonstrates.

**Table 10**

| 10-Yr | US Fund World Large Stock | US Fund Allocation--85%+ Equity | US Fund Allocation--70% to 85% Equity | US Fund Allocation--50% to 70% Equity |
|---|---|---|---|---|
| Std Avg | 9.68 | 10.45 | 9.25 | 8.61 |
| Wtd Avg | 9.81 | 10.09 | 9.57 | 9.66 |
| # Peers | 118 | 37 | 61 | 138 |
| **Intel GDF** | **7.4** | **7.4** | **7.4** | **7.4** |
| Rank | 86 | 98 | 95 | 84 |

140.     Low-cost passively- and actively-managed investments with comparable investment styles and similar or superior performance, including comparable target-date and non-target balanced funds, have been and are available in the market as investment options. Instead of using the Plans' bargaining power to negotiate low-cost investment options and benefit participants and beneficiaries, the Investment Committee Defendants selected and retained as the Plans' investment options high-cost Intel target-date and non-target date balanced funds that underperformed available comparable

alternatives. Despite the Intel Funds' excessive fees and underperformance, the Investment Committee Defendants designated the Intel TDFs as the default investment options of the 401(k) Savings Plan, and the Intel GDF as the default investment option of the Retirement Contribution Plan.

141.    The conduct of the Investment Committee Defendants demonstrates that they failed to perform a proper investigation of the availability of lower-cost target date funds and balanced funds and/or to select and monitor the Plans' default investment options solely based on the merits of the investment options and in the interest of participants. The Investment Committee Defendants adopted extraordinary asset allocation models at extremely high cost in comparison to the models and costs of professional asset managers. Had the Investment Committee conducted a proper investigation and managed the assets of the Plans, including by selecting and evaluating on an ongoing basis the Intel Funds, in a cost-conscious and prudent manner, the Investment Committee Defendants would have removed the costly and underperforming Intel Funds in favor of investment alternatives with similar or superior performance but with lower expense.

142.    By selecting and maintaining the Intel Target Date Funds and the 401K Global Diversified Fund in the 401(k) Savings Plan and designating the Intel Target Date Funds as the default investment options of the 401(k) Savings Plan, the Investment Committee Defendants caused the Plan and many of its participants to pay millions of dollars in excess fees per year.

143.    By selecting and maintaining the Intel Target Date Funds and the Global Diversified Fund in the Retirement Contribution Plan and designating the Global Diversified Fund as the default investment option of the Retirement Contribution Plan, the Investment Committee Defendants caused the Plan and many of its participants to pay millions of dollars in excess fees per year.

C.    **The Investment Committee Defendants Failed to Monitor and Replace the Asset Allocation Models and Allocation Percentages for the Intel Funds**

    1.    **Excessive Allocations to the Non-Traditional Investment Accounts**

144.    The Investment Committee Defendants managed the Intel Funds and dictated the asset allocation model for them with respect to the asset classes and allocation percentages. These Defendants determined the asset classes and the allocation percentages for the Intel Funds and

directed the allocation of the Intel Funds' assets to the Master Trust Investment Accounts. They selected the Non-Traditional Investments Accounts' underlying investments and the investment managers for them. The Investment Committee Defendants were responsible for monitoring and evaluating on a regular basis the asset allocation models and allocation percentages adopted and implemented for the Intel Funds as well as the Master Trust Investment Accounts' underlying investments and their investment managers.

145.    As of December 31, 2015, and December 31, 2016, the 401(k) Plan had approximately $1.1 billion and $1.2 billion in assets allocated to the Non-Traditional Investments Accounts, respectively. As of December 31, 2015, and December 31, 2016, the Retirement Contribution Plan had approximately $3.0 billion and $2.7 billion in assets allocated to the Non-Traditional Investments Accounts, respectively.

146.    Pursuant to the asset allocations adopted and implemented for them, the Intel Funds have allocated and continue to allocate excessive portions of the Intel Funds' assets to the Non-Traditional Investments Accounts, which invest in speculative asset classes such as hedge funds, private equity funds, emerging market funds, and commodities. For example, as of September 2015, each of the Intel Target Date Funds in the 401(k) Savings Plan was managed in such a way that between 27.46 and 37.20 percent of each fund's assets were allocated to the Non-Traditional Investments Accounts that invested in hedge funds, commodities, and emerging market funds, as shown by the following Table 11:

**Table 11**

| Intel Target Date Fund | Defensive Oriented Hedge Fund Account | Growth Oriented Hedge Fund Account | Diversified Real Assets & Emerging Market Fund Account | Total Allocation to Non-Traditional Investments Accounts |
|---|---|---|---|---|
| Income Fund | 13.48% | 12.90% | 3.25% | 29.63% |
| 2005 | 12.34% | 11.93% | 3.19% | 27.46% |
| 2010 | 13.99% | 14.53% | 5.63% | 34.15% |
| 2015 | 13.41% | 16.07% | 7.72% | 37.20% |

| Intel Target Date Fund | Defensive Oriented Hedge Fund Account | Growth Oriented Hedge Fund Account | Diversified Real Assets & Emerging Market Fund Account | Total Allocation to Non-Traditional Investments Accounts |
|---|---|---|---|---|
| 2020 | 11.80% | 15.07% | 7.36% | 34.23% |
| 2025 | 9.72% | 17.33% | 8.70% | 35.75% |
| 2030 | 7.96% | 14.19% | 11.09% | 33.24% |
| 2035 | 7.47% | 13.31% | 12.15% | 32.93% |
| 2040 | 2.95% | 16.92% | 12.17% | 32.04% |
| 2045 | 3.11% | 17.82% | 13.14% | 34.07% |
| 2050 | 3.01% | 16.35% | 13.44% | 32.80% |
| 2055 | 3.11% | 17.64% | 13.57% | 34.32% |

147.    The Target Date Funds in the Retirement Contribution were managed in such a way that the allocations of those funds' assets to the Non-Traditional Investments Accounts were similarly excessive as the Target Date Funds in the 401(k) Savings Plan.

148.    As of September 2015, 56.22% of the assets of 401K Global Diversified Fund in the 401(k) Savings Plan were allocated to the Non-Traditional Investments Accounts that invested in as hedge funds, commodities, and emerging markets funds as well as private equity funds (including venture capital funds and private real estate and natural resources funds), as follows: 10.79% to the Defensive Oriented Hedge Fund Account, 19.32% to the Growth Oriented Hedge Fund Account, 2.34% to the Diversified Real Assets Fund Account, 5.26% to the Emerging Markets Fund Account, and 18.51% to the Alternative Investments Fund Account. Similar or identical percentages of the assets of the Global Diversified Fund in the Retirement Contribution Plan were allocated to these Non-Traditional Investments Accounts.

149.    The Intel TDFs have continued to be managed in such a way that excessive amounts of the funds' assets are allocated to the Non-Traditional Investments Accounts. As of March 2017, each of the Intel Target Date Funds in the Plans had between 25.17 and 30.31 percent of the fund's assets allocated to the Non-Traditional Investments Accounts as presented in Table 12:

**Table 12**

| Intel Target Date Fund | Defensive Oriented Hedge Fund Account | Growth Oriented Hedge Fund Account | Diversified Real Assets & Emerging Market Fund Account | Total Allocation to Non-Traditional Investments Accounts |
|---|---|---|---|---|
| Income Fund | 15.74% | 3.98% | 5.45% | 25.17% |
| 2005 | 16.22% | 4.58% | 6.01% | 27.81% |
| 2010 | 15.16% | 5.45% | 6.90% | 27.51% |
| 2015 | 13.20% | 9.18% | 7.10% | 29.48% |
| 2020 | 10.48% | 9.88% | 9.07% | 29.43% |
| 2025 | 7.83% | 11.14% | 11.34% | 30.31% |
| 2030 | 4.75% | 11.29% | 14.05% | 30.09% |
| 2035 | 3.15% | 11.15% | 15.15% | 29.45% |
| 2040 | 2.76% | 10.78% | 15.21% | 28.75% |
| 2045 | 2.80% | 10.98% | 15.03% | 28.81% |
| 2050 | 2.59% | 9.92% | 15.29% | 27.80% |
| 2055 | 2.53% | 10.30% | 15.09% | 27.92% |

150.    The Intel Global Diversified Funds have continued to be managed in such a way that excessive amounts of the funds' assets are allocated to the Non-Traditional Investments Accounts. As of March 2017, the two Intel Funds allocated 57.18% of their respective assets to the Non-Traditional Investments Accounts, as follows: 6.39%% to the Defensive Oriented Hedge Fund Account, 15.08% to the Growth Oriented Hedge Fund Account, 4.03% to the Diversified Real Assets Fund Account, 4.15% to the Emerging Markets Fund Account, and 27.53% to the Alternative Investments Fund Account.

151.    The poor performance of the Intel TDFs and GDFs can be attributed in large measure to the substantial allocations to hedge funds. The weighted average fee for the hedge fund portfolio in which the Intel TDFs and GDFs invest was 1.52% with an additional weighted average

performance fee of 21.2%. For example, if the hedge fund portfolio earns a gross return of 6%, the hedge fund managers earn a management fee of 1.52%. Of the remaining 6.00% − 1.52% = 4.48%, the managers earn a performance fee of 0.95% (adjusted for any hurdle requirements), leaving a net return to investors of 3.53%. In effect, investors pay a fee of 2.46%. In other words, the hedge fund managers collect 41% of the returns in this hypothetical.

152.    The allocation of Intel TDF and GDF assets to the hedge fund portfolio harmed participant. In pursuing a purported risk-mitigation strategy, the Intel Funds gave up the long-term benefit of investing in equity, which delivers superior returns. Even on a risk-adjusted basis, participants fared worse than a simple allocation of stocks and bonds.

153.    The analysis that follows in Figure 2 compares the hedge fund portfolio to investments in the equity benchmark "MSCI World Stock" and the fixed income benchmark "BarCap Aggregate Bond Index." These are the two comparators used on the hedge fund portfolio fact sheet. The graph below illustrates the risk return trade-off in terms of allocations to these two benchmarks. The left most values represent lower equity weights, which produce lower returns along with lower risk. The right most values represent the alternative higher equity weight portfolios.

**Figure 2**



154.    The isolated green point represents the behavior of the hedge fund portfolio, which is below the portfolios that consist solely of the benchmarks. Participants would have fared better by

---

investing their hedge fund allocation to a portfolio that was simply 26% in equity and 74% in bonds, in that they would have experienced comparable market risk, with greater return.

155.     The alternate point identified in red to the right of the graph illustrates the typical 401(k) plan allocation which is 66% equity and 34% fixed income.[8] Participants typically choose traditional portfolios that have higher equity weights with commensurately greater return. Investors in the hedge fund portfolio earned 4.2%, while those in traditional capital market investments earned nearly a full percentage point higher.

156.     A $10,000 investment in the hedge fund portfolio grew to $15,823, a traditional investment identified above grew to $17,080. As Figure 3 below illustrates, the hedge fund portfolio suffered similar losses to a balanced portfolio during the 2007-2008 financial crisis, but failed to appreciate when the rest of the markets did.

**Figure 3**



---

[8] EBRI Survey,"401(k) Plan Asset Allocation, Account Balances, and Loan Activity in 2014", April 2016, No.423

2. **Deviation from Professional Standards for Target Date Funds**

157.    By overweighting allocations of the Plans' assets to the speculative asset classes represented by the Non-Traditional Investments Accounts, the allocation model for the Intel TDFs deviates and has deviated drastically from prevailing professional asset manager standards for target date funds available in the market.

158.    Generally, a target date fund is a hybrid investment that pursues a long-term investment strategy by holding a mix of asset classes such as stocks, bonds, and cash equivalents that is readjusted to become more conservative over the time horizon of the fund, as the fund approaches the date indicated in its name. Under prevailing standards, a target date fund follows a "glide path" or asset allocation path, according to which the assets of the fund is reallocated across asset classes to become more conservative as the target date approaches. The glide path is designed to account for factors affecting the participant's risk profile over time, which include a shorter time horizon before retirement age, fewer chances to make contributions to savings, and greater sensitivity to capital swings.

159.    Peer target date funds do not allocate to speculative asset classes in any percentage close to the allocations of the Intel TDFs. For example, as of September 2015, the Intel Target Date 2035 Fund allocated 20.78% of its assets to the Defensive Oriented Hedge Fund and Growth Oriented Hedge Fund Accounts alone and over 32% in total to the Non-Traditional Investments Accounts. As of June 2017, the Intel Target Date 2035 Fund allocated 14.17% of its assets to the Defensive Oriented Hedge Fund and Growth Oriented Hedge Fund Accounts and over 29% in total to the Non-Traditional Investments Accounts. In contrast, peer target date funds with a target date of 2035 do not allocate assets anywhere close to 29% to these speculative asset classes. For instance, as of June 2017, the American Funds 2035 Target Date Retirement Fund allocated 79.2% to U.S. and non-U.S. equities, 13.2% to bonds, and 7.6% to cash and equivalents, and no assets to hedge funds or commodities. Also, as of August 2017, the Vanguard Target Retirement 2035 Fund allocated about 79% to U.S. and non-U.S. equities and about 21% to bonds, and no assets to hedge funds or commodities. As of September 2017, the Fidelity Freedom 2035 Fund allocated about 11% of its

assets to commodities and emerging market funds and the rest of its assets to U.S. and non-U.S. equities and bonds, and allocated no assets to hedge funds.

160.    Few professional TDF providers allocate assets to alternative investments such as hedge funds. Of 51 TDF providers analyzed by Morningstar, only 8 allocated any assets to alternative investments. TDF Landscape at 37. Of those eight, only one exceeded an allocation percentage of 7.3%, the Putnam RetirementReady product. *Id.*

161.    No defined contribution plan with assets exceeding $10 billion invested in the Putnam RetirementReady product.

162.    Upon information and belief, none of the 46 other defined contribution plans with assets exceeding $10 billion invested in the Putnam RetirementReady product or any other target date product allocating over 7.3% of its assets to alternative investments. The two that Plaintiff's Counsel's investigation discovered as including *any* hedge fund allocation at all included Verizon (less than 2% hedge funds) and HCA (5% allocated to an "Alternative Pool" which may include hedge funds, among other investments).

163.    The Intel Global Diversified Funds' substantial allocation (consistently of more than 50% of the funds' assets) to the Non-Traditional Investments Accounts differs markedly from the typical allocation of peer balanced funds. For example, neither the Vanguard LifeStrategy Growth Fund nor the T. Rowe Price Balanced Fund allocates assets more than 2%, if any, to commodities, and allocates no assets to hedge funds or private equity funds.

164.    Significant allocations of the Plans' assets to hedge funds and private equity funds are inappropriate for the Intel Funds. Hedge funds pose investment risks not found with traditional investments managed by registered investment companies. For example, registered investment companies are subject to certain strict leverage limits to which hedge funds are not. Whereas hedge funds can use leverage or borrowed money, and often do, to amplify returns, leverage can also magnify losses. Hedge funds lack liquidity as they often require an initial "lock-up" period where investors must commit their money for one-to-two years or more, and capital redemption after the lock-up periods often is limited to one per quarter and requires at least thirty days' notice, as in the case of the hedge funds in the Non-Traditional Investments Accounts. Hedge funds also lack the

transparency of publicly traded funds such as mutual funds. In particular, hedge funds lack transparency by design because individual hedge fund managers claim a proprietary interest in their investment strategies. Investing in hedge funds carries valuation risk because the underlying holdings and strategies of many hedge funds are often not well known, even to institutional investors like the Plans, making the current value of a retirement plan's investment uncertain. Thus, it is difficult for retirement plan fiduciaries to evaluate hedge funds, including their performance. Private equity funds pose the same investment and valuation risks and lack transparency and liquidity as hedge funds do. *See* Barbara Borbjerg, *Plans Face Challenges When Investing in Hedge Funds and Private Equity* (August 31, 2011) ("the GAO Report"), at 6-8, *available a*t http://www.gao.gov/assets/90/82457.pdf. Significant allocations to hedge funds do not increase diversification of asset classes. Hedge funds themselves are not an asset class so much as esoteric investment strategies often holding widely traded securities.

165.    Significant allocations to emerging markets funds and private real estate and natural resources funds also do not provide risk diversification because investments in equities and, in the case of emerging markets, investments in non-U.S. equities, already provide exposure to the sectors represented by these funds. Instead, they expose investors to bets on speculative areas of the markets. Emerging markets are a particularly high-risk area as investments in emerging markets are susceptible to foreign exchange risk, lower liquidity, and political risk, all on top of the overall increase in volatility that comes with investing in developing countries. Investments in commodities are often subject to higher-than-average volatility and the risk of investing through futures contracts, which offer a high degree of leverage.

166.    In 2018, a down year in the equity markets where one might expect hedge funds to provide downside protection, hedge funds largely failed to do so. According to a report from Bloomberg, in 2018 the hedge fund industry had its "biggest annual loss since 2011, declining 4.1% on a fund-weighted basis." Hedge Fund Performance in 2018: The Good, Bad, and the Ugly (Jan. 9, 2019), *available at* https://www.bloomberg.com/news/articles/2019-01-09/hedge-fund-performance-in-2018-the-good-the-bad-and-the-ugly. Similarly, MarketWatch reported that hedge funds outperformed the S&P 500 by a "whisker" in 2018. Hedge funds lose money in 2018 but outperform

S&P 500 by a whisker. In other words, in allocating huge percentages of Intel TDF assets to hedge funds, the Plan fiduciaries effectively exchanged years of robust equity returns for one year of a scintilla of outperformance. The result is that the Plan and its participants lost hundreds of millions.

**3.     The Intel Funds Imprudently Invested in Hedge Funds**

167.     Target date funds are based on two important investment theories: Modern Portfolio Theory ("MPT") and the importance of asset allocation to generating retirement savings.

168.     MPT posits that the power of combining securities and asset classes that have low correlations to each other can reduce risk, as measured by the volatility of a portfolio.

169.     Brinson, Beebower and Hood studied the impacts of asset allocation on 91 pension funds over a 10-year period and found that 94% of differences in performance can be explained purely by the asset allocation and only 6% is explained by market timing and security selection.[9] This underscores that trying to achieve excess returns by timing the markets is a generally superfluous strategy when considering a large pool of assets over a long investment horizon covering many market cycles. Market timing and security selection tied to near-term cycles tend to wash out over time.

170.     Many hedge funds enable the manager to invest in near-term opportunities without adhering to a stated fund objective. By contrast, mutual funds regulated by the 1940 Act are obligated to state and adhere to their investment objectives. Mutual funds also have stringent fee disclosure requirements.

171.     Most TDFs employ a sliding scale of equity, fixed income and cash allocations to provide substantial correlation benefits to market swings. Most off-the-shelf TDFs avoid any meaningful use of leverage (as leverage is strictly constrained in 1940 Act funds) and generally employ only minor use of derivatives, usually for proxy or liquidity needs (and typically in the fixed income allocation where bond liquidity is increasingly challenged). Thus, the portfolio manager of a 1940 Act-regulated Target Date Fund has strong guidance as to the exposures he or she will receive when incorporating standard, prospectus-driven mutual funds in a fund-of-fund lineup. Additionally,

---

[9] Gary P. Brinson et al., *Determinants of Portfolio Performance*, 42 Financial Analysts Journal 133, 133-138 (1995).

for index-based TDFs, computer programs dictate strict adherence to the given index and do not afford manager discretion to deviate from guidelines and strategies.

172.     Hedge funds involved in event driven and directional bets are generally using either focused security selection or market timing strategies, while distressed (and/or stressed) and value-driven funds are generally security selection funds. Brinson, Beebower and Hood explain that these strategies do not make sense for a retirement investment.

173.     Hedge funds have been traditionally limited to "accredited investors" who have over $200,000 in annual income and/or over $1,000,000 in net worth. The reason for limiting investment to those accredited investors is to restrict these investments to those who can afford to lose their invested principal.

174.     The hedge funds to which the Intel TDPs have allocated their assets of the Plan purport to have included as many as 21 different hedge funds between at least 2014 and 2018. For example, in 2014, of those hedge funds at least 6 were primarily deemed Multi-Strategy, 5 were deemed Directional, 5 involved Distressed (or Stressed), and 8 were Event Driven. Several listed multiple strategies. The makeup of the hedge funds for 2018 was largely the same. Some of these hedge funds represent the most potentially volatile of hedge fund strategies. Event driven strategies generally place bets on the chance that a particular market event – such as a merger or a key interest rate change – takes place. If the event does not occur, or if the ramifications are not as impactful, then the leveraging and risk concentration employed will be for naught, and potentially large losses can take place as a result. Distressed strategies tend to seek opportunities with either equity or debt in companies or other entities that are on the verge of a potentially calamitous event – such as a bankruptcy – thus driving the price of their securities down. The hedge fund managers bet the event will not happen and buy in. If the event does happen, the losses are usually deep and permanent. Conversely, if they "short" the event (i.e. a bet on the price of the securities going down) and it does not happen, losses can exceed even the invested principal.

175.     A common feature of these strategies is that the managers often employ significant leverage through various means such as borrowing, shorting or the use of derivatives. For hedge funds that commit significant amounts of capital to sustain the collateral requirement through the

cycle of the anticipated event, the funds are extremely illiquid. As a result, many hedge funds employ strict constraints around access to invested capital by their investors by requiring months of notice and reserving the right to deny such requests for redemptions at their discretion.

176.    The impact or potential impact of the illiquidity of hedge funds on the scale invested in by the Plans is that if the hedge funds refuse to honor redemption requests, the Investment Committee will be forced to sell off other, more marketable investments (*i.e.*, publicly traded securities), thereby increasing the Plans' concentration in hedge funds. There is a significant risk that the lock-up of hedge fund investments will cause selling in traditional securities and further harm the invested principal of the plan participants.

177.    Hedge fund managers often move illiquid or impaired assets out of the main fund into a separate holding vehicle known as a "side pocket." Creating a side pocket is solely within the discretion of the hedge fund manager. As the Wall Street Journal reported as early as 2006, regulators and investors were becoming concerned about the abusive use of side pockets to mask underperformance and inflate manager performance fees.[10] Because side pockets are often used for illiquid investments, hedge fund managers impose onerous withdrawal constraints. In the wake of the 2008 financial crisis, the SEC instituted several enforcement proceedings against hedge fund managers for improper use of side pockets.[11]

178.    As the vast majority of former employees will roll their 401(k) investments into an IRA (upon retirement or changing employers) or into a new employer's plan, portability and liquidity are important considerations in constructing and selecting a TDF. Because hedge funds are not liquid and not portable, the substantial allocation to hedge fund investments by the Investment Committee means that participants attempting to liquidate Intel TDP holdings were (and are) at significant risk of being forced to lock-in substantial realized losses during a down or volatile market upon the need to liquidate their investments in the Plans.

---

[10]Gregory Zuckerman & Scott Patterson, *"Side Pocket" Accounts of Hedge Funds Studied*, The Wall Street Journal (Aug. 4, 2006) http://www.wsj.com/articles/SB115465505123626547.
[11]*SEC Charges Hedge Fund Managers With Fraudulently Overvaluing Side-Pocketed Assets, Defalcation, and Material Misrepresentation,* U.S. Securities and Exchange Commission (October 19, 2010), http://www.sec.gov/litigation/litreleases/2010/lr21699.htm.

---

179.    Further, as of 2010, the year before the Investment Committee decided to move the Intel TDFs and GDF heavily into hedge funds, it was apparent that hedge fund performance did not warrant investment as an alternative to traditional retirement plan allocations. Consider the historical behavior of a standard hedge fund index relative to traditional investments as of 2010. The results were very similar to what transpired in 2011 and after, as illustrated in Figure 4 below. The annualized return of the HFRI FOF Index was more than 1% below a comparable risk portfolio of stocks and bonds. Investors in a simple portfolio of stocks and bonds earned more than FOF investors, while paying lower fees, with no need for complicated due diligence, and without the need to sacrifice liquidity. The traditional portfolio, allocated 66% to equity, still earned slightly more than the hedge fund index, through a volatile market.

**Figure 4**



180.    Figure 5 below illustrates that many of the traditional benchmarks outperformed the hedge fund index even though equity markets were very volatile and declined substantially during parts of this period. The declines of 2002 and 2008 did not compromise the long-term effects of the benefits of a traditional portfolio approach. Even over this period, traditional balanced portfolios provided superior returns.

//

//

**Figure 5**



181.    The data presented above in Figures 4 and 5 was known to the investment community in 2011 when the Investment Committee decided to bet on hedge funds. This data was not known to Plaintiff or other members of the Class. The risks of investing in hedge funds was known to the Investment Committee in 2011 and should have been known to the Investment Committee; however, such information was not known by Plaintiff or by the participants in the Plans.

**4.    Significant Investment in Hedge Funds and Private Equity Are Generally Not Suitable For Balanced Funds**

182.    Like TDFs, balanced funds in retirement plans need certain levels of liquidity, and volatility.

183.    For these reasons, significant investments in hedge funds and private equity generally are not suitable for balanced funds. Few, if any, balanced fund portfolio managers invest in hedge funds and private equity. A prudent investigation by the Investment Committee would have revealed the lack of suitability of significant investments in a balanced fund.

//

//

### 5. Risks and Costs of Hedge Funds and Private Equity

184. Hedge funds and private equity funds are generally structured as investment partnerships. The investors are limited partners and the managers are general partners. Managers are typically paid under a "2 and 20" formula, meaning that the manager gets 2% of the assets under management and 20% of the profits generated by the fund's investments.

a. *Hedge Funds.*

185. A "hedge fund" pools investor assets to pursue a variety of active management strategies.

186. Hedge funds invest in many different types of assets. Hedge funds "do not constitute an asset class but rather provide access to particular trading strategies that may be employed by specific fund managers."[12] Hedge funds usually are classified according to their investment strategy.

(1) Valuation Risk.

187. Because the investment holdings and investment strategies of many hedge funds are often not well known, even to institutional investors like the Plans, it is difficult for the fund assets to be marked to market. The Government Accountability Office noted in 2011 that "[b]ecause many hedge funds may own [securities traded infrequently or in low volume] and derivatives whose valuation can be complex and subjective, a retirement plan official may not be able to obtain timely information on the value of assets owned by a hedge fund. Further, hedge fund managers may decline to disclose information on asset holdings and the net value of individual assets largely because the release of such information could compromise their trading strategy."[13]

188. A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiff or upon information and belief by the most participants in these Plans.

//

---

[12]Theda R. Haber, *et al.*, Report to the Secretary of Labor: *Hedge Funds and Private Equity Investments*, at 6 (November 2011), http://www.dol.gov/ebsa/pdf/2011ACReport3.pdf.
[13]Barbara Borbjerg, *Plans Face Challenges When Investing in Hedge Funds and Private Equity*, at 6 (August 31, 2011), http://www.gao.gov/assets/90/82457.pdf.

(2)     Investment Risk.

189.    Hedge funds pose risks not found with traditional investments managed by registered investment companies. For example, registered investment companies are subject to strict leverage limits; whereas, hedge funds "can make relatively unrestricted use of leverage."[14] Leverage — essentially borrowed money — "can magnify profits, but can also magnify losses to the fund if the market goes against the fund's expectations."[15]

190.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiff or upon information and belief by the most participants in these Plans.

(3)     Lack of Liquidity.

191.    Hedge funds tend to be illiquid investments, where investor redemptions are severely limited by the hedge fund manager. For example, hedge funds often require an initial "lock-up" period where investors must commit their money for one or two years, or more.

192.    In some cases, hedge fund managers may only allow one capital redemption per quarter. Once invested in a hedge fund, it is difficult for an investor to sell its interest in the fund and move to another option. Unlike investments in other vehicles, like mutual funds, a hedge fund investment cannot simply be bought or sold any day of the week.

193.    The hedge funds to which the Plans allocate their assets typically require at least thirty days' notice to receive or redeem capital.[16]

194.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiff or upon information and belief by the most participants in these Plans.

---

[14] *Id*. at 7.
[15] *Id*.
[16] Interview Moderated by Stacy L. Schaus, PIMCO Executive Vice President and Defined Contribution Practice Leader with Stuart Odell, Assistant Treasurer of Retirement Investments, Intel Corp., (March/April 2014), http://media.pimco.com/Documents/PIMCO_DC_Dialogue_Odell_Schaus_Mar_Apr_2014.pdf.

(4)     High Fees.

195.    The hedge funds to which the Plans allocate their assets (each of the Hedge Fund, the Defensive Oriented Hedge Fund, and the Growth Oriented Hedge Fund Investment Accounts managed by Intel is a fund-of-hedge funds) charge incentive fees, and inclusion of hedge fund investments in the Plans' portfolios has increased fees.[17]

196.    Even without an incentive fee, a two percent annual flat fee on assets under management is high and not justified in the defined contribution plan context. Such a fee is up to ten times higher than the average standard wholesale level fees for pension plan investments – for example, 2% versus 0.20%.[18] Indeed, one hedge fund industry expert has calculated that hedge fund managers collected 98% of the profits generated by hedge funds during the years 1998-2010.[19]

197.    The high fees of hedge funds can have a significant negative impact on net investment returns. For example, under the typical two and twenty fee structure, a 12% return would be reduced to only 8% after deduction of fees.[20]

198.    The Investment Committee purportedly chose to invest in hedge funds in an attempt to achieve at least three goals: to increase diversification of plan assets; to decrease the volatility of the plan's investment performance; and to enhance the plan's performance overall.[21]

199.    For example, many hedge funds do not provide substantial risk reduction or risk diversification for pension plan assets because they are correlated to the equity market. According to data compiled by the hedge fund house AQR, the HFRI Fund Weighted Composite Index – a leading hedge fund industry index – was 0.93 correlated with equity markets, or nearly 100% correlated. Often, hedge funds provide insufficient plan visibility into the strategies of their investments to enable an investor to properly understand the risk profile of the investment.

---

[17]*Id.*

[18]Bill Parish, *Intel Q4 2013 Earnings- Time to Fix Pension Plan,* Bill Parish- Parish & Company Registered Investment Advisor Blog (January 16, 2014) ,http://blog.billparish.com/2014/01/16/intel-q4-2013-earnings-time-to-fix-pension-plan/.

[19]Simon Lack, *How The Hedge Fund Industry Has Kept 98% of The Profits In Fees*, SL Advisors: The Hedge Fund Mirage Blog (January 23, 2012), http://www.sl-advisors.com/how-the-hedge-fund-industry-has-kept-98-of-the-profits-in-fees/.

[20]Borbjerg, *supra* note 13, at 8, n. 11.

[21]*401K Global Diversified Fund Fact Sheet*, Mar. 31, 2014 at 3.

---

200.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiff or upon information and belief by the most participants in these Plans.

(5)    Lack of Transparency.

201.    Hedge funds lack the transparency of publicly traded funds such as mutual funds. In particular, hedge funds lack transparency by design, because individual hedge fund managers claim a proprietary interest in their investment strategies.

202.    The desire of the hedge fund manager to keep an investment methodology private conflicts with a plan fiduciary's duty to monitor the fund's methodology. As Randall Dodd, Director of the Financial Policy Forum, testified before the U.S. Department of Labor, Employee Benefits Security Administration: Advisory Council on Employee Welfare and Pension Benefit Plans on September 20, 2006 about hedge funds: "[t]he investment strategies of hedge funds are often not well known, or are so lacking in transparency – even to their own investors […]– that the investors cannot adequately assess the hedge fund investment's contribution to their overall portfolio risk."

203.    It is difficult for retirement plan fiduciaries to evaluate the performance of hedge funds because of the variety of hedge fund strategies; the substantial rate of turnover of funds opening and closing; the selection bias created when new funds choose not to report returns until after they have a run of good years; and the survivorship bias created when closed funds simply disappear from hedge fund indices.[22]

204.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiff or upon information and belief by the most participants in these Plans.

(6)    Operational Risks.

205.    Retirement plans investing in hedge funds are also exposed to greater operational risks than presented by traditional investments. As the GAO Report explained, operational risk is the "risk of investment loss because of inadequate or failed internal processes, people, and systems, or

---

[22]Haber, *supra* note 12, at 13.

1  problems with external service providers." "Operational problems can arise from a number of

2  sources, including inexperienced operations personnel; inadequate internal controls; lack of

3  compliance standards and enforcement; errors in analyzing, trading or recording positions; or

4  outright fraud."[23]

5       206.    Hedge funds are not registered with the SEC, and are subject to few regulatory

6  controls. Unlike mutual funds and other registered investment companies in the United States, hedge

7  funds may avoid the registration requirement imposed by the Investment Company Act.[24] As Mr.

8  Dodd explained, the absence of such regulatory controls, coupled with the fact that many hedge

9  funds make it difficult for their assets to be marked to market, make hedge fund investments

10  "especially prone to financial fraud."

11       207.    Hedge fund strategies are often very complex. A prudent fiduciary must be capable of

12  understanding the strategy in order to evaluate whether it is appropriate for investment of retirement

13  plan assets. "[P]articular care should be exercised in due diligence of hedge funds, because of the

14  complex investment strategies they employ; the fact that hedge fund organizations are frequently

15  young and small; their use of leverage and the associated risks; the possibilities of concentrated

16  exposure to market and counterparty risks, and the generally more lightly regulated nature of these

17  organizations."[25] "The process of selecting and monitoring hedge fund investments requires

18  additional resources and continuous support from experienced professionals, which may be

19  substantially more expensive than those required to select and monitor traditional investments.

20  Fiduciaries should understand the effort and costs that will be required, and should commit these

21  resources prior to investing in hedge funds."[26]

22

23

24

    ————————————————

25  [23]Borbjerg, *supra* note 13, at 8.

    [24]Haber, *supra* note 12.

26  [25]Gary Bruebaker, *et al.*, *Principles and Best Practice for Hedge Fund Investors*, U.S. Commodity

27  Futures Trading Commission at 14 (Jan. 15, 2009),

    http://www.cftc.gov/idc/groups/public/@swaps/documents/file/principlespractices.pdf.

28  [26]*Id.* at 7.

208.    Even if the plan fiduciary is able to gain visibility of a hedge fund's investment strategy, the detailed holdings of a hedge fund portfolio are not disclosed to individual investors like Plaintiff and the participants invested in the Intel TDPs and GDFs.

209.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiff or upon information and belief by the most participants in these Plans.

b.    *Private Equity.*

210.    The term "private equity" refers to a form of alternative investment which uses pooled funds to invest in privately held companies. Investors are generally described as "limited partners."

211.    Private equity advisors have been criticized for their valuation practices, such as using a valuation methodology that is different from the one that has been disclosed to investors or changing the valuation methodology from period to period without additional disclosure. Such valuation practices make it exceedingly difficult, if not impossible, to monitor manager performance and evaluate fees accurately where fees are tied to assets under management and therefore increase as valuations increase.

212.    Private equity investments pose several challenges for retirement plans like the Intel Plans. The four largest TDF providers in the market, BlackRock, Fidelity, T. Rowe Price, and Vanguard, do not include private equity in their TDF funds.[27]

213.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiff or upon information and belief by the most participants in these Plans.

(1)    High Fees, Hidden Fees, and Inflated Fees.

214.    Contracts with private equity managers generally address two forms of manager compensation: a flat fee for all assets under management (generally about 2%), and a "carried

---

[27]Margaret Collins& Devin Banerjee, *Would You Like Some Private Equity in Your 401(k)?*, Bloomberg Businessweek, (Apr. 4, 2013). http://www.bloomberg.com/bw/articles/2013-04-04/would-you-like-some-private-equity-in-your-401-k.

---

interest" fee, which is a percentage of any profits after a "hurdle" has been met. A typical fee structure in the private equity industry is "two and twenty," where the fee for assets under management is 2% and the incentive fee is 20% of profits above the hurdle.

215.     The private equity funds in the Alternative Investments Account charge incentive fees. An examination of private equity firms by the SEC has found that many private equity managers charge hidden and inflated fees to investors in their funds. According to Andrew Bowden, Director of the SEC's Office of Compliance Inspections and Examinations ("OCIE"), the SEC identified "violations of law or material weaknesses in controls over 50% of the time" at private equity firms. This, according to Mr. Bowden, is "a remarkable statistic."[28] The SEC's examination found that the most egregious violations were in the areas of fees, where the SEC found inadequate disclosures to investors. Examples of hidden or undisclosed fees include:

(a)     Accelerated Monitoring Fees. Many private equity managers charge monitoring fees to the portfolio companies in the fund. These fees are charged at the portfolio company level, not the fund level, and, thus, are generally invisible to investors. Moreover, private equity managers often force monitoring agreements of ten years or more on the portfolio companies they control. When the portfolio company is sold before the monitoring agreement expires, the private equity manager accelerates the fees for the remaining years of the contract, even though the manager is no longer monitoring the portfolio company. Disclosure of this practice is virtually nonexistent.

(b)     Operating Partners. Private equity managers often foist "operating partners" or consultants in which they have an interest or affiliation on portfolio companies without the knowledge of investors. The fees collected by the private equity managers via these arrangements are not disclosed to investors. As Mr. Bowden commented: "Many of these Operating Partners, however, are paid directly by portfolio companies or the funds without sufficient disclosure to investors. This effectively creates an

---

[28]Andrew J. Bowden, Director of the Office of Compliance Inspections and Examinations, Spreading Sunshine in Private Equity, Address Before Private Fund Compliance Forum (May 16, 2014). http://www.sec.gov/news/speech/2014--spch05062014ab.html.

additional "back door" fee that many investors do not expect, especially since

Operating Partners often look and act just like other adviser employees. They usually

work exclusively for the manager; they have offices at the manager's offices; they

invest in the manager's funds on the same terms as other employees; they have the

title "partner"; and they appear both on the manager's website and marketing

materials as full members of the team. Unlike the other employees of the adviser,

however, often they are not paid by the adviser but instead are expensed to either the

fund or to the portfolio companies that they advise." [29] Mr. Bowden continues: There

are at least two problems with this. First, since these professionals are presented as

full members of the adviser's team, investors often do not realize that they are paying

for them a la carte, in addition to the management fee and carried interest. The

adviser is able to generate a significant marketing benefit by presenting high-profile

and capable operators as part of its team, but it is the investors who are unknowingly

footing the bill for these resources. Second, most limited partnership agreements

require that a fee generated by employees or affiliates of the adviser offset the

management fee, in whole or in part. Operating Partners, however, are not usually

treated as employees or affiliates of the manager, and the fees they receive therefore

rarely offset management fees, even though in many cases the Operating Partners

walk, talk, act, and look just like employees or affiliates."[30]

    (c)    Usurping Fee Discounts. Private equity firms leverage investor capital to obtain

discounts on professional and vendor services for themselves, but cause their funds

and portfolio companies to use the same professionals and vendors without any

discounts.

    (d)    Charging undisclosed "administrative" or other fees not contemplated by the limited

partnership agreement.

---

[29] *Id.*
[30] *Id.*

(e)     Exceeding the limits set in the limited partnership agreement around transaction fees or charging transaction fees in cases not contemplated by the limited partnership agreement, such as recapitalizations.

(f)     Hiring related-party service providers, who deliver services of questionable value.[31]

216.    The SEC has also found problems in how private equity managers report investment returns. Private equity managers generally report investment performance in the form of a "net internal rate of return" ("IRR"), which is supposed to reflect actual investor profits (or losses). But many managers invest their own money in their funds and that money does not pay fees at the fund level, i.e., the 2% asset fee and the 20% carried interest. Given that fees are a significant factor in net performance, including the manager's fee-free assets in the computation of IRR distorts investor experience because investors actually receive a lower return. Among the private equity firms that include manager assets in calculating IRR is Apollo Global Management LLC.

217.    The high fees of private equity funds can have a significant negative impact on net investment returns. For example, under the typical two and twenty fee structure, a 12% return would be reduced to only 8% after deduction of fees.[32]

218.    A prudent investigation by the Investment Committee would have revealed such information; however, such information was not known by Plaintiff or upon information and belief by the most participants in these Plans.

(2)     Valuation and Reporting.

219.    The SEC has found deep problems in the way private equity conducts valuations of Portfolio Companies. Common valuation problems identified by the SEC include: [33]

(a)     Advisers using a valuation methodology that is different from the one that has been disclosed to investors.

(b)     Cherry-picking comparables or adding back inappropriate items to EBITDA — especially costs that are recurring and persist even after a strategic sale — if there are

---

[31]*Id.*
[32] GAO 11-901SP at 8, n.11.
[33]*Id.*

1   not rational reasons for the changes, and/or if there are not sufficient disclosures to

2   alert investors.

3   (c)   Changing the valuation methodology from period to period without additional

4   disclosure — even if such actions fit into a broadly defined valuation policy — unless

5   there's a logical purpose for the change. For instance, the SEC has observed advisers

6   changing from using trailing comparables to using forward comparables, which

7   resulted in higher interim values for certain struggling investments. While making

8   such changes is not wrong in and of itself, the change in valuation methodology

9   should be consistent with the adviser's valuation policy and should be sufficiently

10   disclosed to investors.

11   220.   These valuation practices make it difficult to monitor manager performance and

12   evaluate fees accurately where fees are tied to assets under management and therefore increase as

13   valuations increase.

14   221.   A prudent investigation by the Investment Committee would have revealed such

15   information; however, such information was not known by Plaintiff or upon information and belief

16   by the most participants in these Plans.

17   **6.   Self-Interest of the Investment Committee Defendants**

18   222.    In selecting and monitoring the asset allocation model and percentages for the Intel

19   Funds and the underlying investments in the Master Trust Investments Accounts, the Investment

20   Committee Defendants included in the Non-Traditional Investments Accounts, especially the

21   Alternative Investments Fund Account, many investments that were provided by investment

22   companies that had invested or would invest in entities that Intel Capital also had invested or would

23   invest in. Many of these investment companies are private equity or venture capital investment

24   firms. Some of the underlying investments in the Non-Traditional Investment Accounts, the

25   companies that offered these underlying investments, and the entities that those companies and Intel

26   Capital invested or would invest in, sometimes in the same funding round and sometimes in different

27   rounds, included the following listed in Table 13:

28

**Table 13**

| Investment Company | Underlying Funds of Non-Traditional Investments Accounts Provided by Investment Company or Its Affiliated Company | Companies that Investment Company and Intel Capital Invested In |
|---|---|---|
| Andreessen Horowitz | Andreessen Horowitz Fund III, L.P.<br><br>Andreessen Horowitz Fund IV, L.P.<br><br>AH Parallel Fund III, L.P.<br><br>AH Parallel Fund IV, L.P. | Airware<br><br>Coho Data<br><br>GoodData<br><br>Maxta<br><br>Prism Skylabs<br><br>BlueStacks<br><br>Ark<br><br>Kno<br><br>CoreOS<br><br>Bromium<br><br>Clinkle |
| Bain Capital Ventures | Bain Capital Asia II, L.P. | Lightbend<br><br>INRIX<br><br>HookLogic<br><br>DocuSign<br><br>DataSynapse |
| Founders Circle Capital | Founders Circle Capital I, L.P.<br><br>Founders Circle Opportunities Fund I, L.P. | DocuSign<br><br>Kabam |
| Kayne Partners | Kayne Anderson Energy Fund VII, L.P.<br><br>Kayne Anderson Energy Fund V, L.P.<br><br>Kayne Anderson Real Estate Partners IV | ColdLight Solutions |
| Top Tier Capital Partners | Top Tier Venture Capital V, L.P.<br><br>Paul Capital Top Tier IV, L.P.<br><br>Paul Capital Top Tier Special Opportunities Fund, L.P. | AlienVault<br><br>VirtusStream |
| Advent International Corporation | Advent International Global Private Equity VII B, L.P. | Demantra |

| Investment Company | Underlying Funds of Non-Traditional Investments Accounts Provided by Investment Company or Its Affiliated Company | Companies that Investment Company and Intel Capital Invested In |
|---|---|---|
| Goldman Sachs Group, Inc. | GS Capital Partner VI Parallel, L.P. | Kaltura |
| | | MongoDB |
| | | Mirantis |
| | | Cloudian |
| | | Guavus |
| | | ScienceLogic |
| | | Clearwire |
| | | Veoh |
| | | Celoxica |
| | | Tejas Networks India |
| | | Spectrawatt |
| | | Virtual Iron Software |
| | | Platform Solutions |
| | | Intellon Corporation |
| | | Cereva Networks |
| | | Silknet |
| Atomico | Atomico Ventures III, L.P. | FreedomPop |
| | | Gengo |
| Axxon Capital | Axxon Brazil Private Equity II C, L.P. | PhotoEx |
| The Carlyle Group | Carlyle Partners V, L.P. | Cidera |
| | | Solsoft |
| | | Skila |
| General Atlantic | General Atlantic Investment 2013 Limited Partnership | Exent |
| Oaktree Capital Partners | Oaktree European Princl Fd III Limited Partnership | Plastic Logic |
| Softbank China Venture Capital | SBCVC Fund III, L.P. | VeriSilicon Holdings |
| | SBCVC Fund IV, L.P. | |
| | SBCVC Fund V, L.P. | |
| SVB Capital | SVB Strategic Investors Fund IV, L.P. | July Systems |
| | SVB Strategic Investors Fund V, L.P. | |

| Investment Company | Underlying Funds of Non-Traditional Investments Accounts Provided by Investment Company or Its Affiliated Company | Companies that Investment Company and Intel Capital Invested In |
|---|---|---|
| | Strategic Investors Fund VI-A, L.P. Strategic Investors Fund VII-A, L.P. | |
| TPG Growth, TPG Biotech, and/or TPG Capital | TPG Growth III (A), L.P. | Swrve CardioDx CareDx |
| BlackRock | BlackRock Dow Jones-UBS Commodity Index Fund | Snapdeal |
| Tybourne Capital Management | Tybourne Equity Offshore Fund | Snapdeal |
| Farallon Capital Management | Farallon Capital Institutional Partners, L.P. | Sohu.com Asit Media Technology |

223.    Intel Capital partners with investment companies to access innovative startup technologies and investment opportunities that Intel Capital and Intel otherwise would not be able to access readily. Intel Capital also seeks out these startups to build a market for and expand consumer use of Intel's processors and other products. While many startups already have an existing relationship with institutional investment companies such as venture capital firms, they do not have such a relationship with the corporate venture division of a large corporation such as Intel. The investment companies that Intel Capital partners with serve as an intermediary between Intel Capital and the startups that Intel Capital wants to assess.

224.    Intel Capital also partners with investment companies to help generate funding for the businesses that Intel Capital invests or will invest in. After the initial round of raising "seed capital," businesses such as technology startups need sequential funding to grow. Intel Capital develops and maintains relationships with investment companies to help secure co-investors in the businesses that Intel Capital invests or will invest in, and to help those businesses achieve sequential funding. As of January 2014, Intel Capital had a global investment syndicate, a ready group of over 30 co-investing

companies, to assist in filling out funding rounds for businesses that Intel Capital invested or would invest in.

225. By including in the Non-Traditional Investment Accounts numerous investments provided by investment companies that Intel Capital partnered with, the Investment Committee Defendants, including Executive Vice President of Intel and President of Intel Capital Arvind Sodhani and Corporate Vice President Treasurer of Intel Ravi Jacob, helped Intel Capital develop and maintain a profitable network of investment companies that could provide Intel Capital and Intel with access to new technology startups and opportunities for market expansion or, by becoming co-investors, could assist Intel Capital in marketing itself to prospective customers or generating funding for them. By including these investments, the Investment Committee Defendants selected and monitored the allocation model and allocation percentages for the Intel Funds and the underlying investments in the Non-Traditional Investments Accounts in a manner that prioritized the interest of Intel Capital and Intel over those of the participants in the Plans and benefited Intel Capital and Intel. Put simply, the Investment Committee used the Plans' assets to promote the investment interests of Intel Capital.

**7. <u>Underperformance of the Non-Traditional Investments Accounts</u>**

226. The significant allocations to the Non-Traditional Investments Accounts and the associated excessive fees were the primary cause of the Intel Funds' underperformance. In the past six years, the Non-Traditional Investments Accounts performed significantly less well than the Traditional Asset Class Accounts. Between 2011 and 2017, the assets held in the Non-Traditional Investments Accounts approximately fell between 37 and 43% of the assets held in all the Master Trust Investment Accounts. However, where both the Traditional Asset Class Accounts and the Non-Traditional Investments Accounts had a net investment gain, the latter consistently accounted for significantly less than 37% of the combined net gain of all the Master Trust Investment Accounts. For example, in 2013, while the assets held in the Non-Traditional Investments Accounts represented more than 40% of the total assets in the Master Trust Investment Accounts, the net investment gain of the Non-Master Trust Investment Accounts was responsible for only about 30% of the $1.16 billion net investment gain of all the Master Trust Investment Accounts. Similarly, in

2014, although the Non-Traditional Investments Accounts held approximately 43% of the assets in all the Master Trust Investment Accounts, they accounted for only about 22% of the $496 million net investment gain of all the Master Trust Investment Accounts. Similarly, the Non-Traditional Investments Accounts approximately accounted for less than 30% and 34% of the net investment gain of all the Master Trust Investment Accounts in 2016 and 2017, respectively.

227.    Where the Non-Traditional Master Trust Investment Accounts had a net investment loss, the poor performance of the Non-Investment Asset Class Accounts either substantially reduced the gains of the Traditional Asset Class Account and thus the net gain of all the Master Trust Investment Accounts or substantially increased their net loss. In 2011, while the Traditional Asset Class Accounts had a net gain of over $128 million, the Non-Traditional Investments Accounts suffered a net loss of $100 million. The Hedge Fund Account had a loss of over $41 million, the Emerging Markets Fund Account had a loss of over $47 million, and the Commodities Fund Account (which was later renamed the Diversified Real Assets Fund Account) had a loss of over $28 million. The net loss of the Non-Traditional Investment Accounts reduced the net gain of all the Master Trust Investment Accounts to $28 million. In 2015, the Non-Traditional Investments Accounts accounted for at least $93 million of the $106 million net loss of all the Master Trust Investment Accounts. That year, the Growth Oriented Hedge Fund Account, the Emerging Markets Fund Account, and the Diversified Real Assets Fund Account had an investment loss of at least $50 million, $114 million, and $83 million, respectively. In fact, for 2012 and 2014, the Diversified Real Assets Fund Account, which invested in commodities, had also reported an annual net loss. For 2013 and 2014, the Emerging Markets Fund Account had also reported an annual net loss. Between 2011 and 2016, the Master Trust Investment Accounts had a combined net gain of approximately $3.4 billion, of which the Non-Traditional Investments Accounts accounted for no more than 28%. As a result of the heavy allocations to the Non-Traditional Investments Accounts and their underperformance, the Intel Funds suffered corresponding underperformance and losses of investment returns.

228.    What added to the underperformance of the Master Trust Investment Accounts and further contributed to the poor investment returns of the Intel Funds were the high costs of investing

in hedge funds and private equity funds, which filled the Non-Traditional Investments Accounts. Hedge funds and private equity funds are generally structured as investment partnerships. Managers for these funds are typically paid under a "two and twenty" compensation structure, that is, a management fee equal to 2% of the assets under management, and an additional incentive or performance fee equal to 20% of any profits on the assets managed. Even without a performance fee, an annual flat fee of 2% or 200 bps on assets under management is excessive and unjustified in the defined contribution plan context where expenses are a key driver in the long-term performance of an investment option. An additional performance fee of 20% on the profits generated further significantly reduces any investment return. GAO Report at 8 n. 11 (reporting that, after fees are deducted, the two-and-twenty compensation structure would reduce a 12% return to only 7.6%). The hedge funds and private equity funds in the Non-Traditional Investments Account charge management and performance fees. As a result of the substantial allocations to the Non-Traditional Investments Accounts, approximately 30% of the assets of each of the Intel TDFs are subject to a performance fee, and approximately 45% of the assets of each of the Intel GDFs are subject to a performance fee. These management and performance fees consistently and substantially decreased the performance of the underlying hedge funds and private equity funds in the Non-Traditional Investments Accounts and reduced the net investment returns of the already-underperforming Non-Traditional Investments Accounts and thus of the Intel Funds.

229.    Despite the significant risks inherent in investing the Plans' assets in hedge funds, private equity funds, emerging market funds, and commodities, and the high fees charged by hedge fund and private equity fund managers, the Investment Committee Defendants did not replace the allocation model that excessively allocated the Intel Funds' assets to the Non-Traditional Investments Accounts. Despite the underperformance of the Non-Traditional Investments Accounts and the excessiveness of the fees charged by the underlying hedge funds and private equity funds, the Investment Committee Defendants did not remove the Intel TDFs or replace them as the default investment options of the 401(k) Savings Plan and did not remove the Global Diversified Fund or replace it as the default investment option of the Retirement Contribution Plan.

230. The Investment Committee also failed to act prudently when in 2015 it retained AllianceBernstein to help manage the Intel Funds. AllianceBernstein was one of the few mutual fund providers that embraced the inclusion of hedge fund-like alternatives in target date fund portfolios. According to a performance evaluation by Morningstar published in July 2014, among the target date series provided by 45 target date fund providers, AllianceBernstein's series ranked last in security selection, that is, selecting securities and funds in designing, adjusting, and monitoring the asset allocation of target date funds. *Morningstar 2014 Target-Date Series Research Paper* ( July 1, 2014), at 27, *available at* http://corporate.morningstar.com/us/documents/methodologydocuments /methodologypapers/2014-target-date-series-research-paper.pdf. In fact, shortly after AllianceBernstein was hired to help manage the Intel Funds, it announced in June 2015 that it would close its own target date series after years of poor performance. The Investment Committee hired the worst target date fund manager in the country to manage the Intel TDFs. The only possible explanation is that AllianceBernstein alone had endorsed the use of hedge funds for TDFs. Apparently, the Investment Committee replaced AllianceBerstein with GTC after the Intel Funds continued to perform poorly.

231. The conduct of the Investment Committee Defendants demonstrates that they engaged in a defective process of selecting and monitoring the asset allocations for the Intel Funds. It shows that they either did not understand and failed to give appropriate consideration to, or disregarded, the risks of investing in hedge funds, private equity, commodities, and emerging markets funds and heavy allocations of the Intel Funds' assets to the Non-Traditional Investments Accounts. Had the Investment Committee Defendants conducted a proper and impartial investigation of these allocations and their associated risks as well as the Plans' investment consultants including AllianceBernstein, they would not have significantly deviated from prevailing standards by excessively allocating assets of the Intel Funds to the Non-Traditional Investments Accounts. By failing to conduct such investigation and properly monitor the Intel Funds and the Plans' investment consultants on an ongoing basis and by failing to replace the Plans' default investment options, the Investment Committee Defendants caused tens of millions of losses to the Plans and participants.

**D.** **The Administrative Committee Defendants Made Inadequate Disclosures About the Intel Funds and Provided Misinformation About Participants' Accounts and the Intel Funds**

232.    The Administrative Committee did not adequately disclose to participants and beneficiaries in the Plans information regarding the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds. Specifically, the Administrative Committee did not disclose (a) that hedge funds and private equity funds often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; and (d) that investing in them carries significant valuation risk. The Administrative Committee did not disclose that, as a result of the Intel Funds' significant allocations to hedge funds and/or private equity, the Intel Funds posed those investment and valuation risks and suffered lack of liquidity and transparency.

233.    According to applicable regulations, 29 C.F.R. § 2550-404a-5(a), "[f]iduciary requirements for disclosure in participant-directed individual account plans" (the "Disclosure Regulation"), the administrator of a participant-directed retirement plan must disclose several types of information to participants in such a plan, both prior to the initial investment and also on an ongoing basis, if there are material changes to the plan's investment options.

234.    Under the Disclosure Regulation, the plan administrator – here, the Administrative Committee – must ensure that participants "are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses thereto, to make informed decisions with regard to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a). Until December 31, 2017, as asset allocation models or portfolios, the Intel TDFs and the Intel GDFs did not issue shares or units and were not actual funds of which participants in the 401(k) Savings Plan and the Retirement Contribution Plan held shares or units. Rather, each of the Intel Funds was effectively an investment strategy that, pursuant to the asset allocation adopted for that Intel Fund, directed the assets of the Plans invested in that Intel Fund to be allocated to certain underlying funds and

1   provided each participant investing in the Intel Fund with a proportionate interest in those underlying

2   funds.

3       235.    Because the Intel TDFs and GDFs were asset allocation models rather than actual

4   share-issuing investments or "funds," the investment funds comprising the TDF and GDF portfolios

5   were "designated investment alternatives" subject to the Disclosure Regulation.

6       236.    In order to comply with the Disclosure Regulation, the Administrative

7   Committee Defendants had to make the following complete and accurate disclosures, among other

8   things:

9           a) An explanation of any specified limitations on investment instructions under the

10          terms of the plan, including any restrictions on transfer to or from a designated

11          investment alternative;

12          b) An identification of any designated investment alternatives offered under the plan;

13          c) An identification of any designated investment managers;

14          d) An explanation of any fees and expenses for general plan administrative services

15          which may be charged against individual accounts of participants and which are not

16          reflected in the total annual operating expenses of any designated investment

17          alternative and the dollar amount of such fees and expenses that are actually charged

18          to an individual account, on a quarterly basis;

19          e) The name of each designated investment alternative and the type or category of

20          investment; performance and benchmark data for such investment; detailed fee and

21          expense information such as expense ratios; the internet web site address containing

22          information about the designated investment alternative. 29 C.F.R. § 2550-404a-5(c)-

23          (d).

24      237.    Based on the documents provided to Plaintiff, the Administrative Committee

25  Defendants failed to make any of the required disclosures listed above, and failed to comply with

26  their duties pursuant to the Disclosure Regulation as a whole, with respect to disclosure of the

27  designated investment alternatives like the Investment Funds underlying the Intel TDPs and

28  Diversified Fund.

238.    Based on the documents provided to Plaintiff, the Administrative Committee Defendants failed to disclose the required information regarding the hedge funds, commodities funds, and private equity funds. These failures to disclose left the majority of participants in the Plans unaware of the true content and character of their retirement savings, because investment in Intel TDPs were the primary investment options for Intel's 401(k) Plan participants and the Diversified Fund was the primary investment option for Retirement Plan participants. Even if participants were provided some information that the TDPs and Diversified Fund included investments in hedge funds and private equity, the plan fiduciaries failed to provide participants with adequate and sufficient information, so that they could make informed intelligent decisions about whether investing in these particular hedge funds and private equity funds was prudent.

239.    For participants whose accounts in the Plans were invested in any of the Intel Funds, the quarterly statements issued for their accounts did not disclose the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds. In the glossary provided in the quarterly statements, "stocks" was defined as representing ownership or equity in a company, "bonds" as representing a loan to a corporation or government agency, and "short-term investments" as including certificate of deposits, Treasury Bills, and money market instruments. The quarterly statements did not mention alternative investment types such as hedge funds and private equity funds or the risks associated with investment in them.

240.    The Administrative Committee also failed to provide accurate information material to participants when making informed investment decisions with respect to the Intel Funds. The quarterly account statements issued to participants who invested in the Intel Funds misinformed and/or failed to inform them about the asset allocation of their account balances. Typically, in the form of a pie chart, the quarterly statements incorrectly represented that the participant's combined account balance between the Plans was allocated among three "asset classes" only, that is, stocks, bonds, and short-term investments, despite the fact that each of the Intel Funds also allocated its assets to other types of investments including hedge funds and/or private equity funds. For example, the quarterly statement for the October-December quarter of 2015 for Plaintiff's accounts

1    represented that Plaintiff's combined account balance between the two Plans was allocated among

2    stocks, bonds, and short-term investments only, in the percentages of 31%, 6%, and 63%,

3    respectively. Plaintiff's account in the Retirement Contribution Plan was and has been invested in

4    the Global Diversified Fund only, and his account in the 401(k) Savings Plan was and has been

5    invested in the Intel Target Date 2030 Fund, the Intel Target Date 2035 Fund, and the Intel Target

6    Date 2040 Fund only. As of the October-December quarter of 2015, the Intel Target Date 2030,

7    2035, and 2040 Funds each allocated more than 20% of its assets to the Defensive Oriented and

8    Growth Oriented Hedge Fund Accounts, which invested in hedge funds. As of the same quarter, the

9    Global Diversified Fund allocated about 30% of its assets to the Defensive Oriented and Growth

10   Oriented Hedge Fund Accounts and about 18% of its assets to the Alternative Investments Fund

11   Account, which invested in private equity funds.

12           241.    By stating that Plaintiff's combined account balance was allocated to 31% stock, 6%

13   bonds, and 63% short-term investments, the October-December 2015 quarterly statement

14   misleadingly represented that Plaintiff's accounts were allocated to these traditional asset classes

15   only, not also to hedge funds and private equity funds. The statement also grossly misrepresented the

16   percentages with respect to the asset classes to which the Intel Funds in which Plaintiff's accounts

17   were invested were allocated. Upon information and belief, for the same quarter and other quarters,

18   the quarterly statements issued to Plaintiff and other participants in the Plans whose accounts were

19   invested in the Intel Funds were similarly misleading in that they misrepresented the mix of asset

20   classes and investment types among which their account balances were actually allocated,

21   inaccurately stated the allocation percentages of their accounts, and failed to disclose that their

22   accounts were also allocated to hedge funds and/or private equity funds.

23           242.    The quarterly statement for Plaintiff's accounts for the October-December quarter of

24   2015 also misleadingly stated that the specific Intel Funds in which Plaintiff's accounts were

25   invested were allocated to stocks and bonds only. For example, the quarterly statement misinformed

26   Plaintiff that the Intel Target Date 2030 Fund and the Intel Target Date 2040 Fund were each

27   invested in traditional asset classes only, with a 90% allocation to stocks and a 10% allocation to

28   bonds. However, as of the October-December quarter of 2015, the Intel Target Date 2030 and 2040

Funds each allocated more than 20% of its assets to the Defensive Oriented and Growth Oriented Hedge Fund Accounts. Upon information and belief, for the same quarter and other quarters, the quarterly statements issued to Plaintiff and other participants in the Plans were similarly misleading in that they misrepresented the mix of asset classes and investment types among which the specific Intel Funds in which the participants' accounts were actually allocated, inaccurately stated the allocation percentages of those specific Intel Funds, and failed to disclose that those specific Intel Funds were also allocated to hedge funds and/or private equity funds.

243.    Peer target date funds, if they allocate to hedge funds at all, do not allocate their assets to hedge funds in a percentage that is anywhere close to the allocations of the Intel Target Date Funds to hedge funds. Similarly, peer balanced funds do not allocate their assets to hedge funds or private equity funds or do not allocate their assets to hedge funds and private equity funds in a percentage that is anywhere close to the allocations of the Global Diversified Funds to hedge funds and private equity funds. By representing that participants' accounts that were invested in the Intel Funds were allocated among traditional asset classes only and with respect to at least some of the specific Intel Funds that those Intel Funds were invested in stocks and bonds only, the quarterly statements issued to these participants misrepresented the true asset allocation mix of their accounts, and misleadingly presented the Intel Funds as investment options whose allocation models were in line with prevailing standards for peer target date and balanced funds, even though the allocation models for the Intel Funds significantly deviated from those prevailing standards.

244.    To the extent that they were provided to participants in the Plans, the "fact sheets" for the individual Intel TDFs did not disclose the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds. The "fact sheets" did not disclose (a) that hedge funds and private equity funds often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; or (d) that investing in them carries significant valuation risk.

245.    To the extent that they were provided to participants in the Plans, the "fact sheets" for the Intel TDFs inaccurately described those Intel Funds and their allocation models. For example, each of the "fact sheets" for the Intel TDFs for the third quarter of 2015 represented that "the Funds

are managed to gradually become more conservative over time as they approach their target date."
However, contrary to such representations, in 2015, the Intel Target Date 2015-2055 Funds were
allocated to hedge funds more heavily, became less conservative, and deviated from prevailing
standards for target date funds more significantly as those Intel Funds approached their target dates,
as Table 14 shows:

**Table 14**

| Intel Target Date Fund | Allocation to Hedge Funds |
| --- | --- |
| 2055 | 20.75% |
| 2050 | 19.36% |
| 2045 | 20.93% |
| 2040 | 19.87% |
| 2035 | 20.78% |
| 2030 | 22.15% |
| 2025 | 27.05% |
| 2020 | 26.87% |
| 2015 | 29.48% |

246.    In fact, as the Intel Target Date 2015 Fund reached its target date in 2015, the Intel
Fund had the highest allocation to hedge funds (i.e., 29.48%) among all Intel TDFs. By representing
the Intel TDFs as investment options that "are managed to gradually become more conservative over
time as they approach their target date," the "fact sheets" misrepresented the allocation strategy
adopted for the Intel TDFs, and misleadingly presented the Intel Target Date Funds as investment
options whose allocation strategy was in line with prevailing standards for peer target date funds,
even though the allocation strategy of the Intel Target Date Funds significantly deviated from
prevailing standards.

247.    The "fact sheets" dated after the third quarter of 2015 made similar
misrepresentations about the allocation strategy adopted for the Intel TDFs. For example, each of the
"fact sheets" for the Intel TDFs for the first quarter of 2017 represented that "the Funds are managed

to gradually become more conservative over time as they approach their target date." However, contrary to such representations, in that quarter, the Intel Target Date 2015–2055 Funds were allocated to hedge funds more heavily, became less conservative, and deviated from prevailing standards for target date funds more significantly as those Intel Funds approached their target dates, as Table 15 shows:

**Table 15**

| Intel Target Date Fund | Allocation to Hedge Funds |
|---|---|
| 2055 | 12.83% |
| 2050 | 12.51% |
| 2045 | 13.78% |
| 2040 | 13.58% |
| 2035 | 14.30% |
| 2030 | 16.04% |
| 2025 | 18.97% |
| 2020 | 20.38% |
| 2015 | 22.38% |

248.    To the extent that they were provided to participants in the Plans, the Summary Plan Descriptions for the Plans ("the SPDs") did not disclose the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds. The SPDs did not disclose (a) that hedge funds and private equity funds often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; or (d) that investing in them carries significant valuation risk.

249.    To the extent that they were provided to participants in the Plans, the SPDs made misrepresentations regarding the allocation strategy adopted for the Intel Target Date Funds. The 2015 SPD represented the Intel Target Date Funds as follows: "While a younger investor may be able to afford to take more risk in order to maximize returns, an investor approaching retirement

should consider reducing his/her risk and choose investments that provide more stability in the portfolio. A Target Date Fund is designed to achieve this balance, because it is adjusted over time to reduce exposure to higher-risk assets, such as stocks and increase exposure to lower risk investments such as bonds and stable value." However, contrary to this representation, the Intel Target Date 2015-2055 Funds were not adjusted over time to reduce exposure to high-risk investments including hedge funds, to which those Intel Funds were heavily allocated. In fact, in 2015, as they approached their target dates, the Intel Target Date 2015-2055 Funds were allocated to hedge funds more heavily, with the allocation of the Intel Target Date 2015 Fund to hedge funds that year culminating at 29.48%, the highest and least conservative among all Intel Target Date Funds. By representing the Intel Target Date Funds as investment options that were "adjusted over time to reduce exposure to higher-risk assets," the 2015 SPD misrepresented the allocation strategy adopted for the Intel Target Date Funds, and misleadingly presented the Intel Target Date Funds as investment options whose allocation strategy was in line with prevailing standards for peer target date, even though the allocation strategy of the Intel Target Date Funds significantly deviated from prevailing standards.

250.    To the extent that they were provided to participants in the Plans, the "Intel Retirement Plans Hedge Fund Portfolio Fact Sheets," did not disclose the risks associated with the Intel Funds' significant allocations to hedge funds or the accompanying risks associated with investment in the Intel Funds. The "fact sheets" did not disclose (a) that hedge funds often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; or (d) that investing in them carries significant valuation risk.

251.    To the extent that they were provided to participants in the Plans, the "Intel Retirement Plans Hedge Fund Portfolio Fact Sheets" provided inconsistent information about the hedge funds to which the Intel Funds were allocated. For example, the "fact sheets" for the quarters ending March 31, 2017 and June 30, 2017 provided inconsistent information about the historical annual performance of the hedge funds. The fact sheet for the quarter ending June 30, 2017 stated that the annual performance of the "Intel Hedge Fund Portfolio" for the years from 2011 through 2016 was -0.54%, 7.41%, 13.41%, 3.31%, 0.21%, and 6.71%, respectively, whereas the fact sheet for the quarter ending March 31, 2017 stated that the annual performance of the hedge funds for

those years was 0.25%, 9.54%, 13.47%, 4.75%, 0.50%, and 6.09%, respectively. The two "fact sheets" also provided inconsistent background information about the individual hedge funds to which the Intel Funds were allocated. Without disclosing the names of the hedge funds, the two "fact sheets" identified them by assigning to each of them a "Fund Identifier" such as "Fund A" and "Fund B," along with a general description of the hedge fund. While the March 31, 2017 fund sheet stated that Fund A and Fund B had fund inception dates of January 1994 and May 2005, respectively, the June 30, 2017 fact sheet stated that Fund A and Fund B had fund inception dates of August 1998 and January 1994, respectively.

252.    By failing to disclose the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds, by misinforming participants about the allocations of their account balances and of the specific Intel Funds that their accounts were invested in, and by misrepresenting presenting the Intel Target Date Funds as investment options whose allocation strategy was in line with prevailing standards for peer target date funds, the Administrative Committee failed to provide complete and accurate information material to participants when making informed decisions with respect to the Intel Funds.

## VI.  CLAIMS FOR RELIEF

### Count I
### (Violations of ERISA § 404(a) by the Investment Committee
### in Selecting and Monitoring the Investment Options for the Plans)

253.    Plaintiff repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

254.    The Investment Committee Defendants were fiduciaries of the Plans under ERISA § 402(a), 29 U.S.C. § 1102(a), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

255.    As fiduciaries of the Plans, the Investment Committee Defendants were required pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plans they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) to discharge their duties on an ongoing basis "with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

256.    ERISA's duty of prudence required the Investment Committee Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plans and to act accordingly. 29 C.F.R. § 2550.404a-1.

257.    Specifically, the Investment Committee Defendants had ongoing duties to manage the Plans' assets by properly evaluating and monitoring the Plans' investment options on a regular and frequent basis and removing or replacing imprudent ones.

258.    The Investment Committee Defendants breached their duties of prudence and loyalty with respect to the Plans by, *inter alia*,

      a.  Failing to properly investigate the availability of, and give appropriate consideration to, lower-cost target date funds with comparable or superior performance as alternatives to the Intel Target Date Funds

      b.  Failing to properly investigate the availability of, and give appropriate consideration to, lower-cost balanced funds with comparable or superior performance as alternatives to the Global Diversified Funds;

      c.  Failing to properly monitor and evaluate on a regular basis the performance and fees and expenses of the Intel Funds and the adverse impact of excessive fees and expenses on the long-term performance of the Intel Funds;

      d.  Failing to properly monitor and evaluate on a regular basis the appropriateness of designating the Intel Target Funds as the 401(k) Savings Plan's default investment options and the Global Diversified Fund as the Retirement Contribution Plan's default investment option, given the fees and expenses for and performance of the Intel Funds;

      e.  Failing to implement and employ an ongoing process to control the fees and expenses of the Intel Funds; and

f.   Failing to promptly remove any imprudent Intel Target Date Funds or Global
Diversified Funds whenever it was prudent to do so.

259.   In choosing and maintaining the Intel Funds as the investments options of the Plans,
the Investment Committee Defendants employed disloyal and imprudent processes by favoring
custom Intel Funds that, as alleged above, invest in certain underlying investments that help Intel
Capital develop and maintain business relationships with certain investment companies to the benefit
of Intel Capital and Intel.

260.   A prudent and loyal fiduciary who had taken these actions and omissions into
consideration would have concluded that the Investment Committee Defendants did not select and
monitor the Plans' investment options solely based on their merits and in the interest of the
participants.

261.   The Investment Committee Defendants breached their fiduciary duties to the Plans
during each of the meetings of the Investment Committee that took place periodically in the relevant
period. At each of these meetings, the Investment Committee Defendants could have removed or
replaced any of the Intel Funds on the basis of its performance or fees or a combination of both. At
each of these meetings, the Investment Committee Defendants failed to do so.

262.   Through these actions and omissions, the Investment Committee Defendants have (a)
failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive
purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C.
§ 1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the
circumstances then prevailing that a prudent man acting in a like capacity and familiar with such
matters would use in the conduct of an enterprise of a like character and with like aims, in violation
of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

263.   As a result of the Investment Committee Defendants' breaches, the Plans, Plaintiff,
and the Plans' participants and beneficiaries have suffered substantial losses in retirement savings.

//

//

//

1
2

**Count II**
**(Violations of ERISA § 404(a) by the Investment Committee**
**and Investment Committee Defendants in Allocating the Intel Funds' Assets)**

3       264.    Plaintiff repeats and re-alleges each of the allegations set forth in the foregoing

4    paragraphs as if fully set forth herein.

5       265.    The Investment Committee Defendants were fiduciaries of the Plans under ERISA

6    § 402(a), 29 U.S.C. § 1102(a), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

7       266.    As fiduciaries of the Plans, the Investment Committee Defendants were required

8    pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to act solely in the interest of the

9    participants and beneficiaries of the Plans they served and (A) "for the exclusive purpose of: (i)

10   providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of

11   administering the plan," and (B) to discharge their duties on an ongoing basis "with the care, skill,

12   prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

13   capacity and familiar with such matters would use in the conduct of an enterprise of a like character

14   and with like aims."

15      267.    ERISA's duty of prudence required the Investment Committee Defendants to give

16   appropriate consideration to those facts and circumstances that, given the scope of their fiduciary

17   investment duties, they knew or should have known were relevant to the particular investments of

18   the Plans and to act accordingly. 29 C.F.R. § 2550.404a-1.

19      268.    Specifically, the Investment Committee Defendants had ongoing duties to manage the

20   Plans' assets by properly evaluating and monitoring the Plans' investment options, including the

21   asset allocations of any custom funds, on a regular and frequent basis and removing or replacing

22   imprudent ones.

23      269.    The Investment Committee Defendants breached their duties of prudence and loyalty

24   with respect to the Plans by, *inter alia*,

25              a.   Adopting and implementing an asset allocation model and allocation percentages

26                   that excessively allocated assets of each of the Intel Funds to the Non-Traditional

27                   Investments Accounts;

28

b.  Adopting and implementing an asset allocation model and allocation percentages that resulted in excessive fees charged to each of the Intel Funds;

c.  Failing to properly investigate and give appropriate consideration to the risks of allocating the assets of the Plans, with respect to each of the Intel Funds, to hedge funds, private equity, commodities, and emerging markets funds;

d.  Failing to properly investigate and give appropriate consideration to the risks of allocating the assets of the Plans, with respect to each of the Intel Funds, to the Non-Traditional Investment Accounts pursuant to the allocation percentages adopted or implemented for the Intel Fund;

e.  Failing to properly monitor and evaluate on a regular basis the asset allocation model and allocation percentages adopted or implemented for each of the Intel Funds;

f.  Failing to explore and give appropriate consideration to prevailing standards for target date funds and balanced funds;

g.  Failing to properly monitor and evaluate on a regular basis the appropriateness of designating the Intel Target Date Funds as the default investment options of the 401(k) Savings Plan and the Global Diversified Fund as the default investment of the Retirement Contribution Plan, given the asset allocation model and allocation percentages adopted for the Intel Funds;

h.  Failing to properly monitor on a regular basis the performance and fees and expenses of the underlying investments in the Non-Traditional Investment Accounts and the adverse impact of the management and performance fees charged by any of the underlying investments on the long-term performance of the Intel Funds;

i.  Failing to properly monitor and evaluate on a regular basis any consultant, including AllianceBernstein, with respect to the management of the assets of the Plans;

j.   Failing to promptly remove or replace any consultant, including AllianceBernstein, that helped contribute to the Intel Funds' excessive allocations to the Non-Traditional Investments Accounts; and

k.   Failing to promptly replace any imprudent asset allocation model or allocation percentages for any of the Intel Funds whenever it was prudent to do so.

270.    In determining and maintaining the asset allocations for the Intel Funds, the Investment Committee Defendants employed disloyal and imprudent processes by including numerous underlying investments in the Non-Traditional Investments Accounts because, as alleged above, investing in those underlying investments helped Intel Capital develop and maintain business relationships with certain investment companies to benefit Intel Capital and Intel.

271.    A prudent and loyal fiduciary who had taken these actions and omissions into consideration would have concluded that the Investment Committee Defendants did not select and monitor the Plans' investment options solely based on their merits and in the interest of the participants.

272.    The Investment Committee Defendants breached their fiduciary duties to the Plans during each of the meetings of the Investment Committee that took place periodically in the relevant period. At each of these meetings, with respect to each of the Intel Funds, the Investment Committee Defendants could have replaced its asset allocation model and allocation percentages on the basis of their imprudence. At each of these meetings, the Investment Committee Defendants failed to do so.

273.    Through these actions and omissions, the Investment Committee Defendants have (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

274.     As a result of the Investment Committee Defendants' breaches, the Plans, Plaintiff, and the Plans' participants and beneficiaries have suffered substantial losses through the loss of return that would have been earned by the prudent investment of the Plans' assets.

### Count III
**(Violations of ERISA §§ 404(a)(1)(A) and 404(a)(1)(B) by the Administrative Committee Defendants for Failure to Make Adequate and Accurate Disclosures)**

275.     Plaintiff repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

276.     The Administrative Committee Defendants were fiduciaries of the Plans under ERISA § 402(a), 29 U.S.C. § 1102(a), and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

277.     As fiduciaries of the Plans, the Administrative Committee Defendants were required pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plans they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) to discharge their duties on an ongoing basis "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

278.     An ERISA fiduciary's duty of loyalty and prudence under ERISA § 404(a)(1)(A) and (B) includes a duty to disclose and inform. Those duties not only require that a fiduciary comply with the specific disclosure provisions in ERISA, but also entail an obligation to convey complete and accurate information material to the beneficiaries' circumstances, even when the beneficiaries have not specifically asked for the information.

279.     A fiduciary's disclosure obligations in ERISA § 404(a) are informed by the common law of trusts. ERISA §404(a) incorporates the trust law duty to communicate to the beneficiaries all material facts in connection with the transaction which the trustee knows or should know and the duty imposed on a trustee to provide an accounting to the participants and beneficiaries. A fiduciary must furnish financial information to its principal upon demand. Restatement (Second) of Trusts §§ 172–73 (1959). A trustee has a duty to account to beneficiaries of the trust and may be compelled

to render financial data upon failure to provide such information. Restatement (Second) of Trusts § 172 comment c (1959).

280.    The Administrative Committee Defendants knew or should have known that information provided to Plan participants contained affirmative misrepresentations about the composition of the Intel TDFs and GDFs and, moreover, also knew or should have known that their failure to provide accurate information about the composition of the Intel TDFs and GDFs might cause harm to Plan participants. In particular, the Administrative Committee Defendants knew or should have known that the disclosure materials they provided to participants:

   a.   did not disclose (a) that hedge funds and private equity funds often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; and (d) that investing in them carries significant valuation risk;

   b.   did not disclose that, as a result of the Intel Funds' significant allocations to hedge funds and/or private equity, the Intel Funds posed those investment and valuation risks and suffered lack of liquidity and transparency;

   c.   incorrectly represented that the participant's combined account balance between the Plans was allocated among three "asset classes" only, that is, stocks, bonds, and short-term investments, despite the fact that each of the Intel Funds also allocated its assets to other types of investments including hedge funds and/or private equity funds; and

   d.   contained misrepresentations regarding the allocation strategy adopted for the Intel Funds.

281.    The Administrative Committee Defendants breached their duties of loyalty and prudence with respect to the Plans by, *inter alia*, failing to disclose the following material information to participants and beneficiaries:

   a.   Failing to adequately disclose to participants in the Plans the risks associated with the Intel Funds' significant allocations to hedge funds and private equity funds and/or the accompanying risks associated with investment in the Intel Funds;

b.  Providing in the quarterly statements issued to participants in the Plans whose accounts were invested in any of the Intel Funds (i) inaccurate information about the mix of asset classes and investment types among which the participants' accounts were actually allocated, and about the corresponding allocation percentages, and (ii) the misinformation that the specific Intel Funds in which the participants' accounts were invested were allocated to stocks and bonds only, not also to hedge funds and/or private equity funds;

c.  In the "fact sheets" for the Intel Target Date Funds, misrepresenting the Intel Target Date Funds as investment options that "are managed to gradually become more conservative over time as they approach their target date," despite the fact that the Intel Target Date Funds were managed to become more heavily allocated to hedge funds and thus less conservative as they approached their target dates;

d.  In the SPDs, misrepresenting the Intel Target Date Funds as investment options that were "adjusted over time to reduce exposure to higher-risk assets," despite the fact that the Intel Target Date Funds were managed to become more heavily allocated to hedge funds and thus less conservative as they approached their target dates;

e.  In the quarterly statements issued to participants in the Plans whose accounts were invested in any of the Intel Funds, misrepresenting Intel Funds as investment options whose allocation models were in line with prevailing standards for peer target date and balanced funds;

f.  In the "fact sheets" for the Intel Target Date Funds and in the SPDs, misrepresenting the Intel Target Date Funds as investment options whose allocation models were in line with prevailing standards for peer target date funds;

g.  Providing in the "Intel Retirement Plans Hedge Fund Portfolio Fact Sheets" inconsistent information about the background and performance of the hedge funds to which the Intel Funds were allocated.

282.     Through these actions and omissions, the Administrative Committee Defendants have failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

283.     Consistent with their obligations under ERISA § 404(a)(1)(A) and (B), the Administrative Committee Defendants were required to ensure that participants "are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan, including fees and expenses, and regarding designated investment alternatives, including fees and expenses thereto, to make informed decisions with regard to the management of their individual accounts." 29 C.F.R. § 2550-404a-5(a) (the "Disclosure Regulation").

284.     Because the Intel TDFs and GDFs were asset allocation models rather than actual share-issuing investments or "funds," the investments funds comprising the TDF and GDF portfolios were "designated investment alternatives" subject to the Disclosure Regulation.

285.     The Administrative Committee Defendants failed to comply with the requirements of the Disclosure Regulation and ERISA §404(a) because they failed to, among other things:

a)     Provide an explanation of any specified limitations on investment instructions under the terms of the plan, including any restrictions on transfer to or from designated investment alternatives contained within the Intel Funds;

b)     Identify the hedge funds and the private equity funds contained within the Intel Funds as designated investment alternatives offered under the plan;

c)     Identify designated investment managers for the hedge funds and the private equity funds contained within the Intel Funds;

d)     Provide an explanation of any fees and expenses for general plan administrative services which may be charged against individual accounts of participants and which are not

reflected in the total annual operating expenses of designated investment alternatives like hedge funds and the private equity funds contained within the Intel Funds and the dollar amount of such fees and expenses that are actually charged to an individual account, on a quarterly basis, for investment in such funds;

e)      Provide the name of each of the hedge funds and the private equity funds contained within the Intel Funds and the type or category of investment; performance and benchmark data for each such investment; detailed fee and expense information such as expense ratios; the internet web site address containing information about such designated investment alternative.

*See* 29 C.F.R. § 2550-404a-5(c)-(d).

286.    The Administrative Committee failed to adequately disclose to participants and beneficiaries in the Plans information regarding risks, fees and expenses associated with such hedge funds and private equity funds. Although the Administrative Committee disclosed information regarding the allocation strategy of the Intel Funds, it failed to provide the required disclosure for the hedge funds and private equity funds in which the Plans invested pursuant to the allocation models for the Intel Funds. Among other things, the Administrative Committee failed to provide adequate disclosures about: the arrangements between the Plans and the hedge fund and private equity funds, including the fees and expenses and the investment strategies and holdings for each fund; and the identity of the private equity and hedge fund firms and individual managers.

287.    As a result of the Administrative Committee Defendants' actions and omissions, Plaintiff and the Plans' participants (a) were not adequately informed about the risks associated with the Intel Funds' significant allocations to hedge funds and private equity funds or the accompanying risks associated with investment in the Intel Funds, and (b) were not provided accurate and consistent information about the asset mix and allocation percentages of their Plan accounts and about the Intel Funds' allocation models and their significant deviation from prevailing standards for target date and balanced funds. Plaintiff and the Plans' participants were not provided accurate information that was material to making informed decisions with respect to the Intel Funds, and have suffered financial losses through the loss of returns that would have been earned on prudent

investment of the Plans' assets. Where, as here, a fiduciary has breached its duty to provide accurate information about the holdings of a trust to the participants and beneficiaries of the trust, the participants and beneficiaries (and in fact, "any person financially interested in the trust administration") are entitled to compel the trustee and other fiduciaries of the Plan to provide such financial information.

**Count IV**
**(Violations of ERISA § 404(a) by the Finance Committee**
**and Chief Financial Officer Defendants**
**for Failure to Monitor Other Fiduciaries)**

288.    Plaintiff repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

289.    The Finance Committee Defendants were fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because, pursuant to Section 13 of the Plan Documents, until at least March 2016, the Finance Committee Defendants were responsible for appointing and removing members of the Investment Committee and for periodically monitoring their performance.

290.    The Chief Financial Officer Defendants were fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because, pursuant to Section 13 of the Plan Documents and the resolution of Intel's Board of Directors, effective March 2016, the Chief Financial Officer of Intel was responsible for appointing and removing members of the Investment Committee and for periodically monitoring their performance.

291.    As fiduciaries of the Plans, the Finance Committee Defendants and the Chief Financial Officer Defendants were and/or continue to be required pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plans they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) to discharge their duties on an ongoing basis "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

292.    Under ERISA, a fiduciary charged with the authority to select and remove other fiduciaries or who, as a practical matter, in fact appoints other fiduciaries, has an ongoing duty to

monitor the performance of those persons whom the fiduciary is empowered to remove. A monitoring fiduciary must, at reasonable intervals, ensure that the fiduciary it has appointed is acting in compliance with the terms of the applicable plan, acting in accordance with ERISA and applicable law, and satisfying the needs of the plan. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the management and investment of the plan assets. A monitoring fiduciary must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their obligations.

293.    The Finance Committee Defendants and Chief Financial Officer Defendants were and/or continue to be monitoring fiduciaries under ERISA. Each of the Finance Committee Defendants and Chief Financial Officer Defendants was and/or continues to be individually and collectively responsible for periodically monitoring the performance of each of the Investment Committee Defendants and for the removal of any of them who failed to perform his or her fiduciary duties.

294.    The Finance Committees Defendants breached their fiduciary duties by, *inter alia*,

    a.  Failing to monitor the Investment Committee and the Administrative Committee, to evaluate their performance, or to have a system in place for doing so, and standing by idly as the Plans suffered significant losses as a result of their appointees' imprudent actions and omissions with respect to the Plans;

    b.  Failing to monitor the Investment Committee Defendants' fiduciary processes, which would have alerted any prudent fiduciary to the potential breach because of the excessive fees and consistent underperformance of the Intel Funds or because of the excessive allocations of the Intel Funds' assets to the Non-Traditional Investments Accounts;

    c.  Failing to monitor their Investment Committee appointees to ensure that they considered the ready availability of comparable non-Intel custom funds, including lower-cost target date funds and balanced funds with similar or superior

performance or the ready availability of other less expensive, better-performing asset allocation strategies for the Plans' assets invested in the Intel Funds;

d.   Failing to monitor their Administrative Committee appointees to ensure that they provided adequate disclosure of material and accurate information to participants and did not misinform them about the allocations of their accounts in the Plans;

e.   Failing to remove Investment Committee appointees whose performance was inadequate in that they continued to maintain imprudent investment options that charged excessive fees and did not perform as well as comparable alternatives, all to the determent of the Plans and participants' retirement savings; and

f.   Failing to remove Investment Committee appointees whose performance was inadequate in that they continued to maintain an imprudent asset allocation strategy for the Plans' investment options, all to the detriment of the Plans and participants' retirement savings.

g.   Failing to remove Administrative Committee appointees whose performance was inadequate in that they provided inadequate disclosures (i.e., no disclosures) to participants about the risks associated with the Intel Funds' heavy allocations to hedge funds and private equity funds, misinformed them about and mischaracterized the allocations of their account balances and the allocation strategy of the Intel Target Date Funds.

295.   Through these actions and omissions, the Finance Committee Defendants and the Chief Financial Officer Defendants have (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

296.   As a result of the Finance Committee Defendants' and the Chief Financial Officers' breaches, the Plans, Plaintiff, and the Plans' participants and beneficiaries have suffered substantial

losses through the payment of excessive fees and the loss of return that would have been earned by the prudent investment of the Plans' assets.

**Count V**
**(Violation of ERISA § 102(a), 29 U.S.C. § 1022(a) Against the Administrative Committee Defendants)**

297.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

298.    ERISA § 102(a), 29 U.S.C. § 1022(a), requires Summary Plan Descriptions (SPDs) to "be written in a manner calculated to be understood by the average plan participant" and to "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."

299.    The DOL Regulations implementing ERISA § 102, 29 C.F.R. § 2520.102-2(a), reiterate that the SPD "shall be written in a manner calculated to be understood by the average plan participant and shall be sufficiently comprehensive to apprise the plan's participants and beneficiaries of their rights and obligations under the plan." 29 C.F.R. § 2520.102-2(a) specifies that in order to fulfill these requirements, the plan administrator must "tak[e] into account such factors such as the level of comprehension and education of the typical participants in the plan and the complexity of the terms of the plan." 29 C.F.R. § 2520.102-2(a) further explains that an SPD "will usually require … the elimination of long, complex sentence. . .[and] the use of clarifying examples and illustrations" to make the terms of the SPD understandable to the average participant. 29 C.F.R. § 2520.102-2(b) requires that "[t]he advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations."

300.    The Administrative Committee Defendants violated ERISA § 102(a), 29 U.S.C. § 1022(a) and the DOL Regulations implementing § 102 by preparing SPDs that failed to disclose the risks associated with the Intel Funds' significant allocations to hedge funds and/or private equity or the accompanying risks associated with investment in the Intel Funds. Section 13(f) of the Plan Documents authorizes the Investment Committee to designate investment options offered to participants under the Plans and conduct periodic review of these investment options. The SPDs did not disclose (a) that hedge funds and private equity funds, to which the Intel Funds have been

significantly allocated, often use leverage, which can magnify losses; (b) that these investments lack liquidity; and (c) that they lack transparency; or (d) that investing in them carries significant valuation risk. The SPDs did not provide examples and illustrations to clarify any of these risks associated with the underlying hedge funds and/or private equity funds of the Intel Funds and thus with the Intel Funds themselves. The SPDs exaggerated the benefits of the Intel TDPs by misrepresenting the allocation strategy adopted for the Intel Target Date Funds as reducing exposure to higher risk investments over time, when in fact the actual allocations of the Intel TDF portfolios were not adjusted to reduce exposure to high-risk hedge funds as they approached their maturity dates.

301.    Because of the Administrative Committee's violations of ERISA § 102(a) and the DOL Regulations implementing it, Plaintiff and the Class were prevented from ascertaining (a) the risks associated with the Intel Funds' significant allocations to hedge funds and private equity funds or the accompanying risks associated with investment in the Intel Funds and (b) whether these assets are being invested and managed in accordance with prevailing standards for target date and balanced funds. Because of Defendants' incomplete and affirmatively misleading disclosures, Plaintiff and the Class have foregone opportunities to make alternative uses of their retirement savings, including by investing those savings in alternatives that have not borne the risks and suffered the losses incurred by the Intel Funds.

## **Count VI**
### **(Co-fiduciary Liability Under ERISA § 405 Against All Defendants)**

302.    Plaintiff repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

303.    ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability, which he may have had under any other provision of ERISA, if

(1)    he participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

(2)      by his failure to comply with ERISA § 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)      he knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

304.    Defendants were fiduciaries of the Plans within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Defendants knew of each breach of fiduciary duty alleged herein arising out of the excessive and imprudent investment of the assets of the Plans in alternative investments. Yet, they knowingly participated in fiduciary breaches, breached their own duties enabling other breaches, and/or took no steps to remedy other fiduciary breaches.

305.    The Finance Committee Defendants knew what the investment lineups of the Plans consisted of and what the fees charged for the Intel Funds were, were aware of the risks associated with the Intel Funds' heavy allocations to alternative investments including hedge funds, private equity funds, commodities, and emerging markets funds, and knew that the Intel Funds were heavily allocated to such alternative investments represented by the Non-Traditional Investments Accounts, because, until at least March 2016, the Finance Committee was responsible for reviewing the continued prudence of its Investment Committee appointments, and because the Investment Committee selected and maintained the Intel Funds and the asset allocation strategy for them, and was responsible for periodically reporting to the Finance Committee about its actions.

306.    The Finance Committee Defendants knew that the Administrative Committee did not disclose to participants the risks associated with the Intel Funds' heavy allocations to hedge funds and/or private equity funds and that the Administrative Committee provide misinformation about the allocation mix of participants' Plan accounts, the management and allocation strategy of the Intel Target Funds, and the hedge funds to which the Intel Funds were allocated, because, until at least March 2016, the Finance Committee was responsible for reviewing the continued prudence of its Administrative Committee appointments, and because the Administrative Committee was responsible for disclosing material and accurate information to participants and ensuring the

1    accuracy of periodic account statements issued to participants, and was responsible for periodically

2    reporting to the Finance Committee about its actions.

3        307.    The Chief Financial Officer Defendants knew what the investment lineups of the

4    Plans consisted of and what the fees charged for the Intel Funds were, were aware of the risks

5    associated with the Intel Funds' heavy allocations to alternative investments including hedge funds,

6    private equity funds, commodities, and emerging markets funds, and knew that the Intel Funds were

7    heavily allocated to such alternative investments represented by the Non-Traditional Investments

8    Accounts, because, effective March 2016, the Chief Financial Officer of Intel was responsible for

9    reviewing the continued prudence of its Investment Committee appointments, and because the

10   Investment Committee selected and maintained the Intel Funds and the asset allocation strategy for

11   them, and was responsible for periodically reporting to the Chief Financial Officer about its actions.

12       308.    The Chief Financial Officer Defendants knew that the Administrative Committee did

13   not disclose to participants the risks associated with the Intel Funds' heavy allocations to hedge

14   funds and/or private equity funds and that the Administrative Committee provide misinformation

15   about the allocation mix of participants' Plan accounts, the management and allocation strategy of

16   the Intel Target Funds, and the hedge funds to which the Intel Funds were allocated, because,

17   effective March 2016, the Chief Financial Officer of Intel was responsible for reviewing the

18   continued prudence of its Administrative Committee appointments, and because the Administrative

19   Committee was responsible for disclosing material and accurate information to participants and

20   ensuring the accuracy of periodic account statements issued to participants, and was responsible for

21   periodically reporting to the Chief Financial Officer about its actions.

22       309.    Each member of the Investment Committee knew what the investment lineups of the

23   Plans consisted of and what the fees charged for the Intel Funds were, and knew that the Plan assets

24   invested in the Intel Funds were heavily allocated to the alternative investments represented by the

25   Non-Traditional Investments Accounts, because the Investment Committee selected and maintained

26   the Intel Funds and the asset allocation strategy for them.

27       310.    Each member of the Administrative Committee knew what the allocation models of

28   the Intel Funds were and knew that the Intel Funds were not only allocated to stocks and bonds and

were heavily allocated to non-traditional investment types including hedge funds and/or private equity funds, because the Administrative Committee was responsible for ensuring that periodic account statements issued to participants did not misinform them about the allocations of their accounts and material and accurate information about the Plans' investment options were provided.

311.    Each member of the Investment Committee knew that the "fact sheets" for the Intel Target Date Funds provided misinformation about the management and allocation strategy of the Intel Target Date Funds because, starting in 2015, AllianceBernstein assisted in providing the contents of these "fact sheets" and the Investment Committee was responsible for monitoring and evaluating AllianceBernstein.

312.    Despite this knowledge, the Finance Committee Defendants, the Chief Financial Officer Defendants, the Investment Committee Defendants, and the Administrative Committee Defendants failed to act to remedy the violations of ERISA alleged in Counts I through IV.

313.    As such, each member of the Investment Committee is liable for the breaches by the other Investment Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

314.    As such, each member of the Administrative Committee is liable for the breaches by the other Administrative Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

315.    As such, each member of the Finance Committee is liable for the breaches by the other Finance Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

316.    As such, each member of the Finance Committee is liable for the breaches by the other Finance Committee Defendants pursuant to ERISA § 405(a)(1) and (2).

317.    As such, each of the Chief Financial Officer Defendants is liable for the breaches by the other Chief Financial Officer Defendant pursuant to ERISA § 405(a)(1) and (2).

318.    As such, each of the Defendants is liable for breaches by the Investment Committee Defendants and the Administrative Committee Defendants pursuant to Section 405(a)(3) of ERISA, 29 U.S.C. § 1105(a)(3).

//

//

//

1

2

<u>**Count VII**</u>
**(Failure to Provide Documents Upon Request Pursuant to ERISA § 104(b)(4), 29 U.S.C.**
**§ 1024(b)(4), & 29 C.F.R. § 2550.404a-5 Against the Administrative Committee Defendants)**

3

4

319.   Plaintiff repeats and re-alleges each of the allegations set forth in the foregoing

paragraphs as if fully set forth herein.

5

6

320.   ERISA § 104(b)(4), 29 U.SC. § 1024(b)(4), provides that the administrator of an

employee benefit plan "shall, upon written request of any participant or beneficiary, furnish a copy"

7

of certain enumerated documents as well as "other instruments under which the plan is established or

8

operated" to the requesting participant or beneficiary within 30 days of the Request.

9

10

321.   In the Ninth Circuit, the documents that a plan administrator must provide pursuant to

ERISA § 104(b)(4) are those that allow the participant to "know[ ] exactly where he stands with

11

respect to the plan—what benefits he may be entitled to, what circumstances may preclude him from

12

obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to

13

whom the management and investment of his plan funds have been entrusted."

14

322.   Plaintiff Winston Anderson sent a letter to the Intel Corporation Retirement Plans

15

Administrative Committee requesting that the Plan provide specified documents pursuant to ERISA

16

§§ 104(b) and 404(a)(1)(A), 29 U.S.C. §§ 1024(b) and 1104(a)(1)(A), and 29 C.F.R. §2550.404a-5

17

on April 19, 2017. The letter was sent by certified mail and was delivered to the Administrative

18

Committee on April 25, 2017. On or about June 6, 2017, Mr. Anderson received a FedEx envelope

19

containing two documents entitled "Intel 401(k) Savings Plan (As Amended and Restated Effective

20

January 1, 2014)", and "Intel Minimum Pension Plan (As Amended and Restated Effective January

21

1, 2011)," respectively. None of the other documents requested by Plaintiff were included. Mr.

22

Anderson received no further response from the Administrative Committee for six months.

23

323.   Mr. Anderson sent another letter to the Intel Corporation Retirement Plans

24

Administrative Committee by certified mail on December 15, 2017. Mr. Anderson's December 15

25

letter reiterated that ERISA requires a response to his April 19, 2017 letter within thirty days, and

26

that the April 19 letter requested "not only 'plan documents' but also, among others, the latest

27

updated summary plan descriptions, any summaries of material modifications to the Plans, the latest

28

full annual reports for the Plans, and documents setting forth the investment policies or guidelines

concerning the investments of the Plans or appointing or removing any fiduciaries of the Plans, as well as documents relating to each of the investment options offered under either of the Plans and their fees and expenses." Because the Administrative Committee had not furnished these documents within thirty days of Plaintiff's April 19 letter, Plaintiff Anderson requested that the Committee "*immediately* provide me with the rest of the documents requested in my April 19, 2017" letter. Nonetheless, the Intel Administrative Committee failed to provide the remainder of the requested documents for an additional two months, delaying its ultimate response until February 23, 2018.

324.    Pursuant to ERISA § 502(a)(1)(A) a participant may sue for the relief provided in ERISA § 502(c). Pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c), "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by [ERISA] to furnish" by mailing the requested material to "the requesting participant . . . within 30 days after such request" may be liable for up to $110 per day in civil penalties. As a result of the failure to produce the requested documents, the Intel Retirement Plans Administrative Committee is liable for the penalties available under ERISA § 502(c).

## VII.  ENTITLEMENT TO RELIEF

325.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled to sue each of the fiduciary Defendants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plans as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plans, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

326.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A declaration that the Defendants breached their fiduciary duties under ERISA;

B.      An order compelling each fiduciary found to have breached his/her/its fiduciary duties to the Plans to jointly and severally restore all losses to the Plans that resulted from the breaches of fiduciary duty, or by virtue of liability pursuant to ERISA § 405;

C.      An order requiring (a) the disgorgement of profit made by any Defendant, (b) a declaration of a constructive trust over any assets received by any breaching fiduciary in connection with his/her/its breach of fiduciary duties or violations of ERISA, (c) an order requiring the Plans to divest themselves of investments in hedge funds, private equity, commodity funds, and emerging markets funds, or (d) any other appropriate equitable monetary relief, whichever is in the best interest of the Plans;

D.      Ordering, pursuant to ERISA § 206(d)(4), 29 U.S.C. § 1056(d)(4), that any amount to be paid to or necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in part, by attaching their accounts in or benefits from the Plans;

E.      Removing any breaching fiduciaries as fiduciaries of the Plans and permanently enjoining them from serving as a fiduciary of any ERISA-covered plan in which Plaintiff or any member of the Class is a participant or beneficiary;

F.      Awarding a surcharge against the Administrative Committee Defendants and requiring that an accounting of the Intel Funds' allocations to hedge funds and private equity funds be provided to all participants;

G.      Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plans and the management of the Plans' investments and/or selection of investment options and/or to oversee the divestment of the Plans' investments in the Non-Traditional Investments Accounts;

H.      Ordering the Plans' fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the Plans;

I.      Award Plaintiff Winston Anderson statutory penalties in the amount of $110 per day, per violation, for the failure to provide each of the requested documents that the Administrative Committee failed to provide within the time periods prescribed by ERISA § 104, 29 U.S.C. §1104.

J.      Awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), the common benefit doctrine and/or the common fund doctrine;

K.      Awarding pre-judgment and post-judgment interest; and

L.      Awarding such other remedial or equitable as the Court deems appropriate.

Dated: August 9, 2019                    Respectfully submitted,

                                          /s/ R. Joseph Barton
                                         R. Joseph Barton (Cal. Bar No. 212340)
                                         jbarton@blockesq.com
                                         BLOCK & LEVITON LLP
                                         1735 20th St NW
                                         Washington DC 20009
                                         Telephone: (202) 734-7046
                                         Facsimile: (617) 507-6020

                                         Joseph Creitz (Cal Bar. No. 169552)
                                         joe@creitzserebin.com
                                         CREITZ & SEREBIN LLP
                                         100 Pine Street, Suite 1250
                                         San Francisco, CA 94111
                                         Telephone: (415) 466-3090
                                         Facsimile: (415) 513-4475

                                         Gregory Y. Porter (*to be admitted pro hac vice*)
                                         gporter@baileyglasser.com
                                         BAILEY & GLASSER LLP
                                         1054 31st Street, NW
                                         Suite 230
                                         Washington, D.C. 20007
                                         Telephone: (202) 463-2101
                                         Facsimile: (202) 463-2103

                                         Major Khan (*to be admitted pro hac vice*)
                                         MAJOR KHAN LLC
                                         1120 Avenue of the Americas
                                         Suite 4100
                                         New York, NY 10036
                                         Telephone: (646) 546-5664
                                         Facsimile: (646) 546-5755

                                         *Attorneys for Plaintiff*