# EXHIBIT A

to Plaintiffs' Amended Consolidated Complaint
(Declaration of Samuel Halpern)
*Anderson, et al., v. Intel, et al.,* Case No. 5:19-cv-04618-LHK

R. Joseph Barton (Cal. Bar No. 212340)
BLOCK & LEVITON LLP
1735 20th St NW
Washington DC 20009
Telephone: (202) 734-7046
Facsimile: (617) 507-6020

Vincent Cheng (Cal. Bar No. 230827)
BLOCK & LEVITON LLP
610 16th Street, Suite 214
Oakland, CA 94612
Telephone: (510) 543-0489
Facsimile: (617) 507-6020

Gregory Y. Porter (*pro hac vice*)
Mark G. Boyko (*pro hac vice*)
BAILEY & GLASSER LLP
1055 Thomas Jefferson St. NW
Suite 540
Washington, D.C. 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WINSTON R. ANDERSON, CHRISTOPHER M. SULYMA, and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>INTEL CORPORATION INVESTMENT POLICY COMMITTEE, FINANCE COMMITTEE OF THE INTEL CORPORATION BOARD OF DIRECTORS, ET AL.<br><br>    Defendants,<br><br>and<br><br>INTEL 401(K) SAVINGS PLAN and INTEL RETIREMENT CONTRIBUTION PLAN,<br><br>Nominal Defendants. | Case No: 5:19-cv-04618-LHK<br><br>(Consolidated with No. 16-cv-04977-NC & No. 16-cv-00522)<br><br><br><br>**DECLARATION OF SAMUEL HALPERN** |

1.   I have been retained by Plaintiffs in *Anderson, et al. v. Intel Corporation Investment Policy Committee, et al,* Case No. 19-CV-04618-LHK (N.D. Cal.) to evaluate whether the benchmarks alleged in Plaintiffs' complaint are appropriate and reasonable for the Intel Target Date Funds ("Intel TDFs") and the Intel Global Diversified Fund ("GDFs") for purposes of investment returns, fees, and asset allocation.

2.   My résumé describing my qualifications on the relevant investment issues here is attached as Exhibit A to this declaration. My opinions stated herein are based on over 40 years of experience as a private sector investment professional and executive and (early in my career) a practicing attorney concentrating on ERISA-covered investment decisions. My legal experience includes working in the Solicitor's Office of the U.S. Department of Labor in the late 1970s and early 1980s, litigating actions to enforce ERISA's fiduciary duty provisions. My investment career began in the mid-1980's with the broker dealer, investment bank and asset manager Bear, Stearns & Co.

3.   Most of my professional experience concerns investors and investments regulated by ERISA, including 401(k) plans. The primary focus of my career has been providing investment services to fiduciaries overseeing ERISA plan investments (such as investment committees, boards of trustees and other decision-makers comparable to the Intel Investment Policy Committee) through my firm as (i) an institutional investment consultant and "investment advice fiduciary" to ERISA plans under 29 U.S.C. §3(21)(A); (ii) an "independent fiduciary" for ERISA plans; (iii) an investment manager under ERISA, 29 U.S.C. §1002(38); and/or (iv) a named fiduciary under 29 U.S.C. §1102. This work includes extensive experience with the central investment considerations and circumstances involved in this matter, specifically, selecting and monitoring target date funds and balanced funds for defined contribution plans.

4.   The opinions and observations expressed in this declaration are preliminary and without the benefit of discovery.

Using Market Indices, Peer Groups, and Peers as Benchmarks Is Standard Industry Practice

5.   When selecting or monitoring a given investment fund for a defined contribution plan, it is standard and reasonable practice for plan fiduciaries to consider and compare the fund

under consideration or review to alternative peer funds available in the market, the peer group for the given fund category (e.g., Large Cap, Small Cap, High Yield Bond), and relevant market-based indices such as the S&P 500.[1]

6. Peer funds are commonly identified by the market index applicable to their type of investment category, as identified by the fund managers, a recognized data base such as Morningstar, Inc., or analysis by a fiduciary or investment consultant. For instance, funds benchmarked against the S&P 500 Index may in that respect be peers and to that extent comparing them against both that benchmark and each other is commonly reasonable and appropriate. An additional conventional way of defining peers is in terms of sharing a similar type of investment strategy or investing in similar types of assets. In that case, the basis for similarity is commonly a combination of the asset class or (more precisely, subclass) involved and the "style" or "discipline" involved. For instance, funds investing in large capitalization domestic equity securities may form a peer group and those investing in investment grade fixed income securities may form another.[2]

7. A common, highly respected resource for conducting this kind of benchmarking analysis is Morningstar, Inc., which publishes data about funds available in the market and groups peer funds by category. In my experience, plan fiduciaries often rely on Morningstar data. Indeed, I understand that Intel (I use the term Intel to refer to the company and the defendants in this lawsuit collectively) commissioned Morningstar reports for the Intel TDFs and the Intel GDFs.

8. Morningstar explains its classification system as follows:[3]

---

[1] See, e.g., Morningstar, "Peer Groups as Benchmarks," at http://news.morningstar.com/classroom2/course.asp?docId=2904&page=4; and "Indexes as Benchmarks," at https://news.morningstar.com/classroom2/course.asp?docId=2904&page=3&CN=COM.
A combination of benchmarks helps with evaluating both individual fund accounts and entire portfolios. See, e.g., "Total Portfolio Benchmarking," at https://meketa.com/wp-content/uploads/2012/10/Total-Portfolio-Benchmarking-FINAL.pdf (hereafter, "Meketa Benchmarking;") and Governance and Investment of Public Pension Assets: Practitioners' Perspectives, Rajkumar and Dorfman editors, World Bank, 2011, including chapter titled "Key Ingredients in Developing Operational Policies and Procedures," Samuel Halpern (hereafter, "Key Ingredients.")
[2] For a general discussion of peer groups as benchmarks see, e.g., Morningstar publication, "Key Factors for Evaluating Mutual Funds," July 30, 2020, at https://www.morningstar.com/articles/990067/key-factors-for-evaluating-mutual-funds.
[3] "Morningstar Category Classifications, April 29, 2016. https://morningstardirect.morningstar.com/clientcomm/Morningstar_Categories_US_April_2016.pdf

> *The Morningstar Category™ classifications were introduced in 1996 to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested. For example, many funds claimed to be seeking "growth," but some were investing in established blue-chip companies while others were seeking growth by investing in small-cap companies.*
>
> *The Morningstar Category classifications solved this problem by breaking portfolios into peer groups based on their holdings. The categories help investors identify the top-performing funds, assess potential risk, and build well-diversified portfolios. Morningstar regularly reviews the category structure and the portfolios within each category to ensure that the system meets the needs of investors.*
>
> *In the United States, Morningstar supports 64 categories, which map into four broad asset classes (U.S. Stock, International Stock, Taxable Bond, and Municipal Bond). The primary and secondary indexes listed with each category are used in Morningstar's tools and reports to show performance relative to a benchmark.*

Target Date Funds of the Same Vintage Year Are Commonly Used as Peers Groups

9.      One of Morningstar's main categories is called "Balanced Funds" and within that category is a subcategory of target date funds. Morningstar then breaks down target date funds by "vintage year," e.g., funds targeted to retirement in different clusters of five and ten-year periods, such as the years 2000-2010, 2011-2015, 2016-2020, etc.

10.     Comparing a given target date fund ("TDF") to peer TDFs is standard and reasonable practice for several reasons related to their common goals and features. TDFs generally share the following goals and features: (1) long-term investment vehicle designed for employee-participants who do not want themselves to actively manage their retirement savings; (2) a combination of asset classes, including at least publicly traded equity, fixed income securities and cash; (3) a "glidepath"

that specifies a defined, automatic decline in equity exposure over time, as the targeted retirement date approaches; and (4) moderate risk so the vehicle typically meets the definition of Qualified Default Investment Alternative ("QDIA") under Labor Department regulations. TDFs may be compared to specific competing TDFs and to larger peer groups by vintage year published by recognized firms such as Morningstar and S&P (the S&P Target Date Index Series, such as the TDF indices presented in Table 4 of Dr. Pomerantz's declaration). The Morningstar fact sheets commissioned by Intel compared the Intel TDFs to their peers in the Morningstar category for each vintage (i.e., the Intel 2030 Fund was compared to the 2030 vintage peer group).[4]

11.     It is also standard and reasonable practice to compare TDFs of a given vintage year that are actively managed to those that are passively managed. Actively managed TDFs are constructed with underlying funds whose investment managers make active decisions to buy and sell select securities that may vary from the composition of the market index benchmark, in an effort to outperform that benchmark. The underlying funds of passively managed TDFs, by contrast, seek to mirror the composition of an index such as the S&P 500 and to track (but neither exceed nor lag) its performance. The premise of active management is that it can deliver alpha. Alpha is, in short, risk-adjusted returns above those from a passive strategy. Active managers seek to justify higher fees than passive managers on the promise of alpha. After all, paying higher active management fees seems unwarranted without a reasonable expectation of outperforming a lower cost passive fund. However, history demonstrates that over full market cycles, passively-managed funds in major public markets generally produce higher net returns for investors than actively-managed ones and that "positive alpha" (excess risk-adjusted return) from active management, net of all fees and costs, is extremely difficult to produce.[5] Thus, many investors conclude that given the common

---

[4] See Defined Contribution Institutional Investment Association (DCIAA) "Guide to U.S. Department of Labor Tips on Selecting Target Date Funds," Feb. 2014, p. 2; U.S. Department of Labor, "Target Date Retirement Funds—Tips for ERISA Fiduciaries," Feb. 2013, p. 2 (hereafter, "Tips").

[5] See, e.g., "Luck vs. Skill in the Cross-Section of Mutual Fund Returns," Fama and French, JOURNAL OF FINANCE, Vol LXV, No. 5, Oct. 2010, pp. 1915-1947; "S&P Indices vs. Active funds (SPIVA) Scorecard," S&P INDEX RESEARCH AND DESIGN, Year-End 2010, at https://www.spglobal.com/spdji/en/documents/spiva/spiva-us-year-end-2010.pdf. Please note the dates of these sources; the conclusion that passive commonly outperforms active was well-documented early in the Class Period.

expectation of higher net returns from passive management, the higher fees of active management are unwarranted. For these reasons, fiduciaries following common investment standards and practices routinely compare active strategies to passive funds in the same asset class or subclass to determine whether there exists a sufficiently reasonable expectation of alpha to warrant the higher fee. Indeed, Morningstar includes both passive and active funds in its categories, including its TDF category.

12. For similar reasons, Department of Labor guidance counsels plan fiduciaries to compare actively managed funds to passive or index funds, including their respective costs and other factors. DoL has long-recognized the "cumulative effect of fees and expenses on retirement savings can be substantial;" that investment fees are by far the largest component of plan fees and expenses; that fiduciaries should "[b]e aware that higher investment management fees do not necessarily mean better performance;" and that actively managed funds generally bear higher fees than passive funds.[6] Thus, the DoL counsels plan fiduciaries to compare competing TDFs on the basis of returns, fees, and asset allocation.

> *… there are considerable differences among TDFs offered by different providers, even among TDFs with the same target date. For example, TDFs may have different investment strategies, glide paths, and investment-related fees. Because these differences can significantly affect the way a TDF performs, it is important that fiduciaries understand these differences when selecting a TDF as an investment option for their plan.*[7]

<u>The TDFs Plaintiffs Selected Are Appropriate Benchmarks for the Intel TDFs</u>

13. Plaintiffs selected several benchmarks for evaluating the Intel TDFs: select TDFs, both active and passive, offered by preeminent providers; and peer group categories as determined by Morningstar.

14. For several reasons, widely-used TDFs including those offered by Vanguard, T.

---

[6] "A Look at 401(k) Plan Fees," U.S. Department of Labor, 2019, pp. 7, 9.
[7] "Tips," p. 1. On the next page of that publication, the DOL similarly states that fiduciaries should consider the investment returns, fees, expenses, asset allocations and glidepaths of different TDFs.

Rowe Price, American Funds, and Fidelity Management, are appropriate benchmarks for the Intel TDFs regarding both selection and monitoring.

15. First, as noted above, all TDFs share common fundamental traits so it is fair to compare them to one another. Second, these four TDF fund families were within the Morningstar TDF category in 2011 and all years thereafter—the peer group to which Morningstar compared the Intel TDFs.[8] Third, these TDFs were available in the market in 2011 and thereafter. Fourth, two of the fund families consist of passive funds (Vanguard and Fidelity) and two consist of active funds (T. Rowe Price and American Funds), thus providing both types of benchmarks. Fourth, all four fund families are among the most widely-recognized providers in the industry with strong reputations; indeed, according to a 2011 Morningstar report, Fidelity, Vanguard, and T. Rowe Price had about 75% of the TDF market in 2010.[9] The same report ranked American Funds, T. Rowe Price, and Vanguard TDFs in the "top" tier of TDFs as of June, 2011, suggesting that plan fiduciaries following reasonable and standard practice would have considered them in comparison to a specific fund under consideration or review. For many of the same reasons, the benchmarks presented in paragraph 11 of Dr. Pomerantz's declaration are reasonable and appropriate for the Intel TDFs.

16. The peer group categories used by Plaintiffs and presented in Dr. Pomerantz's report also are commonly used benchmarks for selection and monitoring the Intel TDFs. Each peer group category was independently constructed by Morningstar for each vintage of a given TDF family. And, as noted, Intel commissioned Morningstar to prepare fact sheets for plan participants that compared the Intel TDFs to the Morningstar peer group categories.

---

[8] For instance, the March 31, 2014, fact sheet for that particular vintage of the Intel TDFs explains that Morningstar rated that Fund against 133 other TDFs of the same vintage and the section of the fact sheet called "Morningstar Analyst Report" evaluated it against those other TDFs. The TDFs selected by Plaintiffs for purposes of comparison were included within the Morningstar Category for that "vintage." The same is true for all the other benchmarks. In other words, the service provider selected by Intel (Morningstar, which is in the business of benchmarking funds) to evaluate the Intel TDFs benchmarked the Intel TDFs against peer funds, including the peer funds selected by Plaintiffs.

[9] Morningstar Target Date Series, Research Report 2011, p. 4.

### Benchmarking the Global Diversified Funds Entails Two Levels of Benchmarks

17.  Background concepts about benchmarking help in determining reasonable comparators for evaluating the Intel GDFs' performance, fees, asset allocation and other features. An initial concept is that benchmarking a fund like GDF operates on at least two fundamental levels. Each seeks to evaluate a different portfolio feature and the two in tandem may provide additional insights beyond what either alone can provide.

18.  The first level benchmark is high-level, using only the broadest asset classes; the second or lower level uses narrower, more specific asset classes and asset subclasses. The high-level asset classes typically include only very broad categories of publicly traded securities such as global equities and fixed income. This high-level benchmark is constructed using passive components for each asset class, e.g., a passive global equity benchmark and a passive global fixed income benchmark. On a lower, more particularized level, are asset classes and subclasses tailored to the specific subparts of the portfolio in question (here, the Intel GDFs). Though these may fall within the high level, broad categories of global equities and fixed income, they are more tightly defined, e.g., domestic equities, domestic fixed income, international (meaning foreign) equities and fixed income, and perhaps "alternatives" such as real estate, private equity, commodities, and hedge funds. Also on this lower level are asset subclasses within domestic equity such as large cap domestic stocks, mid cap stocks and small cap stocks. As with the higher level, the benchmarks on the lower level typically consist of passive indices representative of each component.

19.  The high level of broad asset classes provides a fundamental baseline for evaluating the construction and performance of a portfolio as a whole. For global funds like the Intel GDFs, the high level reflects a straightforward, low-cost approach for the entire portfolio—a simple standard for evaluating the effectiveness of adding and paying for more complex, exotic and expense approaches, including active asset management. For instance, a 60% allocation to an index of global stocks and 40% to a global bond index is a plausible high-level benchmark for a global asset allocation fund such as the Intel TDFs because a 60/40 blend is a longstanding, standard asset

allocation for an investment portfolio. Further, because the Intel GDFs were classified as "World Allocation" funds including both global equities and bonds (as explained in Paragraph 22 below), the benchmarks presented in Tables 8 and 9 of Dr. Pomerantz's declaration are reasonable and appropriate.

20. Including the lower level of more tailored asset classes and subclasses assists in evaluating the effectiveness of each component against its respective benchmark. For instance, including the Russell 2000 small cap index as one component of the overall blended index for the GDFs enables an analyst or fiduciary to evaluate the performance of that one component in isolation.[10]

### Benchmarks the Committee Chose for GDFs—MSCI World Index

21. In fact, the Committee benchmarked the Intel GDFs against both a high-level and a low-level benchmark. In 2014, the lower level benchmark, labelled "Benchmark 1- Blended Benchmark," consisted of allocations to passive indices proportionately weighted to the portfolio's various components, such as domestic large and small cap equities, international equities, domestic and international fixed income, hedge funds, private equity, commodities and real estate.[11] On that same 2014 fact sheet, Benchmark 2 was the MSCI World Index, NR.[12] Although it was the stated

---

[10] To illustrate how these concepts work in practice, take a simplified example using a fund roughly akin to Intel's GDFs. Assume that on the high level its strategic asset allocation is 75% global equity and 25% global fixed income. Assume next, that over time, its portfolio actually tightly adhered to those strategic targets. Finally, assume that its actual investment performance over some meaningful period of time nevertheless materially lagged the top-level benchmark. Applying the second, lower level of benchmarking may disclose that the cause for that underperformance was (hypothetically) the small cap component, if, for instance, it performed extremely poorly compared to the Russell 2000—so poorly that it dragged down the overall performance of the entire portfolio. For a fuller discussion of relevant concepts involving benchmarking, see Meketa Benchmarking and Key Ingredients, at 96-97.

[11] E.g., see the fact sheet from March 31, 2014, p. 2, in section titled "Index Composition."

[12] The publicly traded stocks composing this index are issued by large and mid-sized companies from numerous developed market countries around the world. See, "MSCI World Index (USD) at https://www.msci.com/documents/10199/149ed7bc-316e-4b4c-8ea4-43fcb5bd6523. "NR" means "net returns" and "USD" means the returns are expressed in terms of U.S. dollars. Calculating investment returns on stocks issued by companies domiciled in foreign countries requires taking into account local taxes for non-residents, like a U.S.-based investment fund. The returns on the "NR" index reflect the impact of paying such taxes. By contrast, the version of MSCI using gross (G) returns, reinvests not just a portion but all dividends, based on the amount paid to residents of the country of the company paying the dividends. See, Morningstar Principia "Index Abbreviations," at www.advisor.morningstar.com/principia/pdf/prn_indexabbreviations_1011.pdf; and see MSCI Europe Daily

benchmark, MSCI World is a global equity index, but the Intel GDFs had material allocations to global bonds by 2011-2012. Thus, for the reasons explained below, other benchmarks were more tailored to the GDFs.

<u>Other Benchmarks the Committee Chose for GDF—World Allocation and Balanced</u>

22. The Committee announced yet another benchmark for the GDFs in its November 2014 "Plan IQ" notice to the Plans' participants.[13] That notice informed participants that GDF was in an asset class called "World Allocation."[14] In truth, this benchmark was reasonable and appropriate in 2011-2012 given the heavy allocation to global bonds. Many other funds were available in that same category, including, for instance, American Funds Capital Income Builder, Blackrock Global Allocation, First Eagle Global, Ivy Asset, GMO Global Asset Allocation Fund and others listed in Table 9 of the report of Dr. Steve Pomerantz. Since these funds all fall in the same category as the GDFs, they are reasonable for benchmarking the Intel GDFs' performance.

23. The Committee also used another benchmark for GDF. The "Performance Update" of June 30, 2014, stated that the 401k GDF was in a Morningstar category called "Balanced/Hybrid Funds—International/Growth." The three funds cited in Table 10 of the Pomerantz report are likewise balanced funds and valid peers for purposes of benchmarking the Intel GDF's performance, fees, asset allocation and other features. These are the T. Rowe Price Balanced Fund (ticker RPBAX), Vanguard's Life Strategy Growth Fund Investor (VASGX) and Vanguard's Life Strategy Moderate Growth Fund Investor (VSMGX). Compared to the GDF's exposure of approximately 70-80% in "global equities," the T. Rowe fund is normally allocated approximately 65% to global (U.S.

---

Net Total Return Index, at https://etf.invesco.com/sites/default/files/documents/MSCI%20Europe%20Index%20-%20location%20of%20index%20rules.pdf

[13] Intel Corp. 401(k) Savings Plan/My Plan IQ, Nov. 14, 2014, p. 1.

[14] Morningstar explains that classification this way: "World-allocation portfolios seek to provide both capital appreciation and income by investing in three major areas: stocks, bonds, and cash. While these portfolios do explore the whole world, most of them focus on the U.S., Canada, Japan, and the larger markets in Europe. It is rare for such portfolios to invest more than 10% of their assets in emerging markets. These portfolios typically have at least 10% of assets in bonds, less than 70% of assets in stocks, and at least 40% of assets in non-U.S. stocks or bonds." The Morningstar Category Classifications, April 29, 2016, p. 21.

and foreign) equity and 35% to global fixed income.[15] The Vanguard Growth fund is allocated 80% to global equity and 20% global fixed income, while the Moderate Growth fund is allocated 60%/40%.[16] All three of these funds provide helpful reference points for evaluating value added or subtracted by GDF's different weighting to equity securities and its more exotic, complex, costly and illiquid investment strategies.[17]

### The HFRI Composite Index Is Relevant To Considering a Hedge Fund of Funds Allocation

24. Before commencing a heavy allocation to hedge funds in TDFs or a static allocation fund such as the Intel GDFs, a plan fiduciary following standard and reasonable practice would take into account, among other things, the history of hedge fund of funds performance (including their associated fees) and compare those to more traditional asset classes.

25. As reflected in Dr. Pomerantz's declaration, Plaintiffs have presented the performance of the HFRI Funds of Funds Composite index as indicative of the performance of hedge funds of funds. The hedge fund portfolio in the Intel TDFs and GDFs consisted of hedge funds of funds. Thus, as of 2011, the history of risk and return of the HFRI Composite over a full market cycle was a relevant factor to consider in determining whether to invest in or hold a large allocation to a hedge funds of funds.

26. A plan fiduciary following standard and reasonable practice in 2011 and thereafter would consider whether the high cost and historic performance of hedge fund of funds could plausibly yield a better retirement outcome than a traditional strategic asset allocation. One widely-used, traditional asset allocation model is a 60%/40% equities/bonds portfolio, which Dr. Pomerantz employs in Table 13.

Dated: March 22, 2021                Respectfully submitted,

---

[15] See troweprice.com for fuller discussion of the Balanced Fund, including its strategic asset allocation.
[16] See investor.vanguard.com for fuller discussion of the Life Strategy Growth Fund and Moderate Growth Funds, including their strategic asset allocations.

[17] The Moderate Growth Fund is a suitable benchmark for another reason as well: plan fiduciaries often use a traditional asset allocation of 60% equity/40% fixed income as a baseline standard for comparison.

1
2
3
4   Samuel W. Halpern
5   Prudent Expert, LLC
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A



**PRUDENT EXPERT, LLC**
**Samuel W. Halpern**
**Luray, VA./Washington, DC.**

# EXPERIENCE AND EXPERTISE OF SAMUEL W. HALPERN
www.PrudentExpertLLC.com

Samuel Halpern has over 40 years' experience with financial and fiduciary aspects of institutional investing, especially regarding ERISA-covered funds. He has concentrated on institutional investing for more than 30 years through investment consulting, acting as an ERISA independent fiduciary and serving as an expert witness, after an initial 10 years as a litigation lawyer, handling investment cases governed by ERISA's fiduciary responsibility provisions. Over the years, Mr. Halpern helped establish, build, manage and eventually sell a prominent investment advisory firm; advised a wide range of institutional investors regarding nearly all facets of their investment programs and practices; and led his firm's work as an ERISA "independent fiduciary" regarding employer securities, employer real estate and other assets. He has also served extensively as a testifying expert in ERISA litigation and led investment teams assisting counsel as a non-testifying expert.

With this extensive, combined experience, Mr. Halpern is especially well-qualified to testify as an expert regarding standards of investment due diligence for fiduciaries investing across a wide range of investments and situations.

Investment Advisory Experience—Consulting and Independent Fiduciary

In 1986, Mr. Halpern joined the broker dealer and investment bank Bear, Stearns & Co. to help shape and launch a new, wholly-owned, registered investment advisory subsidiary named Bear Stearns Fiduciary Services, Inc. Over the ensuing 10 years, as the firm's Executive Vice President and General Counsel, he helped establish its suite of investment advisory services, develop clients, advise those clients on their investment portfolios and manage the business.

The firm's primary services were twofold. First, was investment consulting to ERISA-covered funds and other institutional investors, including advice on investment policy; asset allocation; selecting and monitoring investment managers and other types of investment due diligence; measuring and evaluating investment performance, risks and costs; investment best practices; new investment ideas; and investment governance. Second, the firm acted as an independent fiduciary, with discretionary responsibility for investment decisions when the regular fiduciaries confronted conflicts of interest, involving, for instance, in kind contributions, employer securities, employer real estate and other party in interest transactions, for defined benefit and defined contribution plans, including ESOPs.

In 1996, he and his business partner purchased the firm from Bear Stearns and renamed it

Independent Fiduciary Services, Inc. Over the next 15 years, as President of IFS and a member of its Management Committee, Mr. Halpern helped guide the firm's growth as an investment consultant and independent fiduciary, to over 35 employees and assets under advisement or management of approximately $25 billion. Integrally involved in the firm's day to day investment advisory services, he led numerous teams of investment consultants, advising a wide range of institutional clients regarding their investment programs, including single and multiemployer ERISA pension, 401k and health benefit plans; public pension funds; substantial personal trusts and other institutional clients. He also served as Chairman of the Investment Committee, responsible for the firm's formal, final investment decisions when exercising discretionary fiduciary responsibility over entire investment portfolios or particular assets.

In 2011, IFS sold substantially all its assets to a wholly owned subsidiary of the public company Arthur J. Gallagher (NYSE:AJG) and became the primary component of what is now known as Gallagher Fiduciary Advisors, LLC. From the time of that sale until transitioning in early 2014 to the successor he helped select, Mr. Halpern was president of the Washington/Newark branch of GFA, centrally involved in integrating the firm with the larger Gallagher organization, guiding GFA's business and delivering its full range of services as investment consultant and discretionary or independent fiduciary. During his last year with Gallagher, as Executive Vice President, he helped manage the transition, continued advising a wide range of clients on their investment programs and practices and continued serving as Chairman of the firm's Investment Committee. He retired from Gallagher in January 2015 and in February 2015 began business as Prudent Expert, LLC.

Areas of Expertise

With his extensive, combined investment and fiduciary background, Mr. Halpern is highly experienced with investment due diligence and many other aspects of institutional (particularly ERISA) investing.

- *Range of investments.* Over the years, Mr. Halpern has dealt with publicly traded securities (equities and fixed income, including qualifying and non-qualifying employer securities), marketable "alternative" assets (e.g., hedge fund of funds, multi-asset class vehicles), real estate (equity and debt) and a wide range of other private or illiquid assets (e.g., private debt and equity, restricted stock, unregistered warrants, bankruptcy claims, etc.). Across these asset classes and subclasses, he has been heavily involved in selecting and evaluating investment management firms for separately managed accounts and various investment vehicles (limited partnerships, mutual funds, commingled funds, insurance company separate accounts, etc.) as well as monitoring the risks and performance of such investments over time.
- *Range of investors.* These include corporate and Taft Hartley (single and multiemployer) ERISA plans; defined benefit pension plans, defined contribution plans (401K, ESOP and "annuity" funds) and welfare funds (including VEBAs); as well as public pension funds, sovereign wealth funds, union treasuries and other institutional investors.
- *Investment consulting and independent fiduciary.* Mr. Halpern has led numerous consulting teams at IFS and GFA advising clients on their entire, diversified investment programs, including, for instance, advising on investment policy, asset allocation and diversification, manager due diligence (including both separately managed accounts and pooled vehicles such as mutual funds and commingled funds on a 401k platform), measuring and

- monitoring investment risk and expense, brokerage and trading practices and related matters. He also led the firm's role as a discretionary independent fiduciary to many other ERISA plans, e.g., The Ford Motor Subaccount of the United Auto Workers Retiree Medical Fund (unregistered warrants and private notes), Kaiser Aluminum VEBA (restricted stock and bankruptcy claims), Pan American World Airways Pension Plans (in kind contribution and leaseback of employer real estate) and many others. Many of these assignments involved employer securities (equity, warrants and debt) as well as employer real estate.

- *Testifying and nontestifying expert.* Since forming Prudent Expert, LLC, Mr. Halpern has often served as a testifying and nontestifying expert in investigations and litigation concerning ERISA-covered investing. Previously, he led several teams at IFS/GFA that advised legal counsel as a nontestifying expert, regarding a range of other ERISA funds and types of investments.

- *Investment governance.* Mr. Halpern has advised a wide range of clients on investment governance, including domestic clients (e.g., Nestle in the U.S. Pension Trust) and - either directly or through the Asian Development Bank or World Bank-- foreign institutional investment funds in China, Sri Lanka, Thailand and Brunei.

- *Investment best practices.* Mr. Halpern was instrumental in developing IFS' "Operational Review" services-- investment best practice studies of major institutional investors, including ERISA defined benefit and 401k plans as well as public pension funds. These studies evaluated asset allocation; selection and monitoring of investment managers and pooled vehicles such as mutual funds; due diligence practices more broadly; risk management; and related matters. For approximately 20 years, he led numerous IFS/GFA teams, conducting such studies, regarding approximately $1 trillion in assets. These Operational Reviews concerned corporate and multiemployer ERISA pension and 401k plans as well as numerous statewide and other large public pension funds (including, for instance, the Texas Teacher Retirement System, New York City Bureau of Asset Management, New Jersey Division of Investments, Oregon Division of Investments, Virginia Retirement System and many others).

Legal Practice—ERISA Litigation

With his prior experience as a litigation lawyer, Mr. Halpern understands the practical and tactical aspects of serving as an expert consultant and witness.

In 1975-76, Mr. Halpern clerked for Senior District Court Judge Luther Youngdahl, of the U.S. District Court for the District of Columbia, and also served as a motions clerk to the U.S. Court of Appeals for the District of Columbia Circuit.

In early 1977, he joined the litigation staff of the Plan Benefits Security Division of the U.S. Department of Labor, responsible for nation-wide enforcement of what was then a new statute— the Employee Retirement Income Security Act. In early ERISA litigation, he helped develop standards for investing by ERISA fiduciaries, including due diligence processes and criteria for investing in private market assets such as employer stock and real estate. These cases typically entailed preparing and cross-examining expert witnesses regarding various aspects of investment due diligence. Among other matters he handled on behalf of the Secretary of Labor are several reported cases, including:

- Marshall v. Teamsters 282 Pension Trust, 458 F. Supp.986 (E.D.N.Y. 1978) (imprudent construction loan)
- Donovan v. Mazzola, 2 EBC 2115 (N.D. Cal. 1981), aff'd, 716 F.2d 1226 (9th Cir. 1983), cert denied, 464 U.S. 1040 (1984) (objective standards for prudence in real estate investing, portfolio diversification, selection of service providers)
- Donovan v. Cunningham, 541 F. Supp. 276 (S.D. Tex. 1982), rev'd , 716 F.2d 1455 (5th Cir. 1983) (ESOP purchasing private company employer stock)

After leaving the Department in 1982, Mr. Halpern continued concentrating on ERISA investing with a labor-side labor law firm, based in Washington. This included litigation from both a plaintiff's and defense perspective, as well as counselling ERISA fiduciaries on investment decisions and investment products. His reported cases from this period include:

- Arakelian v National Western, 680 F. Supp.440 (D.D.C. 1987) (due diligence regarding investing in group annuity contracts)
- Fink v. NS&T Bank , 772 F.2d 951 (D.C. Cir. 1985)(due diligence regarding profit sharing plan's investment in private company employer stock)

Publications

Over the years, Mr. Halpern has written on numerous aspects of institutional investing. Within the last 10 years, this includes a chapter titled "Key Ingredients in Developing Operational Policies and Procedures," in Governance of Public Pension Assets, Rajkumar and Dorfman (editors), World Bank, 2010.

Education

Mr. Halpern graduated Phi Beta Kappa from Brown University in 1972, earning a Bachelor of Arts degree with a combined major in Political Science and an interdisciplinary humanities program. During his junior year in college, he attended the London School of Economics. In 1975, he earned his law degree from the George Washington National Law Center in Washington, D.C.